# EXHIBIT A

FILED IN MY OFFICE
DISTRICT COURT CLERK
9/12/2017 2:59:47 PM
WELDON J. NEFF
Susan Bengston

STATE OF NEW MEXICO
COUNTY OF SAN JUAN
ELEVENTH JUDICIAL DISTRICT COURT

PRESIDENTIAL HOSPITALITY, LLC, a
New Mexico limited liability company;
ACE DEVELOPMENT, INC., a New
Mexico corporation; and SAM BLUE, an
individual;

       Plaintiffs,                      No. D-1116-
                                     D-1116-CV-2017-01329

vs.

WYNDHAM HOTEL GROUP, LLC a New
Jersey limited liability company;
BAYMONT INN AND SUITES
FRANCHISE SYSTEMS, INC., a Delaware
Corporation; and MICROTEL INN AND
SUITES FRANCHISING, INC., a Georgia
Corporation.

       Defendants.

## COMPLAINT FOR VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT; FRAUDULENT INDUCEMENT; NEGLIGENT MISREPRESENTATION; AND JURY DEMAND

COMES NOW Plaintiffs Presidential Hospitality, LLC ("Presidential"); Ace Development,

Inc. ("Ace Development"); and Sam Blue ("Mr. Blue") (collectively "Plaintiffs" or "Franchisees"),

by and through their attorneys, Lewis Roca Rothgerber Christie LLP, and files their Complaint for

violation of the New Mexico Unfair Practices Act, Fraudulent Inducement, and Negligent

Misrepresentation ("Complaint") against Defendants Wyndham Hotel Group, LLC ("Wyndham");

Baymont Inn and Suites Franchise Systems, Inc. ("Baymont"); Microtel Inn and Suites Franchising,

Inc. ("Microtel") (collectively "Defendants" or "Franchisors"), and in support of their claims they

state as follows:

102296719_1

## I. OVERVIEW

1.      Wyndham on its own or through its affiliates Baymont and Microtel offers and sells, and owns and operates, hotels and hotel chains throughout the United States under the brand names "Baymont Inn," "Baymont Inn and Suites," "Baymont Suites," "Microtel Inn," "Microtel Inn and Suites," and "Microtel Suites."   In contrast to the extensive knowledge and experience of Defendants, at all relevant times, Presidential, Ace Development, and Mr. Blue had no knowledge of, and no prior experience in, the hotel business in New Mexico or the United States generally.

2.      This action arises out of Mr. Blue's purchase of a Baymont franchise and a Microtel franchise (the latter assigned to Presidential and the payments and performance thereunder guaranteed by Mr. Blue and Ace Development) and the subsequent construction of a Microtel hotel in Aztec, New Mexico. Wyndham and Microtel through various representations, promises, omissions, and high-pressure-sales tactics, induced Mr. Blue to purchase a Microtel franchise.   Through the same representations, promises, omission, and high-pressure-sales tactics, Wyndham and Microtel induced Presidential to assume the obligations of the Microtel franchise agreement and to construct and operate a Microtel Inns and Suites hotel.   Through the same representations, promises, omission, and high-pressure-sales tactics, Wyndham and Microtel induced Ace Development and Mr. Blue to guarantee Presidential's obligations under the Microtel franchise agreement.   Wyndham's and Microtel's representations were false, incomplete, and misleading.   Defendants also failed to disclose complete and timely material financial and performance information related to the franchise as required by the Federal Trade Commission. Defendants' actions caused Plaintiffs substantial damage.

3.    Mr. Blue, Presidential, and Ace Development commenced this action to rescind the Microtel franchise agreement and related documents as void *ab initio* and to recover damages, including costs and attorney fees.

## II. THE PARTIES

4.    Presidential is a New Mexico limited liability company.  Presidential owns and operates a Microtel Inn and Suites Hotel in Aztec, New Mexico.

5.    Ace Development is corporation organized and existing under the laws of the State of New Mexico corporation, with its principal place of business at 500 West Main Street, Suite 200, Farmington, New Mexico, 87410.  Ace Development is a member of Presidential.

6.    Mr. Blue is the President and sole shareholder of Ace Development and the Managing Member of Presidential.  He resides in Farmington, New Mexico.

7.    Upon information and belief, Defendant Wyndham is a New Jersey limited liability company that owns, operates, and franchises approximately 8,100 hotels in 79 countries, including the Baymont Inn and Suites and Microtel Inn and Suites brand hotels.  Wyndham is a subsidiary of Wyndham Worldwide Corporation.

8.    Upon information and belief, Defendant Baymont is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.  Baymont is a hotel brand with more than 400 midscale hotels located throughout the United States and Mexico.  Baymont is a subsidiary of Wyndham.

9.    Upon information and belief, Defendant Microtel is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Parsippany, New Jersey.  Microtel is a hotel brand with more than 300 economy hotels throughout the United States.  Microtel is a subsidiary of Wyndham.

102296719_1

### III. JURISDICTION AND VENUE

10.     Jurisdiction and venue in this Court are appropriate given that Defendants have transacted and conducted business in New Mexico, thereby submitting to the jurisdiction of the Courts of New Mexico as to any cause of action arising from said transactions, pursuant to NMSA, § 38-3-1.

11.     Jurisdiction and venue in this Court is also proper under NMSA, § 57-28A-1.

### IV.  FACTUAL BACKGROUND

**A.     The purchase of the Baymont hotel franchise**

12.     On or about May 27, 2010, Mr. Blue received a call from a person representing to work for Wyndham.  He told Mr. Blue that Wyndham had learned through a land development conference that Mr. Blue owned land in Aztec, New Mexico.  He also told Mr. Blue that he wanted to discuss with him the purchase of a hotel franchise.

13.     Mr. Blue told the Wyndham representative that he was not interested in investing in a hotel franchise because he was looking to sell his property.

14.     The Wyndham representative told Mr. Blue that Wyndham was interested in Mr. Blue's property and that the representative told Mr. Blue that he should expect a follow up call soon.

15.     A few days later, Mr. Blue received a call from Gregg Koffler.

16.     Based on information and belief, Gregg Koffler was at all times relevant to this Complaint the Director of Franchise Sales for Wyndham.

17.     Mr. Koffler was friendly and showed an interest in Mr. Blue's business and personal life.  Mr. Koffler told Mr. Blue that Wyndham was "interested in his property" and that he wanted to come out to see it.  Mr. Koffler did not mention to Mr. Blue that his job at

102296719_1

Wyndham was to sell hotel franchises.  Mr. Koffler told Mr. Blue that he would reach out to him in the next few days with a date he could come out to see the property.

18.     Based on Mr. Koffler's representation that Wyndham was interested in his property, Mr. Blue became excited about the possibility of selling his property to Wyndham for a hotel development.

19.     On or about June 29, 2010, Mr. Koffler traveled to Farmington, New Mexico to meet with Mr. Blue and see the property.  During Mr. Koffler's visit to the property, Mr. Koffler started soliciting Mr. Blue to purchase a Baymont hotel franchise.

20.     Mr. Blue, however, told Mr. Koffler that he had spent several years in the automobile service industry and was not looking to go back into the service industry.  He further told Mr. Koffler that he was interested in selling the property.

21.     To induce Mr. Blue to purchase a Baymont hotel franchise, Mr. Koffler told Mr. Blue that it was not a requirement that he operate the hotel.  Mr. Koffler told Mr. Blue that since he owned the land, if he purchased the hotel franchise and built the hotel, he could add value to the land, and then he could "flip it" and sell it as "turnkey ready."  Mr. Koffler told Mr. Blue that "there would be a line of people interested in purchasing the hotel" and he "guaranteed a buyer by the time the hotel was built."  Mr. Koffler told Mr. Blue that the location would "knock it out of the ball park."

22.     To further induce Mr. Blue to purchase a Baymont hotel franchise, and to show Mr. Blue that Wyndham was confident that the hotel would sell upon construction, Mr. Koffler told Mr. Blue that Wyndham liked the property so much that, not only had Wyndham sent him to see the property in person, Wyndham would most likely want to invest in the construction of the hotel.

102296719_1

5

23.     Mr. Koffler then told Mr. Blue that he would call a Wyndham executive to discuss a potential investment in the development of the property. Mr. Koffler excused himself and called an alleged Wyndham executive. When Mr. Koffler hung up the phone, he told Mr. Blue that Wyndham was very excited about the property and its potential and that if he purchased the franchise and built the hotel, Wyndham would invest $150,000.00 of its own money into the property. Mr. Koffler, however, did not tell Mr. Blue that Wyndham's $150,000.00 investment would be in the form of a loan.

24.     Mr. Koffler's representations and Wyndham's willingness to invest $150,000.00 of its own money in the development of the property, gave Mr. Blue confidence that his property was a great location for a hotel and, in turn, confidence that the hotel would appeal to all the prospective buyers Koffler said would be interested in purchasing the hotel from him.

25.     Relying on Mr. Koffler's representations and Wyndham's willingness to invest $150,000.00 of its own money in the development of the property, Mr. Blue gave Mr. Koffler a $1,000.00 check, from Ace Development, for the Baymont hotel franchise non-refundable application fee.

26.     Around the end of July 2010, Mr. Koffler called Mr. Blue to tell him that his application for the Baymont hotel had been approved. Mr. Blue, however, told Mr. Koffler that he had reservations about purchasing the Baymont franchise. Mr. Blue believed that a prospective buyer would be dissuaded from purchasing the hotel once the prospective buyer learned of the cost and complexity of operating a hotel.

27.     To induce Mr. Blue to purchase a Baymont hotel franchise, Mr. Koffler told Mr. Blue that he should not worry about the operation side of the hotel because "corporate takes care of most of it."

102296719_1

6

28.     To further induce Mr. Blue to purchase a Baymont hotel franchise, Mr. Koffler told Mr. Blue that he should not be concerned with operational costs because Wyndham was going to have buyers "lined up" for Mr. Blue and he would not have to operate the hotel.

29.     To further induce Mr. Blue to purchase a Baymont hotel franchise, Mr. Koffler then confided in Mr. Blue that his job at Wyndham was on the line and that he needed to sell a franchise during the quarter or he would certainly lose his job.   Mr. Koffler had on prior occasions complained to Mr. Blue about the demands of his job and the stress on him and his family.

30.     Shortly thereafter, Mr. Blue called Mr. Koffler to tell him that based on the representations he had made about the property, Wyndham's willingness to invest $150,000.00 of its own money in the development of the property, and Wyndham's commitment to find a buyer for the hotel, he would purchase a Baymont hotel franchise so he could "flip" it.

31.     On August 11, 2010, Mr. Koffler traveled to Farmington, New Mexico to meet with Mr. Blue.   During their meeting, Mr. Koffler again reassured Mr. Blue that since he owned the land, purchasing the hotel franchise and building the hotel to "flip" it as turnkey ready was a good investment opportunity.   He told Mr. Blue that "this is what I do for a living" and that he would have "people lined up" to purchase the hotel.

32.     Relying on Mr. Koffler's representations and Wyndham's willingness to invest $150,000.00 of its own money in the development of the property, Mr. Blue provided Mr. Koffler with a check for $26,000.00 (again from Ace Development)—the initial investment fee for a Baymont hotel franchise.

33.     After Mr. Blue provided Mr. Koffler with the initial investment fee, Mr. Koffler showed Mr. Blue a Development Incentive Note ("Note"), which contained the terms of

102296719_1

Wyndham's alleged $150,000.00 investment.  Mr. Koffler did not give Mr. Blue a copy of the Note to review.  Instead, Mr. Koffler held the Note in the air and pointed to the $150,000.00 reference on the Note.  Mr. Koffler then provided Mr. Blue with the Note's signature page and asked him to execute it.  Mr. Koffler never explained the terms of the Note to Mr. Blue or told Mr. Blue that if he defaulted on royalty payments, the Note became a loan.

34.    On August 16, 2010, Mr. Blue received via mail, a copy of the Baymont Franchise Systems, Inc. Franchise Agreement ("Baymont Franchise Agreement").

35.    On the same date, Mr. Blue executed the Baymont Franchise Agreement for a Baymont Inn and Suites franchise to be located at Highway 550 and Pepsi Way, Aztec, NM 87401.

36.    Baymont never provided Mr. Blue a complete and timely copy if its Franchise Disclosure Document ("FDD").

**B.     The purchase of the Microtel hotel franchise**

37.    Shortly after Mr. Blue executed the Baymont Franchise Agreement, Mr. Koffler asked Mr. Blue to accompany him to a meeting to help him sell a hotel franchise to the owner of a farm equipment dealership in Kirkland, New Mexico.  Mr. Koffler asked Mr. Blue to vouch for him and Wyndham.  He mentioned to Mr. Blue that his job was very stressful and that he was having family problems so he needed to make this sale.

38.    During the sales process for the Baymont hotel franchise, Mr. Koffler befriended Mr. Blue.  Both in person and on the phone, Mr. Koffler often told Mr. Blue what a great person he was and that he bragged to his family about him.  Mr. Blue felt compelled to help Mr. Koffler who referred to Mr. Blue as his "friend."

102296719_1

39.     When Mr. Koffler was unsuccessful in selling the a hotel franchise to the dealership owner in Kirkland, Mr. Koffler turned again to Mr. Blue for help.  Mr. Koffler confided to Mr. Blue that he needed to sell two franchises.  He told Mr. Blue that if he could not sell another franchise he was certainly going to be fired and would lose his house and his family.

40.     Mr. Koffler also told Mr. Blue that his family was in trouble because he had made some mistakes and owed people money.  Mr. Koffler made it sound like unless he paid those people, they would hurt his family and loosing his job would make it impossible for him to pay them off.  Sometime later, Mr. Koffler asked Mr. Blue to borrow money so he could pay off the people that were threatening his family.

41.     During the following weeks, Mr. Koffler started frequently soliciting Mr. Blue to purchase a Microtel Inns and Suites franchise for Durango, Colorado. Mr. Koffler told Mr. Blue that the franchise would be for Wyndham's Microtel Inns and Suites, a new brand that was "their top money maker."  Mr. Koffler told Mr. Blue that it was "hard to get a Microtel franchise" but because he was a friend, he could convince Wyndham to grant him a franchise.

42.     To induce Mr. Blue into purchasing the Microtel franchise, Mr. Koffler again told Mr. Blue that if he purchased the franchise and built the hotel, he could "flip it" and sell it as "turnkey ready."  Mr. Koffler told Mr. Blue that Wyndham would have several buyers ready to purchase the hotel.  Mr. Koffler also told Mr. Blue that just like with the hotel in Aztec, he should not worry about the operation of the hotel because Wyndham was going to have buyers "lined up" for Mr. Blue and he would not have to operate the hotel.

43.     To further induce Mr. Blue to purchase the Microtel franchise, on or about March 17, 2011, Mr. Koffler traveled to Farmington, New Mexico.  During his visit, he provided Mr. Blue an "STR report" dated March 8, 2011 from Smith Travel Research that contained earning

102296719_1

representations.   Specifically, the STR report tracked the performance of hotels in Durango, Colorado from January 2005 to January 2011, including occupancy percentage, ADR (Average Daily Rate), RevPAR (revenue per available room), supply, demand, and revenue.  Mr. Koffler told Mr. Blue that a Microtel hotel would perform as well or better than the hotels in the STR report.   Mr. Blue considered the earnings representation important because any prospective purchaser of the hotel would want to purchase a hotel that would perform in par or better than its competitors.

44.      Relying on Mr. Koffler's representations, including the STR report. Mr. Blue agreed to purchase a Microtel Inns and Suites franchise. Mr. Koffler asked Mr. Blue to partially complete the application stating to him that "once they see the 30K check and your assets, they are not going to be picky" and that he would "jam it through." Mr. Koffler also asked Mr. Blue to sign the application but to not date it.

45.      At the March 17, 2011 meeting, Mr. Blue gave Mr. Koffler a Cashier's Check (No. 036138) in the amount of $30,000.00 for the Microtel Inns and Suites initial franchise fee.

46.      On the same day, Mr. Blue executed a Microtel Inns and Suites Franchising, Inc. License Agreement ("Microtel Franchise Agreement") for a Microtel Inns and Suites hotel to be located in Durango, Colorado. He received a fully executed copy dated March 18, 2011, the following day.

47.      A few months later, Mr. Koffler reached out to Mr. Blue to ask him why he had not started the construction processes for the Baymont Inn and Suites hotel in Aztec, New Mexico.  In response, Mr. Blue told Mr. Koffler that the cost required to build the Baymont was starting to sink in and he was not sure he could go through with such an investment. Mr. Blue told Mr. Koffler that he was ok if he lost the Baymont initial investment fee. Mr. Blue told Mr.

102296719_1

Koffler that he was concerned that the debt a prospective buyer would have to assume would dissuade prospective buyers. In response, Mr. Koffler told Mr. Blue that the per unit cost of building a Microtel was less than the Baymont hotel and he was going to work with Wyndham to transfer the Microtel franchise Mr. Blue purchased for Durango, Colorado to Aztec, New Mexico.

48.     To induce Mr. Blue to seek the transfer of the Microtel from Durango, Colorado to Aztec, New Mexico and build the Microtel hotel, Mr. Koffler told Mr. Blue that a Microtel hotel in Aztec, New Mexico would perform equally as profitable as the hotels in the March 8, 2011 STR report that Mr. Koffler provided to Mr. Blue.

49.     Relying on Mr. Koffler's representations, including his earnings representation for the hotel, Mr. Blue agreed to seek a transfer of his Microtel hotel franchise from Durango, Colorado to Aztec, New Mexico and to commence construction of the hotel. To that end, Mr. Blue sought to obtain and did obtain financing to build the hotel.

50.     Microtel never provided Mr. Blue a complete and timely copy of its FDD.

51.     Subsequently Mr. Blue, Presidential, and Microtel entered into an Amendment Assignment and Assumption Agreement ("Assignment Agreement") pursuant to which, Mr. Blue and Microtel Inns & Suites Franchising, Inc. transferred the Microtel Franchise Agreement to Presidential Hospitality, LLC.

52.     Presidential executed the Assignment Agreement and dated it on April 10, 2013.

53.     On or about May 7, 2013, Presidential received a fully executed copy of the Assignment Agreement, but the April 10, 2013 date had been crossed off and replaced with the May 7, 2013 date.

102296719_1

54.    Under the Assignment Agreement, Mr. Blue remained secondarily liable for Presidential's performance of the Microtel Franchise Agreement.  The owners of Presidential executed a Guaranty attached as an exhibit to the Assignment Agreement under which they guaranteed Presidential's performance of the Microtel Franchise Agreement.  The Assignment Agreement and Guaranty are "other documentation" as contemplated under NMSA § 57-28A-1.

55.    The Assignment Agreement changed certain terms of construction of the hotel set forth in Microtel Franchise Agreement.  Among them, the Assignment Agreement changed the location of the hotel construction from Durango, Colorado to 623 Phoenix Court, Aztec, New Mexico 87410 and changed the deadline to construct the hotel to April 5, 2014.

56.    The Assignment Agreement also changed the amount of the Note Mr. Blue executed on August 11, 2010 from $150,000.00 to $105,000.00.

57.    On April 26, 2013, Mr. Blue, in his individual capacity and as Managing Member of Presidential, executed a Development Incentive Note (the "Second Note") for $105,000.00. The Second Note superseded and replaced the Note for $150,000.00.  The Second Note is "other documentation" as contemplated under NMSA § 57-28A-1.

58.    Presidential entered into the Assignment Agreement, assumed the Microtel Franchise Agreement, and built the hotel based on the representations set forth above.

59.    Ace Development and Mr. Blue guaranteed Presidential's performance of the Microtel Franchise Agreement based on the representations set forth above.

**C.     Wyndham reneged on its promise to find a buyer for the hotel and Mr. Blue is forced to operate the Microtel hotel**

60.    As construction on the Microtel hotel was nearing completion, Mr. Blue contacted Wyndham to find out where Wyndham was in the process of finding a buyer for the hotel.  By

102296719_1

12

this time, Mr. Koffler was no longer employed by Wyndham. Wyndham responded to Mr. Blue by telling him that they had no buyers at the time, but would "put the word out."

61.    Mr. Blue was distressed over the fact Wyndham had not found a buyer for the hotel, and he would be required to operate the hotel in order to protect his investment. Mr. Blue was unfamiliar with the cost associated with the operation of a hotel because Microtel never provided Mr. Blue with its FDD. Also, Mr. Blue had relied on Mr. Koffler's representation that he did not need to learn the ins and outs of operating a hotel because Wyndham was going to have "buyers lined up" to purchase the hotel upon completion.

62.    Construction of the Microtel hotel was completed on or about October 3, 2013.

63.    Since the completion of the hotel on or about October 3, 2013, Mr. Blue has contacted Wyndham on several occasions requesting an update on Wyndham's effort to find a buyer for the Microtel hotel. On more than one occasion, he spoke with Joe Luck, a then VP of Franchise Development Managed for Wyndham. Based on information and belief, Wyndham never intended or tried to find a buyer for the Microtel hotel as Mr. Koffler promised. Mr. Koffler's representations and promises were only intended to induce Mr. Blue to purchase the hotel franchises and construct the hotel, so that Wyndham could collect on royalty payments for 20 years. They were also intended to induce Presidential to execute the Assignment Agreement and built the hotel, and to induce Mr. Blue and Ace to guaranty Presidential's performance of the Microtel Franchise Agreement.

64.    Since its opening on or about October 3, 2013, the Microtel hotel has not performed on par or better than the hotels that listed in the March 8, 2011 STR report. In fact, the Microtel hotel has maintained an occupancy rate of about 45% +/- and has operated in the red since opening its doors.

102296719_1

13

**D.     Mr. Koffler telephone conversation with Mr. Blue**

65.     During a telephone conversation between Mr. Blue and Mr. Koffler on June 6, 2016, which Mr. Blue recorded, Mr. Koffler apologized to Mr. Blue for the way he treated him and the tactics he employed to persuade Mr. Blue to purchase the hotel franchise and build the hotel, including the alleged threat of physical harm to his family if he didn't keep his job and pay off his obligations:

> "I want you to know we're good . . . and I apologize for the concern I caused you. It wasn't . . . that was an unintended consequence of my confiding in you. But I want you to know that it turned out okay and that I really appreciate you calling me and texting me and reaching out to me after all these years and it just cements what I originally thought of you as being a guy of the highest integrity; as somebody who I respect and furthermore I like."

***

> "SB:  . . . I know we can't turn the clock back but you really needed the money then, was someone screwing with your family. Well you basically said I'm hurting . . .
> GK:  Yeah.
> SB: . . . so . . .
> GK:  So, I owed the guy money, right?
> SB:  Uh-huh."

***

> "GK:  For previous [inaudible] and not a very nice guy, but I really had no choice. Again, not one of my finer moments. And the threat was hey either you pay me or I'll come knock on your door; I know where you live and I am going to tell your wife exactly what's going on here and you know, who knows what else was going to happen. That kind of thing, right?
> SB:  Yeah.
> GK:  And so you know, that kind of threat I don't take mildly, right because this is the kind of individual who was going to do what he said he was going to do. And so I ended up borrowing money from my sister to essentially pay this guy off and make him go away.
> ***
> GK:  Yeah. Well look, I confided you in Sam [sic] because I felt like we were friends, right?

14

102296719_1

> SB: Yeah.
> GK: . . . I felt a strong connection to you, as I still do and so I
> shared it with you.  Again, not my finest moment but you know
> when you are desperate you do things that you may not do
> otherwise.  Right?"

***

66.     Mr. Koffler also admitted that using high pressure tactics was part of Wyndham's

sales culture:

> "GK:  I agree and I'll tell you what Sam, you know I've been in the
> same line of work ever since right, just with different companies.
> Everybody is cool right? Everybody is cool.  Windham [sic] is not
> cool.
> SB: Right.
> GK:  I've never had this situation since and I've been gone from
> Windham [sic] for what, five years now?"

***

> "SB:  And then  . . . and bear with me on this, because I mean
> nothing personalized but whether I wanted to take a year thinking
> about the licensing or two years or five years, they should not lean
> on a sales executive that is very intelligent and been devoted to
> their lying and I'd be the next customer that you're almost . . . well
> basically going to get to fired [sic] if you don't sell two more
> licenses or three more, is that should be their problem [sic].  It
> shouldn't be your problem.  It shouldn't trickle down to me.  You
> know they're just not . . . you now they are putting themselves
> above everyone else.
> GK: Yeah, I know."

67.     Mr. Koffler also apologized to Mr. Blue for Wyndham not following through with

its promises:

> "…believe me I was one of the most honest guys out there doing
> what I was doing right.  And to hear that they're not holding up
> their end of the bargain, it's terrible right.  And they used us to
> [inaudible] their own cause and then they don't follow through on
> their promises to the developers[.]"

102296719_1

15

68.     On or about June 2016, Mr. Koffler sent Mr. Blue an invoice for "consulting work."  Mr. Koffler attempted to bill Mr. Blue $10,000.00 for work he performed while employed by Wyndham and for work Mr. Koffler had represented was services Wyndham performed for franchisees.  For example, Mr. Koffler billed Mr. Blue for the following work:

a.      "Consulting time & advice locating the qualified feasibility firm of Spurrier Consulting and coordinate this contact."

b.      "Consulting time & advice for Locating [sic] the qualified Management Firm of SKY Management vs. The [sic] time delay & required training to become an owner operator and coordinate this contact."

c.      Consulting time to recommend involving investors in order to encourage the project to an actual build out vs. exploratory only & losing the license fee Moneys [sic]."

d.      "Consulting time to identify & recommend a cost saving idea to tamper the financial pause of building a hotel. The Microtel would be about 100,000.00 +/- cheaper to do build, therefore the recommendation."

e.      "License transferee; Placed all the phone calls and or emails associated with the request to switch the CO Microtel license to Aztec NM, essentially provided 100% of the required effort/work."

69.     Mr. Koffler also sought to invoice Mr. Blue for his travel costs associated with travel to Aztec, New Mexico.

70.     Mr. Koffler's conduct is evidence of his modus operandi and his and Wyndham's practice of deceit on franchisees.

102296719_1

E.     **The Franchise Rule**

71.     The Federal Trade Commission ("FTC") promulgated the Franchise Rule in 1978, after it found widespread deception in the sale of franchises and business opportunities through both material misrepresentations and nondisclosure of material facts, including material misrepresentations about the nature of the seller and its business operations, the cost to purchase and operate a franchise, and other contractual terms and conditions under which the business would operate.   The FTC found other unfair or deceptive practices pervasive, including franchisors' use of false or unsubstantiated earnings claims to lure prospective purchasers into buying a franchise.

72.     To prevent deceptive and unfair practices in the sale of franchises, the FTC adopted the Franchise Rule. The Franchise Rule requires franchisors to provide prospective investors with certain information the FTC deemed necessary for investors to make an informed decision.  The Franchise Rule permits franchisors to use a uniform disclosure format known as the Franchise Disclosure Document or FDD (formerly known as the "Uniform Franchise Offering Circular" or "UFOC").  The FDD sets forth 23 Items of disclosure.  Some of the most basic Items of disclosure include:

> a.     *Item 6* requires a detailed disclosure of all other fees payable by the franchisee to the franchisor or its affiliates or that the franchisor or its affiliates impose or collect in whole or in part for a third party including but not limited to royalties, fees for additional training or assistance, advertising, cooperatives, accounting, and inventory.

> b.     *Item 7* requires the franchisor to describe in detail the expenditures the franchisee should anticipate making on or before the commencement of business

102296719_1

operations.  The franchisor must be able to support its estimate from the actual experience of its franchisors.

c.      *Item 19* concerns "earning claims" or representations of a franchisee's prospective financial performance.  While the FTC permits a franchisor to make earning claims, the Franchise Rule prohibits the making of earnings claims *except* as part of a detailed disclosure in Item 19.

73.     In addition to providing a format for disclosures, the Franchise Rule specifies when a disclosure document must be given to the prospective franchisee.  Such timing requirements are intended to ensure that franchisees have a "cooling off" period in which to evaluate the disclosure document before paying any monies to the franchisor and before executing agreements binding on the prospective franchisee.

74.     Under the Franchise Rule, the prospective franchisee must be provided a disclosure document at least 14 calendar days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

75.     Violations of the Franchise Rule are considered unfair and deceptive acts within the meaning of Section 5 of the Federal Trade Commission Act.

76.     On or about September 2016, Mr. Blue's relationship with Microtel and Wyndham reached a new low.  Microtel was threatening litigation and to shut down the hotel's reservation system.  Frustrated with Microtel's and Wyndham's conduct, Mr. Blue started researching about his rights as a franchisee.  While doing so, Mr. Blue came across the FTC website where he read various articles on the duties of franchisors.  It was while reading these article that Mr. Blue realized that Defendants failed to comply with their FTC obligations.

102296719_1

## V.  CLAIMS

### COUNT I – UNFAIR AND DECEPTIVE PRACTICE – BASIC DISCLOSURE
### (Against All Defendants)

77.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1through 76 above as if fully set forth herein.

78.    Defendants are each a "Franchisor" within the meaning of Part 436 of the Franchise Rule, 16 C.F.R. § 436.1 *et seq.*

79.    Defendants are each a Franchise Seller within the meaning of Part 436 of the Franchise Rule, 16 C.F.R. § 436.1 *et seq.*

80.    Defendants offer franchises for sale within the meaning of Part 436 of the Franchise Rule, 16 C.F.R. § 436.1 *et seq.*

81.    Presidential and Mr. Blue are Franchisees within the meaning of Part 436 of the Franchise Rule, 16 C.F.R. § 436.1 *et seq.*

82.    At all relevant times, Defendants had prior experience and superior knowledge of the hotel market and the market value of various brands, both in the New Mexico market and throughout the United States.

83.    In contrast with the extensive knowledge and experience of Defendants, at all relevant times, Plaintiffs had little knowledge of, and no prior experience in, the hotel market in New Mexico or the United States generally.

84.    In connection with the offering for sale and sale of hotel franchises, Defendants failed to provide Plaintiffs with a timely and complete Baymont FDD and Microtel FDD in violation of Section 436. l(a) of the Franchise Rule and section 5(a) of the FTC Act.

85.    A violation of Section 436. l(a) of the Franchise Rule and section 5(a) of the FTC Act constitutes a violation of the New Mexico Unfair Practices Act ("New Mexico UPA").

102296719_1

86.     The New Mexico UPA makes "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of trade or commerce unlawful." NMSA § 57-12-3. An "unfair or deceptive trade practice is defined as "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "(14) failing to state a material fact if doing so deceives or tends to deceive." NMSA § 57-12-2(D).

87.     Plaintiffs and Defendants are "person[s]" under NMSA § 57-12-2(A).

88.     Defendants' actions as set forth in this Complaint occurred in the conduct of "trade" or " commerce" as defined under NMSA § 57-12-2(C).

89.     As described in this Complaint, Defendants engaged in deceptive acts and practices in the conduct of its trade and business, contrary to the terms of the New Mexico UPA.

90.     Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages, treble damages, and reasonable attorney fees, as well as all other proper and just relief available under NMSA § 57-12-10.

### COUNT II - UNFAIR AND DECEPTIVE PRACTICE – EARNINGS CLAIM MISREPRESENTATION
### (Against Wyndham and Microtel)

91.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

92.     At all relevant times, Defendants had prior experience and superior knowledge of the hotel market and the market value of various brands, both in the New Mexico market and throughout the United States.

102296719_1

20

93.     In contrast with the extensive knowledge and experience of Defendants, at all relevant times, Plaintiffs had little knowledge of, and no prior experience in, the hotel market in New Mexico or the United States generally.

94.     To induce Mr. Blue to purchase the Microtel franchise, on or about March 17, 2011, Mr. Koffler provided Mr. Blue an "STR report" dated March 8, 2011 from Smith Travel Research that contained earning representations for hotels in Durango, Colorado. Mr. Koffler told Mr. Blue that the Microtel hotel would perform as well or better than the hotels in the STR report.

95.     To induce Mr. Blue to transfer the Microtel franchise and build the hotel in Aztec, New Mexico, Mr. Koffler told Mr. Blue that the Microtel hotel in Aztec would perform as well or better than the hotels in the STR report.

96.     Mr. Koffler had also represented to Mr. Blue that the location would "knock it out of the ball park."

97.     Presidential executed the Assignment Agreement and built the Microtel hotel in reliance of Mr. Koffler's performance and earnings representation.

98.     Ace Development and Mr. Blue guaranteed Presidential's performance under the Microtel Franchise Agreement in reliance of Mr. Koffler's performance and earnings presentation.

99.     Plaintiffs' reliance was reasonable.

100.    Wyndham and its affiliate Microtel had a duty to disclose material facts including a description of the factual basis and the material assumptions underlying its earnings performance representation.

101.    Specifically, an earnings performance representation must states:

102296719_1

21

      a.     Material assumptions, other than matters of common knowledge, underlying the claim.

      b.     A concise summary of the basis for the claim including a statement of whether the claim is based on actual experience of franchised units and, if so, the percentage of franchised outlets in operation for the period covered by the earnings claim that have actually attained or surpassed the stated result;

      c.     A conspicuous admonition that a new franchisor's individual financial results are likely to differ from the result stated in the earnings claim; and

      d.     A statement that substantiation of the data used in preparing the earnings claim will be made available to the prospective franchisee on reasonable request.

102.    Wyndham and Microtel did not have a reasonable basis for representing that the Microtel hotel if built in Aztec, New Mexico would perform as well or better than the hotels in the STR report.

103.    Wyndham and Microtel's failure to disclose material information related to its earnings performance representation is a violation of Section 436.l(a) of the Franchise Rule and section 5(a) of the FTC.

104.    A violation of Section 436. l(a) of the Franchise Rule and section 5(a) of the FTC Act constitutes a violation of the New Mexico Unfair Practices Act ("New Mexico UPA").

105.    The New Mexico UPA makes "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of trade or commerce unlawful." NMSA § 57-12-3. An "unfair or deceptive trade practice is defined as "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the

person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "(14) failing to state a material fact if doing so deceives or tends to deceive." NMSA § 57-12-2(D).

106.    Plaintiffs, Wyndham, and Microtel are "person[s]" under NMSA § 57-12-2(A).

107.    Wyndham's and Microtel's actions as set forth in this Complaint occurred in the conduct of "trade" or "commerce" as defined under NMSA § 57-12-2(C).

108.    As described in this Complaint, Wyndham and Microtel engaged in deceptive acts and practices in the conduct of its trade and business, contrary to the terms of the New Mexico UPA.

109.    Because Wyndham's and Microtel's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages, treble damages, and reasonable attorney fees, as well as all other proper and just relief available under NMSA § 57-12-10.

**COUNT III – FRAUDULENT INDUCEMENT**
**(Against Wyndham and Microtel)**

110.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 109 above as if fully set forth herein.

111.    At all relevant times, Wyndham and Microtel had prior experience and superior knowledge of the hotel market and the market value of various brands, both in the New Mexico market and throughout the United States.

112.    In contrast with the extensive knowledge and experience of Wyndham and Microtel, at all relevant times, Plaintiffs had little knowledge of, and no prior experience in, the hotel market in New Mexico or the United States generally.

102296719_1

113.    Wyndham and Microtel, by and through Mr. Koffler while acting in his actual or apparent authority as a representative of Wyndham, engaged in a course of conduct that included false, misleading, fraudulent statements and representations of facts, and high-pressure-sales tactics including:

a.    To induce Mr. Blue to purchase a Baymont hotel franchise, on or about June 26, 2010, Mr. Koffler told Mr. Blue that it was not a requirement that he operate the hotel.  Mr. Koffler told Mr. Blue that since he owned the land, he can add value to it by purchasing a franchise and building a hotel, and then "flip" it as "turnkey ready."  Mr. Koffler told Mr. Blue that "there would be a line of people interested in purchasing the hotel" and he "guaranteed a buyer by the time the hotel was built."  Mr. Koffler told Mr. Blue that the location would "knock it out of the ball park."

b.    To induce Mr. Blue to purchase a Baymont hotel franchise, on or about June 26, 2010, Mr. Koffler told Mr. Blue that he should not worry about the operation side of the hotel because "corporate takes care of that" and he had a management company lined up to manage the hotel, which he would propose to prospective buyers to hire once the hotel opened.

c.    To induce Mr. Blue to purchase a Baymont hotel franchise, on or about June 26, 2010, Mr. Koffler told Mr. Blue that he should not be concerned with operational costs because Wyndham was going to have buyers "lined up" for Mr. Blue.

d.    To induce Mr. Blue to purchase the Baymont hotel franchise, on or about June 26, 2010, Mr. Koffler then confided in Mr. Blue that his job at Wyndham was on the line and that he needed to sell a franchise during the quarter or he would certainly lose his job.

e.    To induce Mr. Blue into purchasing the Microtel franchise, on or about beginning of 2011, Mr. Koffler again told Mr. Blue that if he purchased the Microtel franchise

102296719_1

and built the hotel, he could then sell it as "turnkey ready."  Mr. Koffler told Mr. Blue that Wyndham will have several buyers ready to bid on the project.  Mr. Koffler also told Mr. Blue that just like with the hotel in Aztec, he should not worry about the operation of the hotel because Wyndham was going to have buyers "lined up" for Mr. Blue.

        f.      To induce Mr. Blue into purchasing the Microtel franchise, Mr. Koffler told Mr. Blue that if he could not sell another franchise he was certainly going to be fired and would lose his house and his family.

        g.      To induce Mr. Blue into purchasing the Microtel franchise, Mr. Koffler told Mr. Blue that his family was in imminent threat of physical harm.

        h.      To induce Mr. Blue to purchase the Microtel franchise, on or about March 17, 2011, Mr. Koffler provided Mr. Blue an "STR report" dated March 8, 2011 from Smith Travel Research that contained earning representations.  Mr. Koffler told Mr. Blue that a Microtel hotel would perform as well or better than the hotels in the STR report.

        i.      To induce Mr. Blue to seek the transfer of the Microtel from Durango, Colorado to Aztec, New Mexico and build the Microtel hotel, Mr. Koffler told Mr. Blue that since he owned the land, he can add value to it by purchasing a franchise and building a hotel, and then "flip" it as "turnkey ready."  Mr. Koffler also told Mr. Blue that a Microtel hotel in Aztec, New Mexico would perform equally as profitable as the hotels in the March 8, 2011 STR report that Mr. Koffler provided to Mr. Blue on or about May 17, 2011.

        114.      Presidential executed the Assignment Agreement and built the Microtel hotel in reliance of Mr. Koffler's performance and earnings representation.

102296719_1

115.    Ace Development and Mr. Blue guaranteed Presidential's performance under the Microtel Franchise Agreement in reliance of Mr. Koffler's performance and earnings presentation.

116.    Wyndham and Microtel knew the representations set forth above were false when made.

117.    Plaintiffs reasonably relied on Wyndham and Microtel's misrepresentations as part of the basis for purchasing the franchising and building the Microtel hotel in Aztec, New Mexico.

118.    Mr. Blue would not have purchased the hotel franchises if Wyndham and Microtel had fully disclosed all material facts.

119.    Presidential would not have executed the Assignment Agreement and built the Microtel hotel if Wyndham and Microtel had fully disclosed all material facts.

120.    Ace Development and Mr. Blue would not have guaranteed Presidential's performance under the Microtel Franchise Agreement if Wyndham and Microtel had fully disclosed all material facts.

121.    The misrepresentations made by Wyndham and Microtel were material and made with (1) the intent of convincing and inducing Mr. Blue to purchase the Microtel hotel franchise; (2) the intent of convincing and inducing Presidential to execute the Assignment Agreement; and (3) the intent of convincing and inducing Presidential to build the Microtel hotel so Wyndham and Microtel can collect royalty payments for 20 years; and (4) the intent of convincing and inducing Ace Development and Mr. Blue to guaranty Presidential's performance under the Microtel Franchise Agreement.

102296719_1

122.    Mr. Blue and Presidential reasonably relied on the truth of Wyndham and Microtel's statements and representations in making the decision set forth in paragraph 121 above.

123.    Plaintiffs had a right to rely on Wyndham and Microtel's statements and representations.

124.    As a proximate result of Wyndham and Microtel's misrepresentations and failure to disclose material facts that it had a legal duty to disclose, Plaintiffs suffered actual harm by paying franchise fees to Wyndham and Microtel, building a Microtel hotel that since its opening has performed in the red, and agreeing to pay royalties to Microtel for 20 years for a hotel that does not perform in the manner Plaintiffs were told it would perform.

125.    Wyndham and Microtel's conduct as described herein was willful, wanton, malicious, reckless, oppressive and fraudulent, and resulted in substantial harm to Plaintiffs.

## COUNT IV – NEGLIGENT MISREPRESENTATION
### (Against Wyndham and Microtel)

126.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 125 above as if fully set forth herein.

127.    As alleged above, Wyndham and Microtel provided Plaintiffs with misleading information and omitted disclosing material information it was under an obligation to disclose in order to guide Plaintiffs' business decisions for the benefit of Wyndham and Microtel.

128.    It was reasonably foreseeable by Wyndham and Microtel that Plaintiffs would be harmed as a result of Wyndham and Microtel's misrepresentations and omissions of material facts.

129.    Wyndham and Microtel had no reasonable basis for its misrepresentations and omissions of material fact and failed to exercise reasonable care in communicating or supplying material information to Plaintiffs.

102296719_1

27

130.    At all relevant times hereto, Wyndham and Microtel knew that Plaintiffs were the intended recipients of the information, were receiving the information, and were relying on the information they supplied.

131.    At all relevant times hereto, Wyndham and Microtel intended that Plaintiffs would rely on the misleading information and omissions of material facts, and Plaintiffs did reasonably rely on their misrepresentations and omissions.

132.    As a direct and proximate result of their justifiable reliance on the material information supplied and omissions of material fact, Plaintiffs have suffered substantial monetary losses arising from Wyndham and Microtel's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Presidential Hospitality, LLC; Ace Development, Inc.; and Sam Blue pray for judgment against Defendants Wyndham Hotel Group, LLC; Baymont Inn and Suites Franchise Systems, Inc.; and Microtel Inns and Suites Franchising, Inc. as follows:

A.    Compensatory damages arising from Defendants' conduct as proven at trial;

B.    Punitive damages arising from Defendants' conduct as proven at trial;

C.    Treble Damages;

D.    Rescission of the Microtel Franchise Agreement dated March 18, 2011, as void *ab initio* and payment of an amount sufficient to restore Mr. Blue and Presidential Hospitality, LLC to their original position.

E.    Rescission of the Amendment Assignment and Assumption Agreement dated April 10, 2013, as void *ab initio*;

F.    Rescission of the Guaranty attached as an exhibit to the Amendment Assignment and Assumption Agreement as void *ab initio*;

102296719_1

28

G.   Rescission of the Second Note dated April 26, 2013, as void *ab initio*;

H.   Pre- and post-judgment interest on all damages awarded;

I.   Attorney fees and costs; and

J.   For such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a jury of six for the trial of this matter.

DATE: September 12, 2017.

Respectfully submitted,

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By */s/ Bobbie J. Collins*
Bobbie J. Collins
*Attorneys for Plaintiffs*
201 Third St. NW, Suite 1950
Albuquerque, New Mexico 87102-4388
T (505) 764-5416
bcollins@lrrc.com

102296719_1