# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PRESIDENTIAL HOSPITALITY, LLC,
a New Mexico limited liability
company; ACE DEVELOPMENT,
INC., a New Mexico Corporation and
SAM BLUE,

       Plaintiff,

vs.                                                                     No. CIV 17-0981 JB/JHR

WYNDHAM HOTEL GROUP, LLC, a
New Jersey limited liability company;
BAYMONT INN AND SUITES
FRANCHISE SYSTEMS, INC., a
Delaware Corporation and MICROTEL
INN AND SUITES FRANCHISING,
INC., a Georgia corporation,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Motion for Temporary Restraining

Order and Preliminary Injunction in Federal Court, filed September 27, 2017

(Doc. 8)("Motion"); and (ii) the Plaintiffs' Petition for Temporary Restraining Order and

Preliminary Injunction (Eleventh Judicial District Court, County of San Juan, State of New

Mexico), filed in state court September 22, 2017, filed in federal court September 26, 2017

(Doc. 1-2)("State Motion"). The Court held a hearing on November 28, 2017. The primary

issue is whether to issue a temporary restraining order reinstating the Microtel Inn and Suites

Franchising, Inc. License Agreement (dated March 18, 2011), filed September 27, 2017

(Doc. 15-1)("Contract"), which was terminated on September 18, 2017. The Court will not issue

a TRO reinstating the Contract, because irreparable harm is unlikely to occur absent such an

order.  The primary harm alleged -- revenue loss -- can be cured with money damages, so the harm is not irreparable.  The Court is also unpersuaded that the revenue loss is certain to result in the Plaintiffs' business' failure.  Record evidence suggests that the late September, 2017, drop in reservations, upon which the Plaintiffs' heavily rely in arguing that their hotel is doomed was an expected dip in business.  Moreover, there are many actions, such as relisting their hotel online under a different name, that the Plaintiffs can take to keep their hotel afloat.  Accordingly, the irreparable-harm prong of issuing a TRO weighs against the Plaintiffs.  In addition, the Plaintiffs have not established a likelihood of success on the merits.  There is insufficient factual evidence for the Court to conclude that Defendants Wyndham Hotel Group, LLC or Microtel Inn and Suites Franchising, Inc. waived the Contract's termination provisions with their conduct.  Indeed, much of their conduct suggests that they reserved their Contract termination rights with written notices that stated expressly that they reserved their rights.  Because those two factors -- irreparable harm and substantial likelihood of success on the merits -- are the most important factors in the TRO analysis, and because those two factors weigh against the Plaintiffs, the Court will not issue a TRO.  Accordingly, the Court denies the Motion and the State Motion.

## **FACTUAL BACKGROUND**

Pursuant to rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court makes findings of fact and conclusions of law to support its disposition of the Motion.  See Fed. R. Civ. P. 52(a)(2), 65(d)(1).  The Court will first introduce the parties and then outline the timeline of events in this case.  The Court will then discuss the arguments for and against the Motion.

The parties did not, at the TRO hearing, present any evidence, so the Court may rely on the Complaint, the FAC, the briefing, attachments, and oral arguments to determine the

applicable facts.  The following Findings of Fact and Conclusions of Law are only the Court's early expression of its views on the facts and the law.  They do not bind the Court or the parties down the road.  See University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").  Thus, the Findings of Fact and Conclusions of Law serve the limited purpose of deciding the Motion and the State Motion and do not fully resolve the case.

1.      Wyndham Hotel through its affiliates, Defendant Baymont Inn and Suites Franchise Systems Inc., and Microtel Inn offers, sells, owns, and operates hotels and hotel chains throughout the United States.  See Presidential Hospitality, LLC v. Wyndham Hotel Group, LLC, No. D-1116-CV-2017-01329, First Amended Complaint for Violation of the New Mexico Unfair Practices Act; Fraudulent Inducement; Negligent Misrepresentation; and Jury Demand ¶ 1, at 2 (Eleventh Judicial District Court, County of San Juan, State of New Mexico), filed September 25, 2017, filed in federal court on September 26, 2017 (Doc. 1-5)("FAC").

2.      Plaintiff Sam Blue is a New Mexico citizen, who is a managing member of Plaintiff Presidential Hospitality, LLC.  See Draft Transcript of Motion Proceedings at 10:7-17 (taken September 28, 2017)(Court, Enriquez)("Tr.").[1]

3.      The other member of Presidential Hospitality is Plaintiff Ace Development, Inc., a New Mexico corporation with its principal place of business in New Mexico.  See Tr. at 10:11-14 (Court, Enriquez); id. at 10:18-24 (Court, Enriquez).

4.      In March, 2011, Blue entered the Contract, purchasing the rights to a Microtel Inn franchise.  See Contract at 1.

---

[1]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers

5.     In May, 2013, Blue assigned his rights and obligations under the Contract to Presidential Hospitality.  See Amendment Assignment and Assumption Agreement at 1, filed September 27, 2017 (Doc. 15-2)("Assignment Agreement").

6.     According to the Plaintiffs, "through various representations, promises, omissions," of which many were "false, incomplete, and misleading," in addition to "high-pressure-sales tactics," the Wyndham Hotel and Microtel Inn induced Blue to purchase that Microtel Inn franchise.  FAC ¶ 2, at 1.

7.     Again, according to the Plaintiffs, that inducement resulted from a relationship formed among Blue and an agent of the Wyndham Hotel, Gregg Koffler.  See FAC ¶¶ 12-49, 65-70, at 4-11, 14-16.

8.     Blue first met Koffler in June, 2010, because Koffler had contacted Blue to tell him that the Wyndham Hotel was interested in property that Blue owned in Aztec, New Mexico.  See FAC ¶¶ 15-19, at 4-5.

9.     Blue believed that the Wyndham Hotel wanted to buy his land. See FAC ¶ 18, at 5.

10.     At his meeting with Koffler, however, instead of discussing the Wyndham Hotel's interest in buying Blue's property, Koffler solicited Blue to purchase a Baymont Inn franchise.  See FAC ¶ 19, at 5.

11.     Koffler told Blue that, if Blue purchased the franchise, Blue would be able to quickly flip the property for a profit.  See FAC ¶ 21, at 5 ("Mr. Koffler told Mr. Blue that there would be a line of people interested in purchasing the hotel and he guaranteed a buyer by the time the hotel was built."); id. ¶ 28, at 7.

12.     Blue was initially uninterested, because he wanted to sell his property.  See FAC ¶¶ 13, 20, at 4-5.

13.     To further persuade Blue that purchasing the franchise was a solid investment, Koffler told Blue that the Wyndham Hotel "would most likely want to invest in the construction of the hotel," FAC ¶ 22, at 5, and that Blue, who had no experience in running a hotel, would not have to operate it, see FAC ¶¶ 1, 21, 27 at 2, 5-6.

14.     After speaking briefly with a Wyndham Hotel executive, Koffler represented to Blue that the Wyndham Hotel would invest $150,000.00 in the property.  See FAC ¶ 23, at 6.

15.     Koffler did not tell Blue that the Wyndham Hotel's investment would be a loan. See FAC ¶ 23, at 6.

16.     Upon Koffler's representations, in particular the representation that the Wyndham Hotel would invest $150,000.00 of its own money in the property's development, Blue agreed to apply for a Baymont Inn franchise.  See FAC ¶ 25, at 6.

17.     About a month later, and after Blue had been preliminarily approved to buy the franchise, Blue had second thoughts and said to Koffler that he did not think anyone would want to buy the hotel from him.  See FAC ¶ 26, at 6.

18.     Koffler again told Blue that the Wyndham Hotel "was going to have buyers 'lined up,'" FAC ¶ 28, at 7, and also that, if Blue did not agree to purchase the franchise, Koffler would probably lose his job, see FAC ¶ 29, at 7.

19.     Blue subsequently agreed to the purchase and entered into the Baymont Franchise Systems Inc., Franchise Agreement ("Baymont Contract").  See FAC ¶¶ 34-35, at 8.

20.     Baymont Inn did not provide Blue "a complete and timely copy of its Franchise Disclosure Document" ("FDD").  FAC ¶ 36, at 8.[2]

21.     According to Blue, as a result of the Baymont Contract, he and Koffler befriended each other.  See FAC ¶¶ 37-38 at 8.

22.     "Mr. Koffler often told Mr. Blue what a great person he was and that he bragged to his family about him."  FAC ¶ 38, at 8.

23.     Accordingly, "Mr. Blue felt compelled to help Mr. Koffler who referred to Mr. Blue as his 'friend.'"  FAC ¶ 38, at 8.

24.     Shortly after entering the Baymont Contract, Koffler asked Blue to accompany him on a potential deal to sell another franchise.  See FAC ¶ 37, at 8 ("Mr. Koffler asked Mr. Blue to vouch for him and Wyndham.").

25.     Koffler told Blue that his job had been stressful lately, straining relations with his family, so "he needed to make this sale."  FAC ¶ 37, at 8.

26.     When the potential deal did not happen, Koffler confessed to Blue that he needed to sell another franchise or the Wyndham Hotel would fire him, and he would lose both his house and his family.  See FAC ¶ 39, at 9.

27.     Koffler also told Blue that he "owed people money" and that those people "would hurt his family" if he did not pay them back.  FAC ¶ 40, at 9.

---

[2]The FDD is a document that the franchisor must disclose to the franchisee at least fourteen calendar days before the franchisee signs a binding agreement with the franchisor.  See 16 C.F.R. § 436.2(a).  The FDD must contain certain information, including, among other things: (i) a brief description of the franchised business; (ii) the total investment necessary to begin operation; (iii) the franchisor-franchisee contract's terms; and (iv) a general description of the competition.  See 16 C.F.R. § 436.3-.5.

28.     As Koffler later recounted, the threats against him were "either you pay me or I'll come knock on your door; I know where you live and I am going to tell your wife exactly what's going on here and you know, who knows what else was going to happen." FAC ¶ 65, at 14.

29.     In the following weeks, Koffler frequently solicited Blue to buy a Microtel Inn franchise for a property in Durango, Colorado. See FAC ¶ 41, at 9.

30.     Koffler again aggressively pitched the deal to Blue. See FAC ¶ 41, at 9.

31.     Koffler told Blue that Blue could easily re-sell the property for profit and that "Wyndham would have several buyers ready to purchase the hotel." FAC ¶ 42, at 9.

32.     Koffler added that the Microtel Inn franchise would be an even better deal than the Baymont franchise, because Microtel Inn was a "new brand" that would be Wyndham Hotel's "top money maker." FAC ¶ 41, at 9.

33.     Koffler also told Blue that "it was hard to get a Microtel franchise," but he could get Blue a special price. FAC ¶ 41, at 9.

34.     To further induce the sale, Koffler provided Blue a Smith Travel Research Report ("Smith Report"). See FAC ¶ 43, at 9-10.

35.     The Smith Report contained information about hotels in Durango from 2005 to 2011, including: (i) occupancy percentage; (ii) average daily rate; (iii) revenue per available room; (iv) supply; (v) demand; and (vi) revenue. See FAC ¶ 43, at 10.

36.     Koffler represented that any Microtel Inn hotel would "perform as well or better than the hotels in the S[mith] report." FAC ¶ 43, at 10.

37.     Relying on Koffler's representations, Blue entered the Contract for a Microtel Inn franchise and paid a $30,000.00 initial franchise fee. See FAC ¶¶ 44-46, at 10.

38.     Under the Contract, Wyndham Hotel and Microtel Inn have the right to terminate the Contract with an opportunity to cure if Presidential Hospitality "fail[s] to pay us or any of our affiliates fees or other amounts due under this Agreement . . . including, without limitation, Application Fees, Royalty Fees, Contributions, GDS fees, travel agent commission fees or ISP fees."  Contract at 22.

39.     Wyndham Hotel and Microtel Inn also have the right to terminate the Contract "without giving you an opportunity to cure the default, effective upon written notice to you" if "you receive from us three (3) notices of default of this Agreement within a twelve (12) month period, regardless of whether the defaults are cured."  Contract at 22.

40.     Microtel Inn did not provide Blue "a complete and timely copy of its FDD."  FAC ¶ 50, at 11.

41.     A few months after Blue entered the Contract, Blue had still not yet started building the Baymont hotel.  See FAC ¶ 47, at 10.

42.     When Koffler asked about the delay, Blue responded that he again had doubts about the Baymont hotel, and that he was willing to renege on it, losing his initial investment franchise fee.  See FAC ¶ 47, at 10.

43.     Koffler told Blue that building a Microtel Inn hotel in Aztec would cost less than building a Baymont hotel in the same location.  See FAC ¶ 47, at 11.

44.     Accordingly, Koffler stated to Blue that he would work with the Wyndham Hotel to transfer the Microtel Inn franchise from Colorado to New Mexico.  See FAC ¶ 47, at 11.

45.     Koffler assured Blue that a Microtel Inn hotel in Aztec would "perform equally as profitable as the hotels in the March 8, 2011 S[mith] report."  FAC ¶ 48, at 11.

46.     Blue agreed to the transfer.  <u>See</u> FAC ¶ 51, at 11.

47.     Thus, Blue assigned the Microtel Inn franchise to Presidential Hospitality -- of which Blue was a managing member -- and the Microtel Deal's franchise site was moved from Durango to Aztec.  <u>See</u> FAC ¶¶ 51, 55, 57 at 11-12; Assignment Agreement, at 1.

48.     There are several hotels in the Aztec area, many of which do not have brand names associated with them.  <u>See</u> Step Back Inn, <u>http://stepbackinn.com/</u>; Miss Gail's Inn, https://bit.ly/2xxKple; Enchantment Lodge, <u>https://bit.ly/2xxKple</u>.

49.     Many people who travel to Aztec do not travel there again.

50.     Many hotels exist without a well-known brand, such as Wyndham or Hilton or Hyatt, attached to their name.  <u>See</u>, <u>e.g.</u>, Hotel Encanto, https://www.hotelencanto.com/; MCM Elegenté Hotel, <u>http://www.mcmelegantealbuquerque.com/</u>.

51.     Under the Assignment Agreement, Blue and the other owner of Presidential Hospitality -- ACE Development -- remain secondarily liable for Presidential Hospitality's performance under the Contract.  <u>See</u> FAC ¶¶ 54, 59 at 12.

52.     Presidential Hospitality subsequently built the Microtel Inn hotel in Aztec.  <u>See</u> FAC ¶ 58, at 12.

53.     As the Microtel Inn hotel neared completion, Blue contacted the Wyndham Hotel to determine whether it had found a buyer.  <u>See</u> FAC ¶ 60, at 12.

54.     At that time, Koffler no longer worked for the Wyndham Hotel.  <u>See</u> FAC ¶ 60, at 12-13.

55.     The Wyndham Hotel had no buyers yet, but a representative said it would "put the word out."  FAC ¶ 60, at 13.

56.     When the Microtel Inn hotel was completed on October 3, 2013, the Wyndham Hotel still had not found a buyer.  See FAC ¶ 63, at 13.

57.     According to Blue, "Wyndham never intended or tried to find a buyer. . . .  Mr. Koffler's representations and promises were only intended to induce Mr. Blue to purchase the hotel franchises and construct the hotel so that Wyndham could collect on royalty payments for 20 years."  FAC ¶ 63, at 13.

58.     Since completion, the Microtel Inn hotel has not performed on par or better than the hotels listed in the Smith Report that Koffler gave to Blue.  See FAC ¶ 64, at 13.

59.     On March 10, 2015, Wyndham Hotel sent Presidential Hospitality and Blue a notice of monetary default, stating that they were past due in recurring fees and charges in the amount of $38,453.96.  See Letter from Wyndham Hotel Group to Sam Blue and Presidential Hospitality, LLC at 1 (dated March 10, 2015), filed September 26, 2017 (Doc. 1-3)("March Default Notice").

60.     The default notice also states that:

If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Microtel Inn and Suites by Wyndham System.  This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.  We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system.

March Default Notice at 1

61.     Blue received a copy of the March Default Notice.  See Declaration of Sam Blue in Support of Plaintiffs' Application for Temporary Restraining Order ¶ 9, at 3 (dated September 22, 2017), filed September 26, 2017 (Doc. 1-2)("Blue Declaration").

62.     On April 17, 2015, Wyndham Hotel sent Presidential Hospitality and Blue another notice of monetary default, stating they were past due in fees in the amount of $41,101.56.  See Letter from Wyndham Hotel Group to Sam Blue and Presidential Hospitality, LLC at 1 (dated April 17, 2015), filed September 26, 2017 (Doc. 1-3)("April Default Notice").

63.     The April Default Notice notes that Wyndham Hotel and Microtel Inn had extended the cure period, but states that it is not "waiving the default or any other default under the Agreement by extending the cure period.   We are simply giving you a final opportunity to avoid termination."  April Default Notice at 1.

64.     Blue received a copy of the April Default Notice.  See Blue Declaration ¶ 10, at 3.

65.     In August, 2015, Presidential Hospitality and Microtel Inn entered a payment plan to pay off the past amount owed.  See Payment Plan relating to the License Agreement between Microtel Inn & Suites and Presidential Hospitality, LLC, for the facility designated as Unit #47176-03078-01-MTL, located in Aztec, NM at 1 (dated August 3, 2015), filed September 26, 2017 (Doc. 1-4)("Payment Plan").

66.     The Payment Plan again reserved all of Wyndham Hotel's rights:

> This plan does not affect our rights or remedies for any other default that has or may arise under the Agreement.   You expressly acknowledge that you are obligated to pay timely any other amounts due under the Agreement or any ancillary agreement and that we may also issue default notices for any other defaults under this Agreement.

Payment Plan at 1.

67.     Presidential Hospitality did not make the required payments under the Payment Plan.  See Letter from Wyndham Hotel to Sam Blue and Presidential Hospitality at 1 (dated October 8, 2015), filed September 26, 2017 (Doc. 1-4)("October Default Notice").

68.     Accordingly, in October, 2015, Wyndham Hotel sent Presidential Hospitality and Blue a third notice of default.  See October Default Notice at 1.

69.     In the October Default Notice, Wyndham Hotel again reserved all rights under the Contract, stating:

> If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Microtel Inn and Suites by Wyndham System.  This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.  We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system.

October Default Notice at 1.

70.     Blue received a copy of the October Default Notice.  See Blue Declaration ¶ 11, at 3.

71.     Presidential Hospitality and Blue never cured that default.  See Tr. at 13:1-4 (Sager).

72.     They did, however, make payments to Wyndham Hotel between October, 2015, and July, 2017, in an amount "totaling approximately $42,000.00."  Declaration of Theresa Bailey in Support of Plaintiffs' Application for Temporary Restraining Order ¶ 4, at 2 (dated September 22, 2017), filed September 26, 2017 (Doc. 1-4)("Bailey Declaration").

73.     Blue also exchanged various emails in the following months with Wyndham Hotel "in an attempt to work out a resolution regarding unpaid monies."  Blue Declaration ¶ 12, at 3.

74.     On January 23, 2017, Blue spoke with Jennifer Constantinou -- a Wyndham Hotel in-house attorney -- who told him that "Wyndham would not pursue collection of the amounts

due as long as the parties were discussing a workable solution." Blue Declaration ¶ 12, at 3.

75.     By July 12, 2017, Presidential Hospitality and Blue were past due in charges owed to Wyndham Hotel to the tune of $169,915.47.  See Letter from Wyndham Hotel to Sam Blue and Presidential Hospitality, LLC at 1 (dated July 12, 2017), filed September 26, 2017 (Doc. 1-4)("July Default Notice").

76.     On July 12, 2017, Wyndham Hotel sent another default notice.  See July Default Notice at 1.

77.     The July Default Notice informs Presidential Hospitality and Blue that they have thirty days to cure the default and that Wyndham Hotel reserves all rights under the Contract, but the July Default Notice does not state when the Contract will be terminated if Presidential Hospitality and Blue fail to cure the default.  See July Default Notice at 1.

78.     Blue received a copy of the July Default Notice.  See Blue Declaration ¶ 14, at 4.

79.     After receiving a copy of the July Default Notice, Blue spoke with Lay El-Bassuni -- Wyndham Hotel's Vice President of Brand Operations for Microtel Inn -- who told Blue that "while we work[] together on a workable solution, Wyndham would not shut off the Hotel's access to the central reservation system ("CRS") or Wyndham My Portal Communications website."  Blue Declaration ¶ 15, at 4.

80.     Presidential Hospitality and Blue never cured the default.  See Letter from Wyndham Hotel to Sam Blue and Presidential Hospitality, LLC at 1 (dated September 12, 2017), filed September 27, 2017 (Doc. 15-5)("Termination Notice").

81.     At some time after July 12, 2017, but before September 12, 2017, Wyndham Hotel filed suit against Blue and Presidential Hospitality in the United States District Court for

the District of New Jersey to recover amounts owed.  <u>See</u> Blue Declaration ¶ 16, at 4.

82.     At some time unknown, Presidential Hospitality "spent over $5000 in marketing the hotel in the local community and local groups."  Blue Declaration ¶ 20, at 5.

83.     On September 12, 2017, Wyndham Hotel terminated the Contract.  <u>See</u> Termination Notice at 1.

84.     As a result of that Contract termination, the Plaintiffs' Microtel Inn hotel was delisted from internet websites that advertise available hotel rooms.  <u>See</u> Bailey Declaration ¶¶ 7, 10, at 2-3.

85.     A Google search of "Aztec New Mexico Hotel," however, still yields "Microtel Inn & Suites by Wyndham Aztec" at the correct location with a local phone number. https://bit.ly/2xxKple.

86.     Also as a result of the Contract termination, the Plaintiffs' have not been able to access Wyndham Hotel's central reservation system, which allows the Plaintiffs' to reserve hotel rooms for guests.  <u>See</u> Bailey Declaration ¶ 12, at 3.

87.     Ninety percent of the Plaintiffs' Microtel Inn hotel's reservations are made through third-party websites.  <u>See</u> Bailey Declaration ¶ 13, at 3.

88.     From September 1, 2017 to September 18, 2017, one hundred and seventy-four reservations were made through third parties and two hundred and six reservations were made through Wyndham Hotel's central reservation system.  <u>See</u> Bailey Declaration ¶ 13, at 3.

89.     The Plaintiffs "had projected that between September 21, 2017 and September 30, 2017," they "would receive 40 reservations through third parties."  Bailey Declaration ¶ 13, at 3-4.

90.     Since the Termination Notice, reservations have dropped ninety percent and the hotel has lost revenue.  <u>See</u> Blue Declaration ¶ 19, at 5; Bailey Declaration ¶ 15, at 4.

## <u>PROCEDURAL HISTORY</u>

1.     The Plaintiffs filed suit in state court asserting four theories of liability, <u>see</u> FAC ¶¶ 77-132, at 19-28, and requesting injunctive relief, <u>see</u> FAC ¶¶ 133-37, at 28-29.  First, they assert that, under 16 C.F.R. § 436.1, the Defendants must provide a timely FDD to those purchasing their franchises, but the Defendants failed to timely provide to the Plaintiffs such FDDs in violation of 15 U.S.C. § 45(a) and the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 to 26 ("UPA").  <u>See</u> FAC ¶¶ 77-90, at 19-20.  Second, the Plaintiffs assert that the Wyndham Hotel and Microtel Inn violated 15 U.S.C. § 45(a) and the UPA, because Koffler, as an agent, misrepresented the Microtel Inn franchise's potential value to Blue by stating that a Microtel Inn hotel in either Durango or Aztec would perform as well or better than other hotels in the Smith Report.  <u>See</u> FAC ¶¶ 91-109, at 20-23.  Next, the Plaintiffs argue that Koffler, as the Wyndham Hotel's and Microtel Inn's agent, fraudulently induced the Plaintiffs into the Contract through misstatements and high-pressure sales tactics.  <u>See</u> Complaint ¶¶ 110-125, at 23-27.  Finally, the Plaintiffs assert a negligent misrepresentation claim against the Wyndham Hotel and Microtel Inn premised on the same misleading information that Koffler fed to Blue.  <u>See</u> Complaint ¶¶ 127-32, at 27-28.

2.     On September 22, 2017, the Plaintiffs petitioned the state court for a Temporary Restraining Order and Preliminary Injunction.  <u>See</u> State Motion at 1.[3]  The Defendants soon

_____

    [3]As the arguments in the State Motion and Motion overlap, the Court waits to detail the State Motion's argument until its discussion of the Motion.

thereafter removed the case to federal court based on diversity jurisdiction.  See Notice of

Removal, at 1, filed September 26, 2017 (Doc. 1)("Removal Notice").[4]    The next day, the

Plaintiffs moved the Court to issue a restraining order and preliminary injunction.  See Motion at

1.

       **1.**     **The Motion.**

     3.     According to the Plaintiffs, because they filed this action, the Wyndham Hotel in

retaliation "abruptly and without any notice" terminated the Contract, under the pretext that

Presidential Hospitality had not paid monies owed.  Motion at 2.  See State Motion at 2.  The

---

    [4]The Court concludes that it has subject-matter jurisdiction, because each of the Plaintiffs are New Mexico citizens, each of the Defendants are not New Mexico citizens, and the amount in controversy is greater than $75,000.00.  See Removal Notice ¶¶ 10-18, at 3-5.  Presidential Hospitality, as an LLC, "takes the citizenship of all its members."  Siloam Springs Hotel, L.L.C. v. Century Sur. Co., 781 F.3d 1233, 1234 (10th Cir. 2015).  Presidential Hospitality has two members: Blue and Ace Development.  See Tr. at 10:11-14 (Court, Enriquez).  Blue is a New Mexico citizen.  See Tr. at 10:15-17 (Court, Enriquez).  Ace Development is a New Mexico corporation with a headquarters in Farmington, New Mexico, and no substantial operations outside of New Mexico.  See Tr. at 10:18-11:2 (Court, Enriquez).  It therefore is a New Mexico citizen.  See Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010).  Accordingly, both of Presidential Hospitality's members are New Mexico citizens, so Presidential Hospitality is also a New Mexico citizen.

    None of the Defendants are New Mexico citizens.  Wyndham Hotel is a limited liability company, whose sole member is Wyndham Worldwide Corporation -- an entity incorporated in Delaware that has its headquarters in New Jersey.  See Removal Notice ¶ 13, at 4.  See also Tr. at 11:23-12:1 (Court, Sager).  Baymont Inn and Microtel Inn are incorporated in Georgia with headquarters in New Jersey.  See Removal Notice ¶¶ 14-15, at 4.  None of them appear to have such an interaction with New Mexico that those corporations' nerve centers can be said to be in New Mexico.  See Removal Notice ¶¶ 13-15, at 4.  Accordingly, each Plaintiff is diverse from each Defendant.

    Finally, more than $75,000.00 is in controversy.  The Plaintiffs contend that they were fraudulently induced to pay: (i) a $1,000.00 application fee; (ii) $26,000.00 and $30,000.00 initial franchise fees; and (iii) $42,000.00 in other fees under the Contract.  See FAC ¶¶ 25, 32, 45 at 6-7, 10; State Motion at 6 n.4.  Those fees coupled with the Plaintiffs' request for compensatory damages, treble damages, punitive damages, and attorneys' fees and costs, see FAC at 29, mean that the amount in controversy exceeds $75,000.00.  Therefore, the Court has subject-matter jurisdiction.

Plaintiffs argue that, as a result of that termination, the Wyndham Hotel wrongfully: (i) shut down the Microtel Inn hotel's reservation system; (ii) blocked access to Wyndham Hotel's internal home page, "which allows the Hotel to access employee credentials, employee tracking for bonuses and pay, passwords, guest relations and customer care"; and (iii) removed the Microtel Inn hotel from major hotel booking websites such as Expedia, Priceline, and Orbitz. State Motion at 2-3. The Plaintiffs argue, accordingly, that they are entitled to a TRO or a preliminary injunction reinstating the Contract's terms, which would force the Wyndham Hotel and Microtel Inn to reinstate the services they had wrongfully terminated, because, on balance, the four preliminary injunction factors weigh in their favor. See Motion at 4, 6-7; State Motion at 3, 14-16.

4. First, the Plaintiffs argue that they will suffer irreparable injury without injunctive relief. See Motion at 6 (citing State Motion at 10-16). Specifically, they contend that they will "suffer diminished revenue." Station Motion at 10. They continue that the process of taking down the franchise signs "would be an extremely costly undertaking." State Motion at 13. The Plaintiffs contend that they will suffer an irreparable reputational harm as well for each day the Microtel Inn hotel is not listed and unbookable on premier hotel websites. See State Motion at 14. They also argue the Contract termination "will, in effect, destroy Plaintiffs' business," because the "abrupt termination" of the Contract "makes it impossible for Plaintiffs to protect their investment by, for example, transitioning to a new relationship with another hotel franchisor" or selling the Microtel Inn hotel. Station Motion at 10.

5.      Second, the Plaintiffs contend that, compared to the harm they will suffer, the Wyndham Hotel and Microtel Inn[5] will suffer absolutely no harm if the Court issues injunctive relief.  See State Motion at 13.  According to the Plaintiffs, Wyndham Hotel and Microtel Inn will actually reap a benefit from the imposition of injunctive relief, because they will receive additional royalty payments from the Plaintiffs.  See State Motion at 13.  It follows, again according to the Plaintiffs, a preliminary injunction's second factor weighs in their favor.  See Motion at 6.

6.      Third, the Plaintiffs argue that injunctive relief would favor the public interest, because "hotel employees, vendors, and the Aztec community are innocent parties . . . that are or will be impacted."  State Motion at 15.  The Plaintiffs also argue that if they are forced to shut the Microtel Inn hotel down, the property might become vacant, which can make it a haven for criminal activity.  See State Motion at 15.

7.      Fourth, the Plaintiffs argue that, because the first three factors of the preliminary-injunction test are satisfied, the fourth factor -- substantial likelihood of success on the merits -- is relaxed.  See Motion at 4.  They contend that there is a substantial likelihood of success on the merits for two reasons.  First, they argue that Wyndham Hotel and Microtel Inn have not properly terminated the Contract.  See Motion at 6.  According to the Plaintiffs, the Contract requires Wyndham Hotel and Microtel Inn to give written notice of the date they intend to terminate the Contract if the Plaintiffs are in default, but Wyndham Hotel and Microtel Inn did not give written notice of the termination date.  See State Motion at 12-13 ("As such, Wyndham's Notice of Termination is invalid on its face.").  The Plaintiffs also argue that

_____

[5]The Court omits Baymont Inn here, because the Motion does not seek relief from Baymont Inn.  See State Motion at 1.

equitable principles underlying franchisor-franchisee relationships -- i.e., inequality of economic power -- dictate that the Court should hold that Wyndham Hotel and Microtel Inn did not properly terminate the Contract.  See Motion at 6-7.  Second, the Plaintiffs argue they are likely to win on the case's merits, because Blue was improperly induced into the Contract to build and operate a Microtel Inn hotel.  See Motion at 7.  The Plaintiffs contend that, in addition to the fraudulent inducement, Wyndham Hotel and Microtel Inn did not provide the Plaintiffs the required Federal Trade Commission disclosure statements, which is an independent violation. See Motion at 7.  Accordingly, the Plaintiffs conclude that there is a substantial likelihood of success on the merits.  See Motion at 7.

**2.      The Response.**

8.      Wyndham Hotel and Microtel Inn respond that the Court should not afford the Plaintiffs the "extraordinary remedy" of injunctive relief.  Defendants' Opposition to Plaintiffs' Petition for Temporary Restraining Order and Preliminary Injunction at 8, filed September 27, 2017 (Doc. 15)("Response").[6]  First they argue that the Plaintiffs have not established irreparable harm.  See Response at 9.  Wyndham Hotel and Microtel Inn contend that the Plaintiffs have not established irreparable harm, because they seek the very remedy they claim would cause that irreparable harm -- the Contract's rescission.  See Response at 9.  Specifically, the Plaintiffs request the Court to rescind the Contract and the Assignment Agreement, which would relieve the parties from the rights and obligations under those agreements.  See FAC at 29.  In the Motion, however, the Plaintiffs request the Court to enforce the Contract and the Assignment Agreement, so that the Plaintiffs may still enjoy the benefits attendant to the franchise, while the

---

[6]The Response is only on Wyndham Hotel's and Microtel Inn's behalf, because the "Plaintiffs are not seeking any relief" from Baymont Inn in the Motion.  Response at 1 n.1.

litigation is ongoing.  See Motion at 1-2.  Wyndham Hotel and Microtel Inn argue accordingly that irreparable harm cannot result from Wyndham Hotel's and Microtel Inn's noncompliance with the Contract, otherwise the Plaintiffs would not seek that remedy.  See Response at 9. Wyndham Hotel and Microtel Inn also argue that the Plaintiffs overstate the reputational and other harm, from which they suffer, because of Wyndham Hotel's and Microtel Inn's Contract noncompliance.  See Response at 9-10.  They argue that the Plaintiffs are neither losing their property ownership, nor are Wyndham Hotel and Microtel Inn destroying the Plaintiffs business; rather, according to Wyndham Hotel and Microtel Inn, the Plaintiffs simply lose the use of the Microtel Inn reservation system and forego the right to use signs associating the Microtel hotel with Microtel Inn.  See Response at 10.  Wyndham Hotel and Microtel Inn argue that such harms are merely "financial interests," which do not amount to irreparable harm.  Response at 10.

9.      Wyndham Hotel and Microtel Inn also argue that the Plaintiffs cannot establish a likelihood of success on the merits.  See Response at 10.  First, Wyndham Hotel and Microtel Inn insist that they were justified in ceasing services to the Plaintiffs, because the Plaintiffs failed to pay their fees "over a period of more than two years," and because they failed to cure their fourth default notice issued in July 2017.  See Response at 10 ("Simply, Plaintiffs seek to extend the [Contract] while simultaneously arguing it is void and without paying for the right to operate as a Microtel®.").  Wyndham Hotel and Microtel Inn also argue, contrary to the Plaintiffs' representation that Wyndham Hotel and Microtel Inn gave short notice to the Plaintiffs about terminating the Contract, Presidential Hospitality had notice of default since March, 2015.  See Response at 10.

10.     As to the FAC's merits, Wyndham Hotel and Microtel Inn contend that the Plaintiffs' pre-contractual allegations are factually and legally deficient.  <u>See</u> Response at 11. According to Wyndham Hotel and Microtel Inn, Presidential Hospitality and Blue acknowledged receipt of the requisite disclosure documents.  <u>See</u> Response at 11.  Wyndham Hotel and Microtel Inn also argue that the Plaintiffs did not complain of misrepresentations "until they perceive it as strategically advantageous to do so."  Response at 11.

**3.      The Hearing.**

11.     The Court held a hearing on September 28, 2017.  <u>See</u> Tr. at 1:8 (Court).  The Plaintiffs began by arguing that they are suffering irreparable harm.  <u>See</u> 3:9-10 (Enriquez). According to the Plaintiffs, since Wyndham Hotel and Microtel Inn had terminated the Contract, reservations at the Microtel Inn hotel "declined by 90 percent."  Tr. at 3:13-17 (Enriquez).  The Plaintiffs added that, without the Contract, debts "will become due, taxes that our client will owe will go unpaid" and "it will essentially result in a[] complete destruction of the business."  Tr. at 4:3-8 (Enriquez).  The Plaintiffs then repeated their arguments from briefing that: (i) Wyndham Hotel and Microtel Inn will suffer no harm from Contract's reinstatement, because they will receive royalty payments, <u>see</u> Tr. at 4:15-16 (Enriquez); and (ii) third parties will be harmed, including laid-off employees  and the Microtel Inn hotel's vendors who will lose money, <u>see</u> Tr. at 5:11-21 (Enriquez).  The Plaintiffs also fashioned a freeform equitable argument:

> So preserving the status quo, not only would allow the parties to try to resolve this issue but [it would] also allow my client to try to transition the business such that it could preserve its investment[.]  [M]y client put substantial amounts of money and time into this business.  He has built goodwill in the community, and it would be [i]nequitable for defendants to come in, rip the hotel from under my client's feet and possibly establish a hotel of their own and reap the benefits from the goodwill my client has al[ready] built in the community.

Tr. at 6:5-16 (Enriquez). The Plaintiffs argued that, should the Court allow the Contract to terminate, as opposed to reinstating it, such a decision recognizes the Contract's validity, which turns on the case's merits. <u>See</u> Tr. at 7:7-12 (Enriquez). The Plaintiffs also noted that, if the Contract is terminated, "all possibilities of settlement . . . just go out the window." Tr. at 8:8-12 (Enriquez). Turning to the Contract's termination provisions, the Plaintiffs argue that, contrary to Wyndham Hotel's and Microtel Inn's position that they could unilaterally terminate the Contract without notice, because the Plaintiffs had been given three default notices in a year, "those notices ha[ve] been waived essentially, because the parties had engaged in [settlement] negotiations." Tr. at 9:7-9 (Enriquez). <u>See</u> <u>id.</u> at 9:15-17 ("It's unfair to my client, [it] doesn't give my client sufficient notice that there is termination coming up.").

12. Wyndham Hotel and Microtel Inn responded that the preliminary injunction issue boils down to that the Plaintiffs defaulted on their royalty payments, so Wyndham Hotel and Microtel Inn stopped providing the services they agreed to supply under the Contract. <u>See</u> Tr. at 12:18-13:6 (Sager). According to Wyndham Hotel and Microtel Inn, that issue is the substantive issue the Court must consider for the substantial-likelihood-of-success-on-the-merits prong. <u>See</u> Tr. at 13:7-12 (Sager). Wyndham Hotel and Microtel Inn add that they can, under the Contract, "after giving notif[ication of] nonperformance, nonpayment or default" suspend "the hotel from the reservation system." Tr. at 14:4-8 (Sager). Wyndham Hotel and Microtel Inn argue, accordingly, that their suspension of the reservation system was well within their right, "independent from any right to termination." Tr. at 13:25-14:2 (Sager). They also contend, however, that their notices of default were compliant such that Wyndham Hotel and Microtel Inn are entitled to terminate the Contract. <u>See</u> Tr. at 15:25-16-7.

13. Wyndham Hotel and Microtel Inn contend further that there is no irreparable harm, because the Plaintiffs seek the same relief they assert results in irreparable harm. <u>See</u> Tr. at 15:10-22.

> I am not aware of any authority for the notion a party can simultaneously say that a relationship was procured by fraud and must be rescinded. Yet, simultaneous[ly say] that they're under no compulsion to pay franchise fees and can extend the duration of the allegedly nonexistent franchise agreement. To put [it in] rather stark contrast, if we walked into Court and said we submit, you win, they'd be out of this franchise agreement. That is the fundamental relief they have asked for in their pleadings and that they ask for in these papers. Those two things, re[s]ci[s]sion and an extension are fundamentally inconsistent.

Tr. at 15:10-22. According to Wyndham Hotel and Microtel Inn, "it strains credibility to suggest that the equities favor their position," as the Plaintiffs want to retain the Contract for a limited amount of time, so that they can reap the benefits of a franchise, without paying the royalties for that franchise, but then later void that Contract so that they do not have to pay their fees in arrears. Tr. at 16:15-17:3 (Sager). Wyndham Hotel and Microtel Inn also argue that the only harm alleged is financial harm. <u>See</u> Tr. at 17:7-9 (Sager). Moreover, they contend that, contrary to the Plaintiffs' position that the Contract's termination precludes the Plaintiffs from listing their hotel on Expedia.com or other internet websites, there is nothing keeping the Plaintiffs from posting their hotel online. <u>See</u> Tr. at 17:24-18:3 ("[W]e don't control third party websites.").

14. The Plaintiffs responded that there is no inconsistency in their position. <u>See</u> Tr. at 20:17-20 (Enriquez). They argue that a TRO or preliminary injunction "seeks to keep the status quo" while the litigation is ongoing, whereas "re[s]cis[s]ion seeks to put parties in a completely different position." Tr. at 20:25-21:3 (Enriquez). The Plaintiffs concluded with the argument that they have shown a substantial likelihood of success on the merits, because Wyndham Hotel and Microtel Inn did not "follow the plain text of the agreement." Tr. at 21:17-20 ("The

notif[ication of] termination requires the defendant to give a date certain of termination.  They did not do that.").

15.     The Court "den[ied] the request for a temporary restraining order."  Tr. at 25:5-6 (Court).  It reasoned that it was not convinced that the Plaintiffs had shown a reasonable likelihood of success on the merits.  See Tr. at 23:17-19 (Court).  It also denied the request for a TRO, because it did not see irreparable harm.  See Tr. at 23:22-24 (Court)("It looks to me like it's money, there are money damages here.").  The Court set a preliminary injunction hearing for October 11, 2017.  See Tr. at 25:22-27:15 (Court, Enriquez, Sager).

**4.      Unopposed Motion to Withdraw Request for a Preliminary Injunction.**

16.     The Plaintiffs subsequently moved to withdraw their request for a preliminary injunction.  See Unopposed Motion for Withdrawal of Request for Preliminary Injunction and to Vacate Hearing at 1, filed October 6, 2017 (Doc. 21)("Withdrawal Motion.").  The Defendants did not oppose the Withdrawal Motion.  See Withdrawal Motion at 1 n.1.  The Court granted the Motion, allowing the Plaintiffs to withdraw their request for a preliminary injunction and vacating the October 11, 2017, hearing.  See Order Granting Unopposed Motion for Withdrawal of Request for Preliminary Injunction and to Vacate Hearing at 1, filed October 26, 2017 (Doc. 25).

**CONCLUSIONS OF LAW**

1.      The Court will outline the generally applicable law surrounding TROs and interpreting Contracts.  It will then analyze the Motion.  The Court ultimately concludes that it will not issue a TRO.

## LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER

2.      The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1181 (D.N.M. 2011)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration.  See Fed. R. Civ. P. 65(b).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Leviton Mfg. Co., Inc. v. Nicor, Inc., 2007 WL 505796, at *3 (D.N.M. January 8, 2007)(Browning, J.)(citing Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

3.      To establish its right to preliminary relief under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

4.     In other words, in determining whether to grant injunctive relief, a court considers the following four factors:

> (i) whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest.

Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181 (citing Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992); Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999)).

5.     The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that,

although the standard overruled in <u>Winter v. Natural Resources Defense Council, Inc.</u> dealt with the irreparable-harm factor, "*Winter's* rationale seems to apply with equal force" to the likelihood-of-success factor. <u>Diné</u>, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." <u>Diné</u>, 839 F.3d at 1282.

6.       The Court has written several times on the topic of TROs and preliminary injunctions. In <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke</u>, 286 F. Supp. 3d 1239 (D.N.M. 2017)("<u>O Centro</u>"), the Court issued a preliminary injunction requiring the USCIS to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("UDV"). <u>See</u> <u>O Centro</u>, 286 F. Supp. 3d at 1269. The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"). <u>See</u> <u>O Centro</u>, 286 F. Supp. 3d at 1263-64. USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program. <u>See</u> 286 F. Supp. 3d at 1264. UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated. <u>See</u> 286 F. Supp. 3d at 1264. The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money. <u>See</u> 286 F. Supp. 3d at 1264. The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested. <u>See</u> 286 F. Supp. 3d at 1265-66. The

Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation. See Herrera v. Santa Fe Public Schools, 792 F. Supp. 2d at 1200. It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation. Herrera v. Santa Fe Public Schools, 792 F. Supp. 2d at 1182-99.

**LAW REGARDING DIVERSITY JURISDICTION AND ERIE**

7.       Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the

state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[7] If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the

---

[7]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1247 n.30. Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[8]  The Court may also rely on Tenth Circuit

---

[8]The Supreme Court of the United States of America has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where

decisions interpreting New Mexico law. See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[9] Ultimately, "the Court's task is to predict what the state

_____

the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[9]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges. If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever

federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state Supreme Court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); See Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly-erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the

time the opinion is released, is *x*.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted).  This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-

board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree. In <u>Wankier v. Crown Equipment Corp.</u>, the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the

supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at

665-66).

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

8.      In contract cases, "the role of the court is to give effect to the intention of the

contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190.

"The primary objective in construing a contract is not to label it with specific definitions or to

look at form above substance, but to ascertain and enforce the intent of the parties as shown by

---

rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an opinion of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

the contents of the instrument." <u>Bogle Farms, Inc. v. Baca</u>, 1996-NMSC-051, ¶ 21 (citing <u>Shaeffer v. Kelton</u>, 1980-NMSC-117, ¶8, 619 P.2d 1226, 1229). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" <u>Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc.</u>, 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (quoting <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991 NMSC-070, ¶ 12, 817 P.2d 238, 242). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991 NMSC-070, ¶ 12, 817 P.2d at 242. "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible <u>to vary or modify its terms</u>." <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991 NMSC-070, ¶ 12, 817 P.2d at 242 (emphasis in original)(citation omitted).

9.      The question whether an agreement contains an ambiguity is a matter of law. <u>See Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing <u>Levenson v. Mobley</u>, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted). If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235. On the other hand, when the court concludes that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing <u>Vickers v. North Am. Land Dev., Inc.</u>, 1980-NMSC-021, ¶ 9, 607 P.2d 603, 606). New Mexico courts may consider extrinsic evidence to determine "whether the

meaning of a term or expression contained in the agreement is actually unclear." <u>Mark V. Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)).  Once the court concludes that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  <u>See</u> <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To decide an ambiguous term's meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." <u>Mark V, Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  New Mexico contract law "requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract." <u>Schultz & Lindsay Const. Co.</u>, 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614.  <u>See</u> <u>Rummel v. Lexington Ins. Co.</u>, 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977 ("An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language.").

## <u>ANALYSIS</u>

10.     The Court will not issue the extraordinary relief of a TRO.  In considering whether to issue a TRO, the Court must apply a four factor balancing test.  The party seeking relief must show that: (i) the movant will suffer irreparable injury if relief is denied; (ii) the

movant is substantially likely to succeed on the merits; (iii) the movant's threatened injury outweighs the potential injury to the non-movant should the relief be granted; and (iv) the relief is in the public interest. See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 21 (2008); First Western Capital Management Co. v. Malamed, 874 F.3d at 1141; Stephens v. Jones, 494 F. App'x 906, 910 (10th Cir. 2012)(unpublished)(applying the four factor test, which governs requests for preliminary injunctions, to requests for TROs).[10] See also Fed. R. Civ. P. 65. The Tenth Circuit has recently emphasized that "a showing of probably irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," so "the moving party must first demonstrate that such injury is likely before the other requirements will be considered." First Western Capital Management Co. v. Malamed, 874 F.3d at 1141. See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 353 F.3d 1256, 1260 (10th Cir. 2004). Accordingly, the Court first turns to whether the Plaintiffs will suffer irreparable injury before considering the other factors. Although the Plaintiffs assert a variety of harms, their primary complaint appears to be "diminished revenue" resulting from Wyndham Hotel and Microtel Inn barring the Plaintiffs from booking customers with Wyndham Hotel's computer reservation system, and from Wyndham Hotel delisting the Microtel Inn hotel from online booking services,

---

[10]Stephens v. Jones is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Stephens v. Jones has persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

such as Expedia.com.  State Motion at 10.  See id. at 2-3.  Diminished revenue is, however, a monetary harm, for which equitable relief is not typically available.  See First Western Capital Management Co. v. Malamed, 874 F.3d 1136, 1141 (10th Cir. 2017)("Regarding irreparable harm, the movant must demonstrate a risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.").  The Court also concludes that the Plaintiffs have not shown a substantial likelihood of success on the merits.  The Contract permits Wyndham Hotel and Microtel Inn to terminate the Contract if the Plaintiffs receive "three (3) notices of default . . . within a twelve (12) month period, regardless of whether the defaults are cured."  Contract at 22.  Wyndham Hotel and Microtel Inn gave three notices of default within a twelve month period, see March Default Notice at 1; April Default Notice at 1; October Default Notice at 1, so were entitled to terminate the Contract, see Contract at 22.  Although the other two factors to consider -- the balance of equities and the public interest -- weigh towards granting a TRO, the Court concludes that the irreparable-injury and substantial-likelihood-of-success-on-the-merits factors overcome the other two.  See Nken v. Holder, 556 U.S. 418, 434 ("The first two factors of the traditional standard are the most critical.").  Accordingly, the Court denies the Plaintiffs' request for a TRO.

## I.     THE PLAINTIFFS' INJURY IS NOT IRREPARABLE.

11.     The Plaintiffs contend that two harms result from the Contract's termination: (i) "harm to the goodwill and reputation of the Hotel"; and (ii) "destruction of their business."  State Motion at 9.  According to the Plaintiffs, destruction of the business will result, because of: (i) "diminished revenue," arising from Wyndham Hotel delisting the Microtel Inn hotel from internet websites and blocking the Plaintiffs from accessing Wyndham Hotel's reservation

system; (ii) the Plaintiffs' inability to transition to a new hotel franchisor, who would cover the Plaintiffs' costs, because the Contract termination was "abrupt." State Motion at 10. See Tr. at 4:2-6 (Enriquez)("[T]he termination . . . will result in debts that our client has, they will become due, taxes that our client will owe will go unpaid as a result of not having a revenue stream."). Considering the Plaintiffs' contentions at this early stage, with a slim factual record, the Court concludes that the Plaintiffs' purported irreparable good will and business injuries are merely "theoretical" and not "certain, great, [and] actual," as the law requires. New Mexico Dep't of Game and Fish v. United States Dep't of the Interior, 854 F.3d 1236, 1251 (10th Cir. 2017).

12.     In general, if monetary damages are calculable, the harm is not irreparable. See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1263-64; Heidman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003)("[S]imple economic loss usually does not, in and of itself, constitute irreparable harm."). Irreparable harm exists, however, when "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position" exist. Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1264. Irreparable injury can also occur if the company's "very existence [is] threatened," because the damages, should the entire business fail, are difficult to calculate. Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1264.

13.     Any loss-of-revenue harm that results from the Contract's termination is most likely calculable. Because the Microtel Inn hotel has been in operation since October, 2013, see FAC ¶ 63, at 13, there are several years of data demonstrating what a normal revenue stream is to which a jury or the Court can compare the hotel's revenue stream after the Contract's

termination. Thus, with a simple calculation, either a jury or the Court can later determine the amount of revenue that the Plaintiffs lost because of the Contract's termination.[11]

14.    Although the revenue lost appears to be calculable, the Court's inquiry is not concluded, because it must consider whether the lost revenue is "certain" to result in the business' destruction. New Mexico Dep't of Game and Fish v. United States Dep't of the Interior, 854 F.3d at 1251. The Plaintiffs argue that their business is in jeopardy, because their reservation numbers have precipitously declined. See Tr. at 3:16-17 (Enriquez)(stating that, within the first two weeks of the Contract's termination, reservations had dropped by ninety percent). That decline, purportedly, results from two causes. First, the Plaintiffs are no longer able to use Wyndham Hotel's internal system to book reservations. See Tr. at 3:13-15 (Enriquez). This problem, however, seems manageable. Hotels, and their predecessors -- inns and taverns -- have been logging reservations and staying in business for centuries without computer systems. See Werner v. Corporation of Washington, 2 Hay. & Haz. 175, 175 (D.C. Cir. 1854)("The establishment [of public inns and taverns] has been found indispensably needful for the public convenience from the earliest periods of time."); Luke 2:7 (King James)("And she brought forth her firstborn son, and wrapped him in swaddling clothes, and laid him in a manger; because there was no room for them in the inn."). Moreover, this is not a resort with a thousand or more rooms; it is a seventy-room hotel. See State Motion at 2. There is nothing before the Court to suggest that the Plaintiffs cannot create a makeshift reservation log with spreadsheet software or with, if all else fails, pen and paper to keep track of its guests and their stays for a short time until the Plaintiffs secure a new reservations system. The Court acknowledges that

_____

[11]Likewise, any fees that accumulate, because of unpaid debts, are also calculable based on the terms and conditions of the Plaintiffs' agreements with those debtholders.

keeping track of guests by hand may not be the most efficient or elegant way to run a hotel, but it can be done.

15.     Second, the Plaintiffs allege that the reservation decline has resulted from Wyndham Hotel delisting their Microtel Inn hotel from hotel-booking websites.  See Tr. at 3:17-19 (Enriquez).  Although the Court is inclined to think that delisting a hotel, or otherwise diminishing a hotel's online presence, will cause a revenue drop, that inclination does not lead the Court to conclude that the Plaintiffs' Microtel Inn hotel is certain to fail.  New Mexico Dep't of Game and Fish v. United States Dep't of the Interior, 854 F.3d at 1251 ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.").  First, the Plaintiffs' online presence does not appear to have been completely eradicated.  The Plaintiffs' hotel with a listed local phone number still appears when the Court Google searches "Aztec New Mexico hotel."  https://bit.ly/2xxKple.  Second, there does not appear to be anything precluding the Plaintiffs from listing their hotel on hotels.com or on other hotel websites under a different name.  See Tr. at 18:1-2 (Sager).  Certainly, a new name will have less brand recognition than Wyndham Hotel or even Microtel Inn and Suites.  Plenty of hotels, however, continue to exist without a well-known brand, such as Wyndham or Hilton or Hyatt, attached to their name.  See, e.g., Hotel Encanto, https://www.hotelencanto.com/; MCM Elegenté Hotel, http://www.mcmelegantealbuquerque.com/.  Indeed, there are at least three hotels in Aztec's immediate vicinity that do not have a brand name.  See Step Back Inn, http://stepbackinn.com/; Miss Gail's Inn, https://bit.ly/2xxKple; Enchantment Lodge, https://bit.ly/2xxKple.  Apart from internet advertising, the Plaintiffs could increase business in other ways.  They could drop their room prices, or they could advertise via other media, such as with billboards on the highway.

Indeed, there is evidence that the Plaintiffs already market their hotel in the local community via media other than the internet -- i.e. sponsoring "youth groups, Carrie Tingly Children's Hospital, and Mosaic School Academy in Aztec." Blue Declaration ¶ 20, at 5. To be sure, the purported ninety percent drop in reservations within the first two weeks of the Contract's termination is, at first glance, alarming. See Tr. at 3:16-17 (Enriquez). The Court notes, however, that two weeks is a small sample size and that the Plaintiffs do not detail to what the ninety percent drop is in relation. If it is a ninety percent drop from the previous weeks' reservations, it could still fall within a normal business range if the last two weeks in September typically receive fewer reservations than the first two weeks in September -- weeks which includes the Labor Day weekend. Record evidence in fact suggests that, before the Contract's termination, the Plaintiffs had already projected an eighty-one percent decline in reservations from third-party websites between the first eighteen days in September and the last ten days in September. See Bailey Declaration ¶ 13, at 3-4.[12] The Court is also mindful that travelers often reserve hotel rooms weeks if not months in advance. Even with a ninety percent drop-off in reservations, the Plaintiffs' hotel is unlikely to feel the full brunt of that drop-off until some point in the future. Thus, it is unlikely that there is high risk of the business immediately failing, i.e., failing before a preliminary injunction hearing. Moreover, the drop in reservations does not take into account some of the mitigating actions just explained that the Plaintiffs could take to buoy their business. Given the exacting standard of "certain" irreparable harm, the Court is unpersuaded that delisting

---

[12]The Microtel Inn hotel's general manager attests that they received one-hundred and seventy-four reservations from third-party websites between September 1, 2017, and September 18, 2017, but projects only forty reservations from third-party websites between September 21, 2017, and September 30, 2017. See Bailey Declaration ¶ 13, at 3-4.

a hotel from a website, even coupled with evidence of a reservation drop, means that the Plaintiffs' hotel is certain to fail.  See New Mexico Dep't of Game and Fish v. United States Dep't of the Interior, 854 F.3d at 1251.[13]

16.    With regard to reputational harm or loss of client goodwill, the Court concludes that there is some loss of goodwill.  The Plaintiffs' only explanation for what they mean by goodwill is the business reputation that flows from a franchisor lending a franchisee its brand name.  See State Motion at 11.  It follows, according to the Plaintiffs, that they lost that goodwill when they lost the Wyndham Hotel and Microtel Inn brand name.  See State Motion at 11.  A more precise definition of goodwill, which the Court adopts, is "the expectancy of continued patronage."  Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555 (1993).[14]  Many courts discussing goodwill in the franchisor-franchisee relationship have suggested that client goodwill or expected patronage remains with the franchisee for some time after the franchisor removes its name.  See e.g., Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C., 636 F.

---

[13]The Court is also unpersuaded that the Contract termination's short notice caused irreparable harm.  See State Motion at 10-11.  The only irreparable harm short notice could cause is destruction of the Plaintiffs' business.  The Court's conclusions above are premised on the actions the Plaintiffs could take from the moment of Contract termination, so already account for short notice.

[14]Justice Joseph Story's lengthier definition of goodwill captures the same concept:

"[G]ood will [is] the advantage or benefit which is acquired by an establishment, beyond the mere value of the capital, stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessity, to even from ancient partialities or prejudices."

Metropolitan Nat. Bank v. St. Louis Dispatch Co., 149 U.S. 436, 446 (1893)(quoting J. Story, Partnerships § 99 (1841)).

Supp. 2d 1237, 1249 (D. Utah 2009)(Waddoups, J.)("Bad Ass Coffee"); Quizno's Corp. v. Kampendahl, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002)(Pallmeyer, J.). For example, in Bad Ass Coffee, the Honorable Clark Waddoups, United States District Judge for the District of Utah, determined that the franchisee -- Java Cove -- which shed its franchisor's name -- Bad Ass Coffee Company of Hawaii -- retained many of its former Bad Ass Coffee Company of Hawaii customers after the rebrand. See 636 F. Supp. 2d at 1249. Indeed, instead of the franchisee losing customer goodwill, it was the franchisor that lost the goodwill. See 636 F. Supp. 2d at 1249 ("Defendants' overnight switch to Java Cove may send the message to potential customers that [Bad Ass Coffee Company of Hawaii] endorses Java Cove, or that the Defendants no longer stand by [Bad Ass Coffee Company of Hawaii].").  See also Quizno's Corp. v. Kampendahl, 2002 WL 1012997, at *7 (concluding that a former franchisee of Quizno's continued to reap Quizno's goodwill after the franchise agreement terminated, because "the location became associated with Quizno's.").

17.     A lesson to be drawn from those cases is that, in terms of expected patronage, all else remaining the same, a name change will not dissuade repeat customers. A coffee lover who always goes to Bad Ass Coffee Company of Hawaii will continue to frequent that particular location for coffee even if the shop changes its name to Java Cove. Those cases do not consider, however, that Java Cove might lose those out-of-town customers who have heard of Bad Ass Coffee Company of Hawaii, but not Java Cove. Estimating that lost patronage is difficult to calculate. See, e.g., Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1192 (10th Cir. 2009)("[I]t is so difficult to prove the value of goodwill."). Unlike a coffee company, which draws a lot of local, repeat customers, hotels, almost by definition, draw new customers most of

whom have traveled from far-flung locations. To be sure, some might be repeat customers. Often those who travel to the same place for work will stay at the same hotel, even if there are other hotel options in the area. The oil and gas industry is booming right now, so Aztec might have a lot of repeat patrons who are traveling to the area for work. Other repeat customers could include folks temporarily out of their home, because of house problems. Many of the Plaintiffs' customers, however, are unlikely to visit Aztec again. Accordingly, the brand name would have an outsized effect on expected patronage. Someone who has stayed at a Wyndham Hotel property -- and had a good experience -- is more likely to select another Wyndham Hotel property in a new location than he or she would select a hotel with no brand-name connection. The Court concludes accordingly that the brand-name loss will cause the Plaintiffs to lose some goodwill.

18. Although the Court determines that there is a loss of goodwill, it still does not conclude that there is irreparable harm. Mere loss of goodwill does not require an irreparable harm conclusion; rather, it is one factor, among many to be considered, which suggests irreparable harm. See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1263. Indeed, "serious or substantial harm is not irreparable harm." Schrier v. University of Colorado, 427 F.3d 1253, 1267 (10th Cir. 2005). Loss of goodwill might not be measurable, but it is not necessarily irreparable. Companies can, over time, regain or exceed prior expectations of patronage. Another consideration that weighs on the Court's mind is the information imbalance between it and the Plaintiffs. The Motion is brought at this litigation's early stage. The Court has only the pleadings, the parties' arguments, the Contract, and some other miscellaneous evidentiary documents. In contrast, the parties have direct knowledge of all of

their negotiations, their business interactions, and, most importantly, the Plaintiffs have intimate knowledge of their business' balance sheets.    Given the information that the Plaintiffs have, the Court is struck that the Plaintiffs have chosen to sue to rescind the Contract.    Should they succeed, they will have voluntarily relinquished the goodwill associated with the Wyndham Hotel and Microtel Inn brand names -- the same goodwill they assert will cause them irreparable harm if they lose it.    The Court concludes that it is unlikely that the Plaintiffs, with access to all of that information, would have chosen to sue to rescind if they had calculated that such a rescission would result in irreparable harm.[15]    Given the extraordinary burden the Plaintiffs have, the Court concludes that, on balance, with one factor weighing toward irreparable harm, but with serious reason to doubt that true irreparable harm exists, the Plaintiffs have not established irreparable harm for a TRO.

## II.    THE PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

19.    The Court also concludes that the Plaintiffs are unlikely to succeed on the merits.[16]    The Plaintiffs' main contention is that the Contract's termination was invalid, because,

---

[15]This conclusion is premised on the assumption that the Plaintiffs are rational actors. The Court has no reason to suspect the Plaintiffs of irrationality.    It is possible that the Plaintiffs made a calculation that, in the long run, there would not be irreparable harm connected with rescission, but in the short run, there might be irreparable harm, because their business would collapse.    The Court has, however, already rejected the certainty of business-collapse as a reason to determine that there is irreparable harm.    See supra, at 41-44.    Even if the Plaintiffs made such a calculation, it would still not warrant a conclusion of irreparable harm.

[16]Because the Court concludes that the irreparable harm factor counsels against the Plaintiffs, the Court does not need to address the Plaintiffs' argument that, because "the first three factors . . . support [a] grant of injunctive relief, the final factor for substantial likelihood of success on the merits becomes less strict."    Motion at 6.    The Court notes, however, that the Court has dealt with such an argument before and concluded   that, after Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008)("Winter"), such a relaxed standard is no longer good law.    See Diné Citizens Against Ruining Our Environment v. Jewell, 2015 WL

contrary to the Contract's terms, the July Default Notice did not state the Contract termination

date.  See State Motion at 12-13.  They secondarily contend that the Contract termination is

contrary to Wyndham Hotel's oral representations to Blue that it would not terminate the

Contract "while the parties resolved their legal disputes."  State Motion at 13.  See Blue

Declaration ¶ 15, at 4.

> 20.    The standard for prevailing on the
>
> substantial-likelihood-of-success prong is that the movant must (i) carry the
> burden of production, i.e., he or she must present a prima facie case; and (ii) make
> it reasonably likely -- beyond just being not unreasonable -- that the factfinder
> would actually find for the movant, i.e., that the movant would satisfy the burden
> of persuasion.

Diné Citizens Against Ruining Our Environment v. Jewell, 2015 WL 4997207, at *36.  See Diné

Citizens Against Ruining Our Environment v. Jewell, 839 F.3d at 1282.  The Plaintiffs have not

carried their burden of persuasion.  The Contract's relevant provisions read:

> Default with Opportunity to Cure.  We have the right to terminate this Agreement,
> effective on the date stated in our written notice (or the earliest date permitted by
> applicable law). if:
>
> > (a)    you fail to pay us or any of our affiliates fees or other amounts due
> > under this Agreement . . . .
>
> . . . .
>
> Default Without Opportunity to Cure (Immediate Termination by Us).  We may
> terminate this Agreement without giving you an opportunity to cure the default
> effective upon written notice to you (or such later date as required by law), if:
>
> . . . .

---

4997207, at *36 (D.N.M. Aug. 15, 2015)(Browning, J.).  The Tenth Circuit agreed, affirming the
Court and determining that, "[u]nder Winter's rationale, any modified test which relaxes one of
the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné
Citizens Against Ruining Our Environment v. Jewell, 839 F.3d 1276, 1282 (10th Cir. 2016).
Accordingly, the Plaintiffs' argument is incorrect as a matter of law.

> (s)    you receive from us three (3) notices of default of this Agreement within a twelve (12) month period, regardless of whether the defaults are cured by you.

Contract at 20-22. "Where a contract provides for a manner by which termination can be effected, those provisions must ordinarily be enforced as written." Smith v. Price's Creameries, Div. of Creamland Dairies, Inc., 1982-NMSC-102, ¶ 20, 650 P.2d 825, 830.

21.    Because Blue received three notices of default in a twelve-month period, see March Default Notice at 1; April Default Notice at 1; October Default Notice at 1, the Contract's plain language suggests that Wyndham Hotel and Microtel Inn properly terminated the contract, see Contract at 22 ("We may terminate this Agreement without giving you an opportunity to cure . . . if: . . . you receive from us three (3) notices of default of this Agreement within a twelve (12) month period."). That termination provision does not require Wyndham Hotel and Microtel Inn to state a date of termination on the written notice, obviating the Plaintiffs' main contention. See State Motion at 12-13 ("Under the Microtel Franchise Agreement, Wyndham was required to provide a date certain of termination in its notice.").

22.    Three factors might, however, counsel against such a conclusion. First, Wyndham Hotel and Microtel Inn sent the notices in 2015, but Wyndham Hotel and Microtel Inn did not terminate the Contract until 2017. Second, in that interim period, the Plaintiffs made payments to Wyndham while negotiations about the fees were ongoing. See Bailey Declaration ¶ 4, at 2 ("Between October 2015 and July 2017, the Hotel has made payments to Wyndham in the amount totaling approximately $42,000.00."). Third, Wyndham Hotel representatives told Blue during negotiations over the fees that Wyndham Hotel would not "shut off the Hotel's access to [Wyndham Hotel's] central reservation system or Wyndham My Portal

Communications website" nor would they "pursue collection of the amounts" while "the parties were discussing a workable solution. Blue Declaration ¶¶ 12, 16, at 3-4. The Plaintiffs argue that these three factors demonstrate a course of conduct that overrides the Contract's termination provisions. See Tr. at 9:12-16 (Enriquez)("So there was a course of conduct that had been established between plaintiffs and defendant and to go back and rely on those three notices from two plus years ago [would be] unfair to my client."). See also Blue Declaration ¶ 17, at 5 ("Given this course of conduct between Presidential and Wyndham, I was le[]d to believe . . . that I would be notified if negotiations had ended and before suit was filed or booking services terminated.").

23.     Course of conduct can be grounds to create an implied contract between parties. See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 10, 773 P.2d 1231, 1234; Kestenbaum v. Penzoil, 1988-NMSC-092, ¶ 6, 766 P.2d 280, 282. "To create an implied contract, the offer or promise must be sufficiently explicit to give rise to reasonable expectations." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 13, 857 P.2d 776, 783. "Implied-in-fact contracts are based on parties' mutual assent as manifested by their conduct." Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 15 n.1, 918 P.2d 7, 11 n.1. Implied-contract caselaw in New Mexico has been robustly developed in the employer-employee context. See, e.g., Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 2002-NMSC-004, ¶¶ 23-24, 41 P.3d 333, 341-42; Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶¶ 10-13, 918 P.2d at 10-11; Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 13, 857 P.2d at 783; Kestenbaum v. Penzoil, 1988-NMSC-092, ¶ 6, 766 P.2d at 282. In those cases, an implied contract is typically premised, in addition to course of conduct, on an employee manual suggesting that certain

manual terms apply to the employer-employee relationship, and thus limit the general New Mexico rule of at-will employment.  See e.g., Beggs v. City of Portales, 2009-NMSC-023, ¶ 13-16, 210 P.3d 798, 801-02; Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, 918 P.2d at 10-11.  See also Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1150 (D.N.M.  2011)(Browning, J.).  Moreover, an implied contract is more likely to exist should the course of conduct occur "over an extended period of time."  Beggs v. City of Portales, 2009-NMSC-023, ¶ 16, 210 P.3d at 801-02.  See Trujillo v. Chavez, 1966-NMSC-175, ¶ 7, 417 P.2d 893, 895 ("In view of the undisputed long-standing conduct of the parties, courts cannot fail to conclude as a matter of law that an arrangement for payment existed between them.").  Courts are typically hesitant to "imply a contract by course of conduct 'when there is an existing valid express contract embracing the same subject.'"  Russell v. New Mexico Interstate Stream Commission, 2014 WL 12650654, at *8 (D.N.M. Aug. 29, 2014)(Gonzales, J.)(quoting Wolfe v. Prairie Oil & Gas Co., 83 F.2d 434, 438 (10th Cir. 1936)(construing Oklahoma law))).  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 29, 218 P.3d 75, 84 ("The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter.").

24.    The Tenth Circuit, in an old case, has determined that implied contracts can form in contexts other than employer-employee relationships.  See City of Roswell v. Mountain States Telephone & Telegraph Co., 78 F.2d 379, 386 (10th Cir. 1935)("Mountain States Telephone").  In that case, the city of Roswell granted a twenty-five year contract,[17] which would expire in

_____

[17]The Tenth Circuit opinion refers to the contract as a "franchise," but the Court concludes that the contract is more akin to a public-utility service agreement rather than the franchise agreement among Wyndham Hotel, Microtel Inn, and the Plaintiffs, in which

1919, to the Roswell Telephone & Manufacturing Company to maintain Roswell's "poles, wires, appliances, and equipment in the streets, alleys, and other public places." Mountain States Telephone, 78 F.2d at 380. The Roswell Telephone & Manufacturing Company later assigned the contract to the Colorado Telephone Company, which continued to maintain the poles and wires and paid all appropriate annual fees for fourteen years beyond the contract's expiration date. See 78 F.2d at 381. The Tenth Circuit determined that, by accepting those fees for so many years beyond the expiration date, Roswell and the Colorado Telephone Company entered "an implied agreement of indefinite duration, terminable within a reasonable time after their acceptance has ceased." 78 F.2d at 386.[18] In a much more recent case, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, construing New Mexico law, determined that an implied contract existed between a municipality and a public utility company,

_____

Wyndham Hotel and Microtel Inn has licensed its name and trademarks. Mountain States Telephone, 78 F.2d at 381. In Mountain States Telephone, Roswell was not lending its name and trademarks to the telephone company; instead, Roswell was granting the telephone company the exclusive right to maintain its telephone wires. See 78 F.2d at 380-81. Although New Mexico law still refers to service agreements between municipalities and public utility companies as "franchises," N.M. Stat. Ann. § 3-42-1, the Court refers to the "franchise" in Mountain States Telephone as a contract to avoid confusion, 78 F.2d at 381.

[18]Although the case is applying New Mexico law in some instances, the Court determines that the relevant portion for the Court's purposes -- the implied-contract discussion -- is not binding. Mountain States Telephone was decided before Erie. Given that the case antedates Erie, the Court concludes that the Tenth Circuit would not have felt bound to interpret and apply New Mexico contract law. Moreover, for its conclusion that an implied contract exists, the Tenth Circuit does not cite New Mexico cases; it instead cites cases from the Supreme Court, the United States Court of Appeals for the Fourth Circuit, the Supreme Court of Iowa, and the Supreme Court of North Carolina. See Mountain States Telephone, 78 F.2d at 386 (citing Denver v. Denver Union Water Co., 246 U.S. 178 (1918); Hill v. Elizabeth City, 298 F. 67 (4th Cir. 1924); State v. Des Moines City Ry. Co., 140 N.W. 437 (Iowa 1913); Elizabeth City Water & Power Co. v. Elizabeth City, 124 S.E. 611 (N.C. 1924)). Accordingly, it appears likely that the Tenth Circuit was not interpreting and applying New Mexico contract law, but interpreting and applying the general federal common law of contracts. Accordingly, the Court concludes that Mountain States Telephone is only persuasive authority.

even though an express contract had expired, because the utility company's "use of the rights of way and payments to the City have continued." Quest Corp. v. City of Santa Fe, 2013 WL 12241269, at *3 (D.N.M. April 5, 2013)(Brack, J.)("Quest Corp.").

25.     Another theory upon which the Plaintiffs may be relying is waiver. "Generally, New Mexico cases have defined waiver as the intentional relinquishment or abandonment of a known right." J.R. Hale Contracting Co., Inc. v. United New Mexico Bank at Albuquerque, 1990-NMSC-089, ¶ 11, 799 P.2d 581, 585 ("J.R. Hale"). "[T]he intent to waive contractual obligations or conditions may be implied from a party's representations that fall short of an express declaration of waiver or from his conduct." J.R. Hale, 1990-NMSC-089, ¶ 11, 799 P.2d at 585. Distilling several related strands of precedent, the Supreme Court of New Mexico has recognized three potential grounds for finding waiver:

> (1) actual waiver, either express or implied in fact, not supported by consideration, which may be retracted in the absence of detrimental reliance; (2) modification, which is not subject to retraction, based upon mutual agreement to waive certain obligations or conditions and the exchange of consideration; or (3) waiver by estoppel based upon either an actual waiver or certain "expressions or conduct" where the reliance of the opposite party and his change of position justifies the inhibition to assert the obligation or condition

J.R. Hale, 1990-NMSC-089, ¶ 13, 799 P.2d at 586. Accepting payment notwithstanding a contract breach can be evidence of waiver. See J.R. Hale, 1990-NMSC-089, ¶ 21, 799 P.2d at 588 ("When a party accepts a late payment on a contract without comment he waives the default that existed."); Easterling v. Peterson, 1988-NMSC-030, ¶ 6, 753 P.2d 902, 903 ("Acceptance of rent with knowledge of an existing breach constitutes a waiver of the right of forfeiture for such breach."). A time delay in asserting rights does not necessarily mean that a party has waived its rights. See Brown v. Jimerson, 1980-NMSC-125, ¶ 7, 619 P.2d 1235, 1236 ("[W]e cannot say

that appellees intended to relinquish their rights by not asserting them for some sixteen to twenty months."); Molybdenum Corp. of America v. Brazos Engineering Co., 1970-NMSC-098, ¶ 6, 472 P.2d 971, 972 ("Mere delay in rescinding a contract does not amount to a waiver of the right to rescind.");

26.     Given these two potential theories -- implied contract and waiver -- the Court concludes that waiver is the correct analytical framework to apply.  The relevant question is whether Wyndham Hotel and Microtel Inn properly terminated the Contract.  There is no question that, until the Termination Notice, the Contract was in effect.  Should the Court apply an implied contract theory to override a contract's express provision governing the parties' relationship, the Court, in effect, would be deciding whether Wyndham Hotel and Microtel Inn, through conduct, waived or modified the existing Contract.  Cf. Russell v. New Mexico Interstate Stream Commission, 2014 WL 12650654, at *8 ("The Court will not imply a contract by course of conduct when there is an existing valid express contract expressing the same subject."); Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 29, 218 P.3d 75, 84 ("The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter."); Smith v. Price's Creameries, Div. of Creamland Dairies, Inc., 1982-NMSC-102, ¶ 20, 650 P.2d at 830 ("Where a contract provides for a manner by which termination can be effected, those provisions must ordinarily be enforced as written.").  Given that reality, waiver is the most proper precedent to apply.

27.     Considering both the time lapse between the October Default Notice and Wyndham Hotel's termination of the Contract, and the Plaintiffs continued payments in that time period, the Court concludes that there was no actual waiver and no waiver by modification.  The

time lapse between the time Wyndham Hotel could terminate the contract without affording the Plaintiffs' an opportunity to cure and when Wyndham Hotel terminated the contract was twenty-three months, see October Default Notice at 1; Termination Notice at 1, which is not so far afield from time lapses that the Supreme Court of New Mexico has already confirmed are not waivers, see Brown v. Jimerson, 1980-NMSC-125, ¶ 7, 619 P.2d 1235, 1236 ("[W]e cannot say that appellees intended to relinquish their rights by not asserting them for some sixteen to twenty months."). As for accepting payments, that conduct is evidence of waiver when the "a party accepts late payment on a contract without comment." J.R. Hale, 1990-NMSC-089, ¶ 21, 799 P.2d at 588 (emphasis added). Wyndham Hotel and Microtel Inn, however, repeatedly commented that they were not waiving their right to terminate by continuing their relationship. For example, the March Default Notice, the October Default Notice, and the July Default Notice contain express provisions that Wyndham Hotel and Microtel Inn "reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in Microtel Inn and Suites by Wyndham System." March Default Notice at 1; October Default Notice at 1; July Default Notice at 1. Moreover, each of those default notices also rejects the contention that Wyndham Hotel or Microtel Inn is modifying the Contract: "This Notice does not modify, replace, or affect any default under the Agreement. . . . We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system." March Default Notice at 1; October Default Notice at 1; July Default Notice at 1. Accordingly, the Court concludes that there is no actual waiver or waiver by modification based on the time lapse or Wyndham Hotel's and Microtel Inn's acceptance of payments. See J.R. Hale, 1990-NMSC-089, ¶ 22, 799 P.2d at

588 (concluding that there is no modification by waiver, if a party does not "intend[] to waive its right").

28.     The Court also concludes that there is no waiver by estoppel based on the payments or time lapse.  To show waiver by estoppel, the Plaintiffs must have changed their position based on a reasonable interpretation of Wyndham Hotel or Microtel Inn's actions.  See J.R. Hale, 1990-NMSC-089, ¶ 13, 799 P.2d at 586.  A time lapse alone does not demonstrate that the Plaintiffs changed their position; a time lapse is simply the lack of action.  Continued payments could be a change in position, but only if they were sums that the Plaintiffs were not already obligated to pay.  See Brown v. Jimerson, 1980-NMSC-125, ¶¶ 7-8, 619 P.2d at 193 (concluding that there was no waiver by estoppel where "[t]he only detriment appellants can show is that they will have to pay sums to the officers which they were already obligated to pay.").  On a motion for a TRO, the Plaintiffs have the burden of production, and the only factual evidence about the payments is that the Plaintiffs made payments of about "$42,000.00" between "October 2015 and July 2017."  Bailey Declaration ¶ 4, at 2.  There is nothing to suggest these payments were anything other than what the Plaintiffs already owed to Wyndham Hotel and Microtel Inn under the Contract.  Accordingly, there is no waiver by estoppel based on the time lapse in terminating the Contract or the continued payments made.

29.     The final facts, which the Plaintiffs contend show waiver, are representations from Wyndham Hotel representatives to Blue in January, 2017, and to Blue at some time after July, 2017.  Specifically, a Wyndham Hotel representative told Blue on January 23, 2017, that "Wyndham would not pursue collection of the amounts due as long as the parties were discussing a workable solution."  Blue Declaration ¶ 12, at 3 ("January Statement").  A different

representative told Blue some time after July 12, 2017, that, "while we worked together on a workable solution, Wyndham would not shut off the Hotel's access to the central reservation system ("CRS") or Wyndham My Portal Communications website." Blue Declaration ¶ 15, at 4 ("July Statement"). Neither statement can constitute an express or implied waiver, because there is no language about forever relinquishing Wyndham Hotel's and Microtel Inn's right to terminate. The January Statement concerns Wyndham Hotel's and Microtel Inn's right to collect, see Blue Declaration ¶ 12, at 3, so it cannot be an express or implied waiver of termination. The July Statement is not an express or implied waiver, see Blue Declaration ¶ 15, at 4, because it reaffirms Wyndham Hotel's and Microtel Inn's right to terminate. At best, it modifies when that right to terminate can be exercised. If the July Statement was some sort of modification, however, there was no consideration exchanged for it, so the modification is not legally enforceable. See J.R. Hale, 1990-NMSC-089, ¶ 13, 799 P.2d at 586 (concluding that modification requires an "exchange of consideration"). Moreover, that Wyndham Hotel and Microtel Inn sued the Plaintiffs in New Jersey after those representations, see Blue Declaration ¶ 16, at 4, would suggest that negotiations had collapsed, so, even if there was a modification, Wyndham Hotel and Microtel Inn would have regained their right to terminate. Finally, there is insufficient evidence to conclude that the Plaintiffs detrimentally relied on the Wyndham Hotel representatives' statements to create a modification by estoppel. The Plaintiffs state that they "recently spent $5,000 in marketing the hotel in the local community and local groups," Blue Declaration ¶ 20, at 5. While perhaps this is some evidence of detrimental reliance, there are too many questions about this fact for the Court to conclude that the Plaintiffs are substantially likely to succeed on the merits. See Nken v. Holder, 556 U.S. 418, 434 (2009)("More than a mere

possibility of relief is required.").  For example, there is nothing telling the Court when the Plaintiffs planned the marketing event.  The Plaintiffs could have planned to market to local groups early in the year before either Wyndham Hotel representation.  The Plaintiffs could also still benefit from the marketing event regardless of the Contract's termination.  Buzz in the community about the hotel could lead to reservations regardless of the hotel's name.  Thus, the reliance might not be detrimental.  Accordingly, the Court concludes that the Plaintiffs are not substantially likely to succeed on the merits.[19]

## III.    THE BALANCE OF HARMS FAVORS THE PLAINTIFFS.

30.    Should the Court enforce the Contract, Wyndham Hotel and Microtel Inn would not suffer any appreciable harm.  The Plaintiffs assert that, if the Court enforces the Contract, Wyndham Hotel and Microtel Inn will reap a benefit, because the Plaintiffs will owe them additional royalty payments for the time the Contract is in effect.  See State Motion at 13, 16. That argument assumes, of course, that the Plaintiffs will  pay Wyndham Hotel and Microtel Inn what they owe.  Given the Plaintiffs' past failure to pay dues, that assumption is questionable. Nevertheless, the Court cannot see how enforcing the Contract will harm Wyndham Hotel. Wyndham Hotel does not even argue this factor.  See Response at 9-11.    In contrast, the Plaintiffs have shown that the Contract's termination has harmed them with a loss of revenue. See Bailey Declaration ¶ 13, at 3-4; State Motion at 9-10.  On balance, the Court concludes that this factor favors the Plaintiffs.

---

[19]The Court considers only the merits of the Contract's interpretation.  The FAC's underlying merits, and the Plaintiffs' relative success on the FAC, are not tied to the relief they request here.  In fact, the relief requested here and the relief requested in the FAC are opposed. Accordingly, the FAC's merits do not bear on the Court's TRO analysis, so the Court does not consider them.

## IV.  A TRO WEIGHS IN FAVOR OF THE PUBLIC INTEREST.

31.    Enforcing the Contract favors the public interest.  The Plaintiffs argue that, absent the Contract, they will be forced to lay off some of their employees and will be unable to pay some of their vendors.  See Tr. at 5:13-21 (Enriquez).  There is record evidence to support this contention, because the Plaintiffs are losing revenue.  See Bailey Declaration ¶ 13, at 3-4.  It follows that a loss in revenue, especially a substantial loss in revenue, will cause the Plaintiffs to lay off some of their employees and default on some of their obligations.  The Defendants do not contest this factor.  See Response at 9-11.  Independently, the Court cannot see how enforcing the Contract would lead to public harm outweighing the public harms associated with allowing the Contract's termination.  Accordingly, this factor weighs in the Plaintiffs' favor.

32.    Although this factor and the balance-of-equities factor weighs toward issuing a TRO, the irreparable-harm and substantial-likelihood-of-success-on-the-merits factor weigh against issuing one.  The latter two factors, however, are "the most critical."  Nken v. Holder, 556 U.S. at 434.  Because the irreparable-harm and substantial-likelihood-of-success-on-the-merits factor weigh against issuing a TRO, the Court will deny the Motion and the State Motion.

**IT IS ORDERED** that: (i) the relief requested in the Motion for Temporary Restraining Order and Preliminary Injunction in Federal Court, filed September 27, 2017 (Doc. 8), is denied; and (ii) the relief requested in the Plaintiffs' Petition for Temporary Restraining Order and Preliminary Injunction (Eleventh Judicial District Court, County of San Juan, State of New Mexico), filed in state court September 22, 2017, filed in federal court September 26, 2017 (Doc. 1-2), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Bobbie Jo Collins
Lewis Roca Rothgerber Christie LLP
Albuquerque, New Mexico

-- and --

E. Martin Enriquez
Anovven Law
Greenwood Village, Colorado

 *Attorneys for the Plaintiffs*

Rufus E. Thompson
Elizabeth Ann Martinez
Modrall, Sperling, Roehl, Harris & Sick, PA
Albuquerque, New Mexico

-- and --

David S. Sager
Steven R. Marino
DLA Piper
Short Hills, New Jersey

 *Attorneys for the Defendants*