# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PRESIDENTIAL HOSPITALITY, LLC,
a New Mexico limited liability
company; ACE DEVELOPMENT,
INC., a New Mexico Corporation and
SAM BLUE,

       Plaintiff,

vs.                                                No. CIV 17-0981 JB/JHR

WYNDHAM HOTEL GROUP, LLC, a
New Jersey limited liability company;
BAYMONT INN AND SUITES
FRANCHISE SYSTEMS, INC., a
Delaware Corporation and MICROTEL
INN AND SUITES FRANCHISING,
INC., a Georgia corporation,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Brief in Support of Motion

to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), filed September 29, 2017

(Doc. 19)("Motion"). The Court held a hearing on June 4, 2018. The primary issues are:

(i) whether the forum selection clause in the Microtel Inns and Suites Franchising, Inc. License

Agreement, filed September 27, 2017 (Doc. 15-1)("Franchise Agreement"), is contractually

valid; (ii) whether the United States District Court for the District of New Jersey would have

personal jurisdiction over the Plaintiffs if the Court transferred the case; (iii) whether the forum

selection clause in the Franchise Agreement and incorporated in the Amendment Assignment

and Assumption Agreement, filed September 27, 2017 (Doc. 15-2)("Assignment Agreement"),

is void under New Mexico law, as those agreements are construction contracts under N.M. Stat.

Ann. § 57-28A-1; and (iv) whether the Court should transfer this matter to the United States District Court for the District of New Jersey so that it can be consolidated with <u>Microtel Inns and Suites Franchising, Inc. v. Presidential Hospitality, LLC</u>, No. 17-5637 (D.N.J.)(Wigenton, J.)("New Jersey Action"). The Court concludes that: (i) the forum selection clause is contractually valid; (ii) New Jersey has personal jurisdiction over Plaintiff Presidential Hospitality and Plaintiff Sam Blue, but not over Plaintiff Ace Development, Inc.; (iii) the Court may not consider New Mexico public policy when it sits in diversity and considers a 28 U.S.C. § 1404(a) motion, but, even if it could, the Franchise Agreement and the Assignment Agreement are not construction contracts under N.M. Stat. Ann. § 57-28A-1, so the forum selection clause at issue would not be void as against public policy; and (iv) the Court will transfer Presidential Hospitality's and Blue's claims. The Court may not transfer Ace Development's claims, because New Jersey does not appear to have personal jurisdiction over that Plaintiff. Accordingly, the Court grants the Motion in part and denies it in part. The Court severs Ace Development's claims under rule 21 of the Federal Rules of Civil Procedure and transfers the remaining parties and claims.

## FACTUAL BACKGROUND

The Court draws its facts from the First Amended Complaint for Violation of the New Mexico Unfair Practices Act; Fraudulent Inducement; Negligent Misrepresentation; and Jury Demand, filed September 25, 2017 (Eleventh Judicial District Court, County of San Juan, State of New Mexico), filed in federal court on September 26, 2017 (Doc. 1-5)("FAC") and from various attachments to the parties' briefing. The Court uses and accepts those facts as true only for the purposes of this Memorandum Opinion and Order. The Court's acceptance and use of

those facts here does not mean that those facts are true or that later litigation on those facts is foreclosed.  The Court also notes that the case is at an uncommon posture on a motion to transfer in that the Court has already adjudicated a motion for a temporary restraining order, <u>see</u> Memorandum Opinion and Order, 2018 WL 2604831, filed June 2018 (Doc. 37)("MOO"), so it has a greater grasp on the facts than it would have on a typical motion to transfer.  The Court summarizes the facts relevant to the transfer issue and then states its more detailed factual findings from the MOO.

1.     <u>Summary of Facts</u>.

Defendant Wyndham Hotel Group, LLC, through its affiliates, Defendants Baymont Inn and Suites Franchise Systems Inc., and Microtel Inn and Suites Franchising, Inc., offers, sells, owns, and operates hotels and hotel chains throughout the United States.  <u>See</u> FAC ¶ 1, at 2.  In March, 2011, Plaintiff Sam Blue, a managing member of Plaintiff Presidential Hospitality, LLC, entered the Franchise Agreement with Microtel Inn, purchasing the rights to a Microtel Inn franchise.  <u>See</u> Franchise Agreement at 1.  In exchange for the right to build and operate a Microtel Inn hotel in Durango, Colorado, Blue agreed, among other things, to pay monthly fees to Microtel Inn.  <u>See</u> Franchise Agreement at 1, 6, 33.  The Franchise Agreement includes a forum selection clause, which reads:

> <u>Venue</u>.  Any litigation arising out of or related to this Agreement including, without limitation, any breach of this Agreement and any and all disputes between the parties, regardless of the form of action, shall be instituted exclusively at our discretion in the state or federal court of general jurisdiction closest to our then-current principal business address.  You expressly agree that you are subject to the jurisdiction and venue of those courts for purposes of such litigation.  You hereby waive and covenant not to assert any claim that you are not subject to personal jurisdiction in those courts or that venue in those courts is for any reason improper, inconvenient, prejudicial or otherwise inappropriate (including, without

limitation, any claim under the judicial doctrine of forum non conveniens). The provisions of this Paragraph 13N shall be self-executing.

<u>See</u> Franchise Agreement at 29. In May, 2013, Blue, Presidential Hospitality, and Microtel Inn, entered into the Assignment Agreement, which transferred Blue's rights and obligations under the Franchise Agreement to Presidential Hospitality, and allowed Presidential Hospitality to build and operate the hotel in Aztec, New Mexico, instead of in Durango. <u>See</u> Assignment Agreement at 1, 4. Blue remained secondarily liable for payment and performance of the Franchise Agreement. <u>See</u> Assignment Agreement at 1. The Assignment Agreement incorporates the Franchise Agreement, including the Franchise Agreement's forum selection clause. <u>See</u> Assignment Agreement at 2; Response at 2 n.1 (admitting that the forum selection clause is incorporated into the Assignment Agreement by reference). Related to the Assignment Agreement, Blue signed a Guaranty that Presidential Hospitality will punctually pay and perform its obligations. <u>See</u> Guaranty at 1, filed September 27, 2017 (Doc. 15-3)("Guaranty"). Blue acknowledged in the Guaranty that the Franchise Agreement's forum selection clause applies to the Guaranty. <u>See</u> Guaranty at 1.

The Assignment Agreement also stipulates that a Development Incentive Note, filed September 29, 2017 (Doc. 19-2)("Dev. Incentive Note") amends the Franchise Agreement. <u>See</u> Assignment Agreement at 4. In the Dev. Incentive Note, Microtel Inn agrees to loan $105,000.00 to Presidential Hospitality, at no interest, on the conditions that Presidential Hospitality passes a credit review, pays an application fee, completes the hotel in compliance with the standards set forth in the Franchise Agreement, and opens the hotel no later than April 5, 2014. <u>See</u> Dev. Incentive Note at 1. Under the Dev. Incentive Note, one-fifteenth of the loan

amount will be forgiven on each anniversary of the hotel's opening date.  See Dev. Incentive Note at 1.

In March, 2015, Presidential Hospitality and Blue defaulted on their fee payments to Microtel Inn.  See Letter from Wyndham Hotel Group, LLC to Presidential Hospitality, LLC and Sam Blue, at 1 (dated March 10, 2015), filed September 26, 2017 (Doc. 1-3).  In August, 2015, Presidential Hospitality and Microtel Inn entered a payment plan to pay off the past amount Presidential Hospitality and Blue owed as a result of the March, 2015 default.  See Payment Plan Relating to the License Agreement between Microtel Inn & Suites and Presidential Hospitality, LLC, for the Facility Designated as Unit #47176-03078-01-MTL, Located in Aztec, New Mexico at 1 (dated August 3, 2015), filed September 26, 2017 (Doc. 1-4)("Payment Plan").  Presidential Hospitality did not make the required payments under the Payment Plan.  See Letter from Wyndham Hotel Group, LLC to Sam Blue and Presidential Hospitality, LLC at 1 (dated October 8, 2015), filed September 26, 2017 (Doc. 1-4)("October Default Notice").  In July, 2017, Wyndham Hotel sent Presidential Hospitality and Blue another default notice.  See Letter from Wyndham Hotel Group, LLC to Sam Blue and Presidential Hospitality, LLC at 1 (dated July 12, 2017), filed September 26, 2017 (Doc. 1-4)("July Default Notice").  Presidential Hospitality and Blue never cured that default, so Wyndham Hotel and Microtel Inn terminated the Franchise Agreement.  See Letter from Wyndham Hotel Group, LLC to Sam Blue and Presidential Hospitality, LLC at 1 (dated September 12, 2017), filed September 27, 2017 (Doc. 15-5)("Termination Notice").

On August 1, 2017, Microtel Inn sued Presidential Hospitality and Blue in New Jersey for the fees owed under the Franchise Agreement.  See  Microtel Inns and Suites Franchising,

Inc. v. Presidential Hospitality, LLC, No. 17-5637, Complaint at ¶¶ 1-3, 35-44, at 1-2, 7-8 (D.N.J.)(Doc. 1).  See also Microtel Inns and Suites Franchising, Inc. v. Presidential Hospitality, LLC, No. 17-5637, First Amended Complaint at ¶¶ 1-3, 67-86, at 1-2, 14-17 (D.N.J.)(Doc. 9)("NJ FAC").  In the NJ FAC, Microtel Inn alleges that Presidential Hospitality and Blue: (i) have violated the Lanham Act, 15 U.S.C. § 1125(a), by continuing to use the Microtel registered mark after the Franchise Agreement's termination, see NJ FAC ¶¶ 45-55, at 10-12; (ii) owe damages for breach of the Franchise Agreement, NJ FAC ¶¶ 56-81, at 12-16; and (iii) owe damages for breach of the Dev. Incentive Note, NJ FAC ¶¶ 82-86, at 16-17.

**2.**     **Previous Factual Findings.**

1.     Wyndham Hotel through its affiliates, Baymont Inn and Microtel Inn offers, sells, owns, and operates hotels and hotel chains throughout the United States.  See FAC ¶ 1, at 2.

2.     Plaintiff Sam Blue is a New Mexico citizen, who is a managing member of Plaintiff Presidential Hospitality, LLC.  See Draft Transcript of Motion Proceedings at 10:7-17 (taken September 28, 2017)(Court, Enriquez)("Sept. Tr.").[1]

3.     The other member of Presidential Hospitality is Plaintiff Ace Development, Inc., a New Mexico corporation with its principal place of business in New Mexico.  See Sept. Tr. at 10:11-14 (Court, Enriquez); id. at 10:18-24 (Court, Enriquez).

4.     In March, 2011, Blue entered the Franchise Agreement, purchasing the rights to a Microtel Inn franchise.  See Franchise Agreement at 1.

5.     In May, 2013, Blue assigned his rights and obligations under the Contract to Presidential Hospitality.  See Assignment Agreement at 1.

---

[1]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers

6.      According to the Plaintiffs, "through various representations, promises, omissions," of which many were "false, incomplete, and misleading," in addition to "high-pressure-sales tactics," the Wyndham Hotel and Microtel Inn induced Blue to purchase that Microtel Inn franchise.  FAC ¶ 2, at 1.

7.      Again, according to the Plaintiffs, that inducement resulted from a relationship formed among Blue and an agent of the Wyndham Hotel, Gregg Koffler.  See FAC ¶¶ 12-49, 65-70, at 4-11, 14-16.

8.      Blue first met Koffler in June, 2010, because Koffler had contacted Blue to tell him that the Wyndham Hotel was interested in property that Blue owned in Aztec, New Mexico.  See FAC ¶¶ 15-19, at 4-5.

9.      Blue believed that the Wyndham Hotel wanted to buy his land. See FAC ¶ 18, at 5.

10.     At his meeting with Koffler, however, instead of discussing the Wyndham Hotel's interest in buying Blue's property, Koffler solicited Blue to purchase a Baymont Inn franchise.  See FAC ¶ 19, at 5.

11.     Koffler told Blue that, if Blue purchased the franchise, Blue would be able to quickly flip the property for a profit.  See FAC ¶ 21, at 5 ("Mr. Koffler told Mr. Blue that there would be a line of people interested in purchasing the hotel and he guaranteed a buyer by the time the hotel was built."); id. ¶ 28, at 7.

12.     Blue was initially uninterested, because he wanted to sell his property.  See FAC ¶¶ 13, 20, at 4-5.

13.     To further persuade Blue that purchasing the franchise was a solid investment,

Koffler told Blue that the Wyndham Hotel "would most likely want to invest in the construction of the hotel," FAC ¶ 22, at 5, and that Blue, who had no experience in running a hotel, would not have to operate it, <u>see</u> FAC ¶¶ 1, 21, 27 at 2, 5-6.

14.     After speaking briefly with a Wyndham Hotel executive, Koffler represented to Blue that the Wyndham Hotel would invest $150,000.00 in the property.  <u>See</u> FAC ¶ 23, at 6.

15.     Koffler did not tell Blue that the Wyndham Hotel's investment would be a loan. <u>See</u> FAC ¶ 23, at 6.

16.     Upon Koffler's representations, in particular the representation that the Wyndham Hotel would invest $150,000.00 of its own money in the property's development, Blue agreed to apply for a Baymont Inn franchise.  <u>See</u> FAC ¶ 25, at 6.

17.     About a month later, and after Blue received preliminary approval to buy the franchise, Blue had second thoughts and told Koffler that he did not think anyone would want to buy the hotel from him.  <u>See</u> FAC ¶ 26, at 6.

18.     Koffler again told Blue that the Wyndham Hotel "was going to have buyers 'lined up,'" FAC ¶ 28, at 7, and also that, if Blue did not agree to purchase the franchise, Koffler would probably lose his job, <u>see</u> FAC ¶ 29, at 7.

19.     Blue subsequently agreed to the purchase and entered into the Baymont Franchise Systems Inc., Franchise Agreement ("Baymont Contract").  <u>See</u> FAC ¶¶ 34-35, at 8.

20.     Baymont Inn did not provide Blue "a complete and timely copy of its Franchise Disclosure Document" ("FDD").  FAC ¶ 36, at 8.[2]

_____

[2]The FDD is a document that the franchisor must disclose to the franchisee at least fourteen calendar days before the franchisee signs a binding agreement with the franchisor.  <u>See</u> 16 C.F.R. § 436.2(a).  The FDD must contain certain information, including, among other things:

21.     According to Blue, as a result of the Baymont Contract, he and Koffler became friends.  See FAC ¶¶ 37-38 at 8.

22.     "Mr. Koffler often told Mr. Blue what a great person he was and that he bragged to his family about him."  FAC ¶ 38, at 8.

23.     Accordingly, "Mr. Blue felt compelled to help Mr. Koffler who referred to Mr. Blue as his 'friend.'"  FAC ¶ 38, at 8.

24.     Shortly after entering the Baymont Contract, Koffler asked Blue to accompany him on a potential deal to sell another franchise.  See FAC ¶ 37, at 8 ("Mr. Koffler asked Mr. Blue to vouch for him and Wyndham.").

25.     Koffler told Blue that his job had been stressful lately, straining relations with his family, so "he needed to make this sale."  FAC ¶ 37, at 8.

26.     When the potential deal did not happen, Koffler confessed to Blue that he needed to sell another franchise or the Wyndham Hotel would fire him, and he would lose both his house and his family.  See FAC ¶ 39, at 9.

27.     Koffler also told Blue that he "owed people money" and that those people "would hurt his family" if he did not pay them back.  FAC ¶ 40, at 9.

28.     As Koffler later recounted, the threats against him were "either you pay me or I'll come knock on your door; I know where you live and I am going to tell your wife exactly what's going on here and you know, who knows what else was going to happen."  FAC ¶ 65, at 14.

29.     In the following weeks, Koffler frequently solicited Blue to buy a Microtel Inn

_____

(i) a brief description of the franchised business; (ii) the total investment necessary to begin operation; (iii) the franchisor-franchisee contract's terms; and (iv) a general description of the competition.  See 16 C.F.R. § 436.3-.5.

franchise for a property in Durango, Colorado.  See FAC ¶ 41, at 9.

30.     Koffler again aggressively pitched the deal to Blue.  See FAC ¶ 41, at 9.

31.     Koffler told Blue that Blue could easily re-sell the property for profit and that "Wyndham would have several buyers ready to purchase the hotel."  FAC ¶ 42, at 9.

32.     Koffler added that the Microtel Inn franchise would be an even better deal than the Baymont franchise, because Microtel Inn was a "new brand" that would be Wyndham Hotel's "top money maker."  FAC ¶ 41, at 9.

33.     Koffler also told Blue that "it was hard to get a Microtel franchise," but he could get Blue a special price.  FAC ¶ 41, at 9.

34.     To further induce the sale, Koffler provided Blue a Smith Travel Research Report ("Smith Report").  See FAC ¶ 43, at 9-10.

35.     The Smith Report contained information about hotels in Durango from 2005 to 2011, including: occupancy percentage, average daily rate, revenue per available room, supply, demand, and revenue.  See FAC ¶ 43, at 10.

36.     Koffler represented that any Microtel Inn hotel would "perform as well or better than the hotels in the S[mith] report."  FAC ¶ 43, at 10.

37.     Relying on Koffler's representations, Blue entered the Contract for a Microtel Inn franchise and paid a $30,000.00 initial franchise fee.  See FAC ¶¶ 44-46, at 10.

38.     Under the Contract, Wyndham Hotel and Microtel Inn have the right to terminate the Contract with an opportunity to cure if Presidential Hospitality "fail[s] to pay us or any of our affiliates fees or other amounts due under this Agreement . . . including, without limitation, Application Fees, Royalty Fees, Contributions, GDS fees, travel agent commission fees or ISP

fees." Franchise Agreement at 22.

39.     Wyndham Hotel and Microtel Inn also have the right to terminate the Contract "without giving you an opportunity to cure the default, effective upon written notice to you" if "you receive from us three (3) notices of default of this Agreement within a twelve (12) month period, regardless of whether the defaults are cured." Franchise Agreement at 22.

40.     Microtel Inn did not provide Blue "a complete and timely copy of its FDD." FAC ¶ 50, at 11.

41.     A few months after Blue entered the Contract, Blue had still not yet started building the Baymont hotel. See FAC ¶ 47, at 10.

42.     When Koffler asked about the delay, Blue responded that he again had doubts about the Baymont hotel, and that he was willing to renege on it, losing his initial investment franchise fee. See FAC ¶ 47, at 10.

43.     Koffler told Blue that building a Microtel Inn hotel in Aztec would cost less than building a Baymont hotel in the same location. See FAC ¶ 47, at 11.

44.     Accordingly, Koffler stated to Blue that he would work with the Wyndham Hotel to transfer the Microtel Inn franchise from Colorado to New Mexico. See FAC ¶ 47, at 11.

45.     Koffler assured Blue that a Microtel Inn hotel in Aztec would "perform equally as profitable as the hotels in the March 8, 2011 S[mith] report." FAC ¶ 48, at 11.

46.     Blue agreed to the transfer. See FAC ¶ 51, at 11.

47.     Thus, Blue assigned the Microtel Inn franchise to Presidential Hospitality -- of which Blue was a managing member -- and the Microtel Deal's franchise site was moved from Durango to Aztec. See FAC ¶¶ 51, 55, 57 at 11-12; Assignment Agreement, at 1.

48.    There are several hotels in the Aztec area, many of which do not have brand names associated with them.  See Step Back Inn, http://stepbackinn.com/; Miss Gail's Inn, https://bit.ly/2xxKple; Enchantment Lodge, https://bit.ly/2xxKple.

49.    Many people who travel to Aztec do not travel there again.

50.    Many hotels exist without a well-known brand, such as Wyndham or Hilton or Hyatt, attached to their name.  See, e.g., Hotel Encanto, https://www.hotelencanto.com/; MCM Elegenté Hotel, http://www.mcmelegantealbuquerque.com/.

51.    Under the Assignment Agreement, Blue and the other owner of Presidential Hospitality -- ACE Development -- remain secondarily liable for Presidential Hospitality's performance under the Contract.  See FAC ¶¶ 54, 59 at 12.

52.    Presidential Hospitality subsequently built the Microtel Inn hotel in Aztec.  See FAC ¶ 58, at 12.

53.    As the Microtel Inn hotel neared completion, Blue contacted the Wyndham Hotel to determine whether it had found a buyer.  See FAC ¶ 60, at 12.

54.    At that time, Koffler no longer worked for the Wyndham Hotel.  See FAC ¶ 60, at 12-13.

55.    The Wyndham Hotel had no buyers yet, but a representative said it would "put the word out."  FAC ¶ 60, at 13.

56.    When the Microtel Inn hotel was completed on October 3, 2013, the Wyndham Hotel still had not found a buyer.  See FAC ¶ 63, at 13.

57.    According to Blue, "Wyndham never intended or tried to find a buyer. . . .  Mr. Koffler's representations and promises were only intended to induce Mr. Blue to purchase the

hotel franchises and construct the hotel so that Wyndham could collect on royalty payments for 20 years."  FAC ¶ 63, at 13.

58.     Since completion, the Microtel Inn hotel has not performed on par or better than the hotels listed in the Smith Report.  See FAC ¶ 64, at 13.

59.     On March 10, 2015, Wyndham Hotel sent Presidential Hospitality and Blue a notice of monetary default, stating that they were past due in recurring fees and charges in the amount of $38,453.96.  See Letter from Wyndham Hotel Group to Sam Blue and Presidential Hospitality, LLC at 1 (dated March 10, 2015), filed September 26, 2017 (Doc. 1-3)("March Default Notice").

60.     The default notice also states:

If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Microtel Inn and Suites by Wyndham System.  This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.  We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system.

March Default Notice at 1

61.     Blue received a copy of the March Default Notice.  See Declaration of Sam Blue in Support of Plaintiffs' Application for Temporary Restraining Order ¶ 9, at 3 (dated September 22, 2017), filed September 26, 2017 (Doc. 1-2)("Blue Declaration").

62.     On April 17, 2015, Wyndham Hotel sent Presidential Hospitality and Blue another notice of monetary default, stating they were past due in fees in the amount of $41,101.56.  See Letter from Wyndham Hotel Group to Sam Blue and Presidential Hospitality, LLC at 1 (dated April 17, 2015), filed September 26, 2017 (Doc. 1-3)("April Default Notice").

63.     The April Default Notice notes that Wyndham Hotel and Microtel Inn had extended the cure period, but states that it is not "waiving the default or any other default under the Agreement by extending the cure period. We are simply giving you a final opportunity to avoid termination." April Default Notice at 1.

64.     Blue received a copy of the April Default Notice. See Blue Declaration ¶ 10, at 3.

65.     In August, 2015, Presidential Hospitality and Microtel Inn entered a payment plan to pay off the past amount owed. See Payment Plan relating to the License Agreement between Microtel Inn & Suites and Presidential Hospitality, LLC, for the facility designated as Unit #47176-03078-01-MTL, located in Aztec, NM at 1 (dated August 3, 2015), filed September 26, 2017 (Doc. 1-4)("Payment Plan").

66.     The Payment Plan again reserved all of Wyndham Hotel's rights:

This plan does not affect our rights or remedies for any other default that has or may arise under the Agreement. You expressly acknowledge that you are obligated to pay timely any other amounts due under the Agreement or any ancillary agreement and that we may also issue default notices for any other defaults under this Agreement.

Payment Plan at 1.

67.     Presidential Hospitality did not make the required payments under the Payment Plan. See Letter from Wyndham Hotel to Sam Blue and Presidential Hospitality at 1 (dated October 8, 2015), filed September 26, 2017 (Doc. 1-4)("October Default Notice").

68.     Accordingly, in October, 2015, Wyndham Hotel sent Presidential Hospitality and Blue a third notice of default. See October Default Notice at 1.

69.     In the October Default Notice, Wyndham Hotel again reserved all rights under the Contract, stating:

If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Microtel Inn and Suites by Wyndham System. This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system.

October Default Notice at 1.

70.     Blue received a copy of the October Default Notice. <u>See</u> Blue Declaration ¶ 11, at 3.

71.     Presidential Hospitality and Blue never cured that default. <u>See</u> Tr. at 13:1-4 (Sager).

72.     They did, however, make payments to Wyndham Hotel between October, 2015, and July, 2017, in an amount "totaling approximately $42,000.00." Declaration of Theresa Bailey in Support of Plaintiffs' Application for Temporary Restraining Order ¶ 4, at 2 (dated September 22, 2017), filed September 26, 2017 (Doc. 1-4)("Bailey Declaration").

73.     Blue also exchanged various emails in the following months with Wyndham Hotel "in an attempt to work out a resolution regarding unpaid monies." Blue Declaration ¶ 12, at 3.

74.     On January 23, 2017, Blue spoke with Jennifer Constantinou -- a Wyndham Hotel in-house attorney -- who told him that "Wyndham would not pursue collection of the amounts due as long as the parties were discussing a workable solution." Blue Declaration ¶ 12, at 3.

75.     By July 12, 2017, Presidential Hospitality and Blue were past due in charges owed to Wyndham Hotel to the tune of $169,915.47. <u>See</u> Letter from Wyndham Hotel to Sam

Blue and Presidential Hospitality, LLC at 1 (dated July 12, 2017), filed September 26, 2017 (Doc. 1-4)("July Default Notice").

76.     On July 12, 2017, Wyndham Hotel sent another default notice.  <u>See</u> July Default Notice at 1.

77.     The July Default Notice informs Presidential Hospitality and Blue that they have thirty days to cure the default and that Wyndham Hotel reserves all rights under the Contract, but the July Default Notice does not state when the Contract will be terminated if Presidential Hospitality and Blue fail to cure the default.  <u>See</u> July Default Notice at 1.

78.     Blue received a copy of the July Default Notice.  <u>See</u> Blue Declaration ¶ 14, at 4.

79.     After receiving a copy of the July Default Notice, Blue spoke with Lay El-Bassuni -- Wyndham Hotel's Vice President of Brand Operations for Microtel Inn -- who told Blue that "while we work[] together on a workable solution, Wyndham would not shut off the Hotel's access to the central reservation system ("CRS") or Wyndham My Portal Communications website."  Blue Declaration ¶ 15, at 4.

80.     Presidential Hospitality and Blue never cured the default.  <u>See</u> Letter from Wyndham Hotel to Sam Blue and Presidential Hospitality, LLC at 1 (dated September 12, 2017), filed September 27, 2017 (Doc. 15-5)("Termination Notice").

81.     At some time after July 12, 2017, but before September 12, 2017, Wyndham Hotel filed suit against Blue and Presidential Hospitality in the United States District Court for the District of New Jersey to recover amounts owed.  <u>See</u> Blue Declaration ¶ 16, at 4.

82.     At some time unknown, Presidential Hospitality "spent over $5000 in marketing the hotel in the local community and local groups."  Blue Declaration ¶ 20, at 5.

83. On September 12, 2017, Wyndham Hotel terminated the Contract. <u>See</u> Termination Notice at 1.

84. As a result of that Contract termination, the Plaintiffs' Microtel Inn hotel was delisted from internet websites that advertise available hotel rooms. <u>See</u> Bailey Declaration ¶¶ 7, 10, at 2-3.

85. A Google search of "Aztec New Mexico Hotel," however, still yields "Microtel Inn & Suites by Wyndham Aztec" at the correct location with a local phone number. <u>https://bit.ly/2xxKple</u>.

86. Also as a result of the Contract termination, the Plaintiffs' have not been able to access Wyndham Hotel's central reservation system, which allows the Plaintiffs' to reserve hotel rooms for guests. <u>See</u> Bailey Declaration ¶ 12, at 3.

87. Ninety percent of the Plaintiffs' Microtel Inn hotel's reservations are made through third-party websites. <u>See</u> Bailey Declaration ¶ 13, at 3.

88. From September 1, 2017 to September 18, 2017, one hundred and seventy-four reservations were made through third parties and two hundred and six reservations were made through Wyndham Hotel's central reservation system. <u>See</u> Bailey Declaration ¶ 13, at 3.

89. The Plaintiffs "had projected that between September 21, 2017 and September 30, 2017," they "would receive 40 reservations through third parties." Bailey Declaration ¶ 13, at 3-4.

90. Since the Termination Notice, reservations have dropped ninety percent and the hotel has lost revenue. <u>See</u> Blue Declaration ¶ 19, at 5; Bailey Declaration ¶ 15, at 4.

# PROCEDURAL BACKGROUND

On September 12, 2017, Presidential Hospitality, Ace Development, and Blue filed suit in the Eleventh Judicial District Court, County of San Juan, State of New Mexico contending that Koffler, as the Wyndham Hotel's agent, fraudulently induced Blue into entering the Franchise Agreement, fraudulently induced Presidential Hospitality and Blue into the Assignment Agreement, and fraudulently induced Ace Development and Blue into guaranteeing Presidential Hospitality's performance under the Assignment Agreement. See Presidential Hospitality, LLC v. Wyndham Hotel Group, No. D-1116-CV-2017-01329, Complaint for Violation of the New Mexico Unfair Practices Act; Fraudulent Inducement; Negligent Misrepresentation; and Jury Demand ¶¶ 110-125, at 23-27, filed September 12, 2017 (Eleventh Judicial District Court, County of San Juan, State of New Mexico), filed in federal court September 26, 2017 (Doc. 1-1). See also FAC ¶¶ 110-125, at 23-27. The Plaintiffs also bring two claims premised on the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 to 26 ("UPA"), and a negligent misrepresentation claim. See FAC ¶¶ 77-109, 126-132, at 19-23, 27-28. In addition to damages, the Plaintiffs seek rescission of the Franchise Agreement and the Assignment Agreement. See FAC at 29. On September 26, 2017, the Defendants removed the action to federal court on the basis of diversity jurisdiction. See Notice of Removal at 1, filed September 26, 2017 (Doc. 1).[3]

1. **The Motion.**

The Defendants move to transfer this matter to the District of New Jersey, so that it may be consolidated with the New Jersey Action. See Motion at 1. The Defendants argue that

---

[3]In the MOO, the Court concluded that it had subject-matter jurisdiction based on complete diversity. See MOO at 16, n.4, 2018 WL 2604831, at *8, n.4.

transfer and consolidation are proper, because they meet 28 U.S.C. § 1404(a)'s factors: "(1) whether the case could have been brought in the other district or division; (2) whether discretionary factors weigh in favor of transfer based on the convenience of parties and witnesses; and (3) whether transfer is in the interest of justice." Motion at 7 (citing Biotronik, Inc. v. Lamorak Ins. Co., 2015 WL 3522362, at *4 (D.N.M. June 3, 2015)(Johnson, J.)). The Defendants argue that they meet the first factor, because the Defendants all maintain a principal place of business in New Jersey and are subject to personal jurisdiction in New Jersey. See Motion at 7-8 (citing 28 U.S.C. § 1391(b)(1) ("A civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located.")).

The Defendants argue that the second factor also weighs in favor of transfer. See Motion at 8-12. According to the Defendants, the United States Court of Appeals for the Tenth Circuit recognizes nine discretionary factors a court can consider when faced with a motion to transfer: (i) the plaintiff's choice of forum; (ii) the accessibility of witnesses and other sources of proof; (iii) the cost of making the necessary proof; (iv) the likelihood of enforcing the judgment if one is obtained; (v) the relative advantages and obstacles to a fair trial; (vi) congested dockets; (vii) conflict-of-law issues; (viii) the advantage of having a local court determine local law questions; and (ix) all other economical considerations. See Motion at 8 (citing Employers Mut. Cas. Co. v. Bartiles Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010)). The Defendants argue that, because they filed the New Jersey Action first, the Court should transfer the case. See Motion at 9 (citing Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1163-64 (10th Cir. 1982)("[T]he first court in which jurisdiction attaches has priority to consider the case.")).

According to the Defendants, courts "should depart from the first-filed rule only in extraordinary circumstances involving inequitable conduct, bad faith, anticipatory suits or forum shopping." Motion at 10 ("The Court should not depart from the first-filed rule as there are no extraordinary or special circumstances.").

The Defendants also argue that conflicts of law issues favor transfer. <u>See</u> Motion at 10. The Defendants contend that the operative agreements contain New Jersey choice-of-law provisions, so, according to the Defendants, a New Jersey Court would be better equipped to apply New Jersey contract law. <u>See</u> Motion at 11. The Defendants admit that, should the Court transfer this action, a New Jersey court will be required to interpret two New Mexico UPA claims and two New Mexico tort claims, but they argue that transfer is still proper, because the "majority of claims will still be governed by New Jersey law and the outcome will depend on facts rather than novel or difficult legal issues." Motion at 11.

The Defendants argue that many of the remaining factors favor transfer. Specifically they contend that: (i) "many of the witnesses are located in New Jersey"; (ii) "[b]oth sides may have to travel regardless of the venue"; (iii) both districts "would provide for fair trials"; and (iv) "there is no evidence that the District of New Jersey is more congested than the District of New Mexico." Motion at 11-12. Finally, the Defendants contend that the interests-of-justice factor favors transfer "primarily due to the first filed rule," as it would "waste judicial resources" for two federal courts to adjudicate separate cases with "the same nucleus of operative facts." Motion at 12-13.

2.     **The Response**.

The Plaintiffs respond.  <u>See</u> Plaintiffs' Response to Defendants' Brief in Support of Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), filed October 13, 2017 (Doc. 23)("Response").  The Plaintiffs contend that the Franchise Agreement, the Assignment Agreement, and the Dev. Incentive Note are related to construction, and, accordingly, under New Mexico law, the forum selection clause is void as against public policy.  <u>See</u> Response at 2 (citing N.M. Stat. Ann. § 57-28A-1).  <u>See</u> <u>id.</u> at 9.  In support of that contention, the Plaintiffs highlight language that mentions construction from the Franchise Agreement, Assignment Agreement, and the Dev. Incentive Note.  <u>See</u> Response 3-11; <u>id.</u> at 3 (quoting Franchise Agreement at 1)("We have the exclusive right . . . *to establish and operate* **all new construction**.")(emphasis in Response)); Response at 4 (quoting Franchise Agreement at 2)("[W]e hereby grant to you a non-exclusive license . . . ***to build and operate*** *the Hotel*.")(emphasis in Response)); Response at 5 (quoting Franchise Agreement at 16)("***In connection with the construction or any material renovations of the Hotel***, *you also agree to cause* **your general contractor** *to maintain comprehensive liability insurance*.")(emphasis in Response)); Response at 6 (quoting Assignment Agreement at 3)("Notwithstanding any other provision of this Agreement, ***the deadline for completion of the Hotel*** shall be no later than April 5, 2014.")(emphasis in Response)).   The Plaintiffs also argue that the operative agreements are construction agreements, because the "Plaintiffs were **<u>required</u>** to construct a new hotel," otherwise Microtel Inn could terminate the Contract.  Response at 8-9 (emphasis in Response).

The Plaintiffs' second argument is that 28 U.S.C. § 1404(a)'s factors do not favor transfer. First, they argue that the case could not have been brought in New Jersey, because New Mexico law requires construction-contract disputes to be conducted in New Mexico. See Response at 12. Second, they contend that the first-filed rule does not apply, because the service was defective in New Jersey, and because the Plaintiffs challenge whether New Jersey has personal jurisdiction over them. See Response at 12. They also contend that, even if New Jersey can assert personal jurisdiction, the first-filed rule is inapplicable, because the operative agreements are construction contracts, so are a "special circumstance sufficient" to supplant "the first filed rule." Response at 13. They argue that conflicts of law issues favor a New Mexico forum, because the operative agreements are construction contracts. See Response at 13. The Plaintiffs assert that the other factors counsel against transfer, because: (i) litigation would be costly for the Plaintiffs; (ii) the Defendants are part of a hotel conglomerate that can easily travel and defend themselves in New Mexico; (iii) two key witnesses, Blue and Koffler, reside in New Mexico and in Arizona respectively, so travel to New Jersey as opposed to Albuquerque, New Mexico would be costlier; (iv) New Jersey law is inapplicable as to every claim; and (v) the New Jersey docket is more congested than the New Mexico docket. See Response at 13-14. Accordingly, the Plaintiffs request that this Court deny the Motion. See Response at 15.

**3.    The Reply.**

The Defendants reply. See Defendants' Reply Brief In Further Support of Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), filed October 27, 2017 (Doc. 26)("Reply"). The Defendants contend that Presidential Hospitality and Blue waived their rights to challenge venue and personal jurisdiction by entering into the Franchise Agreement and the Assignment

Agreement. See Reply at 2. According to the Defendants, because Presidential Hospitality and Blue do not contend that their consent was procured by fraud, the Court may properly transfer the case to New Jersey. See Reply at 2 (citing Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 957 (10th Cir. 1992)). The Defendants argue that the Franchise Agreement and Assignment Agreement are licensing agreements and not construction contracts. See Reply at 3 ("Plaintiffs have not identified any case from any court in which a hotel license agreement was construed as a construction contract merely because the licensee built the facility."). The Defendants also assert that, even if the operative agreements are construction contracts, their provisions about venue and jurisdiction cannot be voided under N.M. Stat. Ann. § 57-28A-1. See Reply at 4. They argue that N.M. Stat. Ann. § 57-28-1(A) voids provisions that "require[] any litigation arising from the construction contract to be conducted in another state," but the Franchise Agreement's and Assignment Agreement's provisions do not require that litigation be brought in New Jersey, Reply at 4 (emphasis added); rather, according to the Defendants, they merely allow litigation to be brought in New Jersey, see Reply at 4.

The Defendants argue that, because the Plaintiffs' construction-contract argument fails, the first-filed doctrine applies. See Reply at 5. They contend that, contrary to the Plaintiffs' assertion, defective service does not negate the first-filed rule. See Reply at 5-6. They conclude that the discretionary factors and the interests of justice favor transfer, because the Plaintiffs consented to a New Jersey forum, and because judicial economy would be served if the Court transferred this action, so that the two actions could be consolidated. See Reply at 7-8.

4.      **The New Jersey Action.**

In the New Jersey Action, Presidential Hospitality and Blue moved to stay, dismiss, or transfer the action to the United States District Court for the District of New Mexico.  <u>See Microtel Inns and Suites Franchising, Inc. v. Presidential Hospitality, LLC</u>, Opinion and Order on Motion to Transfer, 2018 WL 1221160, at *1 (D.N.J. March 8, 2018)(Mannion, M.J.).  The Honorable Steven C. Mannion, Magistrate Judge for the United States District Court for the District of New Jersey, declined to stay or transfer the action.  <u>See Microtel Inns and Suites Franchising, Inc. v. Presidential Hospitality, LLC</u>, 2018 WL 1221160, at *2-3.[4]  He denied the request for a stay, because the two actions are "nearly identical," so, according to Magistrate Judge Mannion, the first-filed rule favored the action continuing in New Jersey.  <u>See</u> 2018 WL 1221160, at *2-3.  Magistrate Judge Mannion denied the request for transfer, even though a substantial part of the events giving rise to the action occurred in New Mexico, because: (i) Microtel Inn -- the plaintiff in the New Jersey Action -- chose New Jersey as a venue, and "the plaintiff's choice of venue should not be lightly disturbed"; (ii) "[w]hile [Presidential Hospitality and Blue] argue that the books and records and witnesses are located in New Mexico," there is no evidence that producing that evidence in New Jersey will burden Presidential Hospitality and Blue; (iii) the first-filed rule counsels toward denying transfer; (iv) although New Jersey has a "higher average number of civil cases per judge than the District of New Mexico," that fact does not mean the District of New Jersey would be "less expeditious"; and (v) Presidential Hospitality and Blue, who hold the burden of demonstrating transfer, do not make a sufficient showing that the District of New Jersey lacks personal jurisdiction over them.

---

[4]The Defendants filed a notice of supplemental authority, alerting the Court of this decision.  <u>See</u> Notice of Supplemental Authority at 1-2, filed March 13, 2018 (Doc. 32).

2018 WL 1221160, at *3.  Finally, Magistrate Judge Mannion ordered additional discovery to determine whether he should dismiss the case for lack of personal jurisdiction.  See 2018 WL 1221160, at *4.  He noted that, if the forum selection clause is valid, "then Defendants have consented to venue and jurisdiction in this District," but he needed more information to determine if that consent exists, more facts to determine whether N.M. Stat. Ann. § 57-28A-1 applies, and, if the forum selection clause is invalid, whether Presidential Hospitality and Blue had minimum contacts with New Jersey.  2018 WL 1221160, at *4.

5.     **The Hearing.**

The Court held a hearing.  See Draft Transcript of Motion Proceedings at 1:5 (dated June 4, 2018)(Court)("Tr.").[5]  The Defendants argued briefly that the Franchise Agreement and Assignment Agreement are not construction contracts, as the Plaintiffs' FAC has no construction-based claims.  See Tr. at 4:11-5:1 (Sager).  They argued that transfer would achieve efficiency "having all of the issues relating to this franchise relationship litigated in one forum at one time."  Tr. at 5:1-6 (Sager).

The Plaintiffs emphasized that transfer to New Jersey was improper, because "New Jersey has not yet determined whether there is jurisdiction over my client."  Tr. at 5:20-21 (Enriquez).  The Plaintiffs argued that the operative agreements were construction contracts, because, under N.M. Stat. Ann. § 57-28A-1, a contract merely has to relate to construction to be a construction contract.  See Tr. at 6:1-11 (Enriquez)("There is nothing in the statute, Your Honor, that states that claims must be[] of a construction nature.").  They asserted that the

---

[5]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Franchise Agreement "dictated h[ow the] hotel should be built," indicating that it is a construction contract. Tr. at 8:9-21 (Enriquez). The Plaintiffs also argue that one of their fraudulent inducement theories relates to the Dev. Incentive Note, which does not have a forum selection clause, so, according to the Plaintiffs, even if the forum selection clause in the Franchise Agreement is valid, New Jersey would not have personal jurisdiction over that claim. See Tr. at 9:19-10:7 (Enriquez). The Court expressed doubt that, once a party consents to personal jurisdiction, such jurisdiction had to be litigated claim-by-claim, see Tr. at 11:11 (Court), to which the Plaintiffs argued that it is the scope of consent that matters, see Tr. at 11:21-12:5 (Enriquez). The Plaintiffs contended that, if the forum selection clause is valid, they consent to jurisdiction only to claims arising out of the Franchise Agreement and not claims arising out of the Dev. Incentive Note. See Tr. at 11:23-12:5 (Enriquez).

The Plaintiffs also argued that, in terms of witness convenience, every relevant Plaintiffs' witness resides in New Mexico, Arizona, or Colorado, so it would be hard for them to travel to New Jersey. See Tr. 6:18-7:2 (Enriquez). The Plaintiffs asserted that, in terms of docket congestion, 28 U.S.C. § 1404(a) favors New Mexico, because the District of New Jersey has more civil cases per judge, but the Court noted that the civil statistics do not capture the District of New Mexico's criminal docket, which is one of the busiest in the nation. See Tr. at 7:3-8:2 (Court).

The Defendants argued that the Franchise Agreement's forum selection clause covers "any litigation arising out of or related to this agreement," which, according to the Defendants, includes any litigation on the Dev. Incentive Note. Tr. at 12:19-13:3 (Sager). They contended that, in terms of convenience to witnesses, keeping the case in New Mexico would

inconvenience the defense witnesses -- who reside in New Jersey -- and that the first-filed rule favors New Jersey as a forum. See Tr. at 13:16-24 (Sager). The Defendants asserted that, if N.M. Stat. Ann. § 57-28A-1 was applied to "any contract that has in any way relation to construction, alteration, repair, or maintenance," there would be no limiting principle. Tr. at 14:13-17 (Sager). They argued that the operative contracts "in no way relate to or require the building of a facility, the alteration of a facility, the repair or maintenance of a facility. . . . Wyndham is not a construction company [and] [M]icrotel[] is not a construction company." Tr. at 14:17-24 (Sager). The Defendants added:

> I think the fair limitation that can be drawn is that . . . where you're dealing with nails and hammers and actual construction mechanisms, and those issues relating to the quality or the competency of the actual construction . . . itself are at issue, New Mexico courts want to make sure that a New Mexico plaintiff has the opportunity to litigate [in New Mexico].

Tr. at 15:1-9 (Sager). The Defendants conceded that the Franchise Agreement mandates that the hotel look a certain way, see Tr. at 17:8-13 (Sager)("So a McDonalds looks like a McDonalds and a Microtel looks like a Microtel"), but they asserted that the Franchise Agreement does not "tell them how to construct or what materials they have to use," so, according to the Defendants N.M. Stat. Ann. § 57-28A-1 does not encompass the Franchise Agreement, Tr. at 17:14-18:13 (Sager). The Plaintiffs rejoined that the Franchise Agreement gives the Defendants the power to ensure that the hotel is "built according to their specification," so the Franchise Agreement is a construction agreement. Tr. at 19:19-25 (Enriquez).

The Defendants noted that the Plaintiffs have gone beyond the briefing, so made an additional argument that N.M. Stat. Ann. § 57-28A-1 does not apply to the Franchise Agreement, which was executed on 2010, because the statute applies "to contracts entered into or after July

1st, 2011." Tr. at 20:14-21:13 (Sager).  The Plaintiffs countered that the Assignment Agreement was signed in 2013, which incorporates the Franchise Agreement, so N.M. Stat. Ann. § 57-28A-1 applies to both contracts.  See Tr. at 21:17-22:1 (Enriquez).  The Defendants rejoined that none of the construction provisions upon which the Plaintiffs rely come from the Assignment Agreement.  See Tr. at 22:4-10 (Sager).

## LAW REGARDING PERSONAL JURISDICTION

When contested,[6] the party asserting the claim has the burden of proving personal jurisdiction.  See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).  To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process.  See Doering v. Copper Mountain, Inc., 259 F.3d 1201, 1209-10 (10th Cir. 2001).  Under due process, the Court's jurisdiction exists if the defendants have "minimum contacts" with the forum state, which may rest on specific or general personal jurisdiction, and the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice."  Dudnikov v. Chalk & Vermilion Fine Arts Inc., 514 F.3d 1063, 1070 (10th Cir. 2008)(quotation marks omitted).  See Bristol-Myers, Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1779-80 (2017)("Bristol-Myers"); Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).

1.    **Burden of Proof.**

As already noted, the Plaintiff bears the burden of proving personal jurisdiction.  See Wenz v. Memery Crystal, 55 F.3d at 1505.  When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of

_____

[6]Personal jurisdiction can be waived.  See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).

facts that would support the assertion of jurisdiction.  Wenz v. Memery Crystal, 55 F.3d at 1505.

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by

the defendant's affidavit."  Behagen v. Amateur Basketball Ass'n, 744 F.2d 731, 733 (10th

Cir. 1984).  When, however, a defendant presents credible evidence through affidavits or other

materials suggesting the absence of personal jurisdiction, the plaintiff must come forward with

sufficient evidence to create a genuine dispute of material fact on the issue.  See Doe v. Nat'l

Med. Servs., 974 F.2d 143, 145 (10th Cir. 1992).  Only if the plaintiff meets the obligation of

contesting the credible evidence that the defendant presents does the court resolve the factual

disputes in the plaintiff's favor.  See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v.

Amateur Basketball Ass'n, 744 F.2d at 733;  Clark v. Meijer, Inc., 376 F. Supp. 2d 1077, 1082

(D.N.M.2004)(Browning, J.).

> **2.      Due Process and Personal Jurisdiction.**

The personal-jurisdiction due process analysis is two-fold.  See Fabara v. GoFit, LLC,

308 F.R.D. 380, 400 (D.N.M. 2015)(Browning, J.).  First, the defendant must have "minimum

contacts" with the forum state such that it "should reasonably anticipate being haled into court

there."  Burger King Corp. v. Rudzewicz, 471 U.S. at 473-76.  Second, exercising personal

jurisdiction over the defendant must comport with "traditional notions of fair play and substantial

justice."  Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quotation marks

omitted).  A defendant may have "minimum contacts" with the forum state in one of two ways,

providing a court with either general or specific personal jurisdiction.  Trierweiler v. Croxton &

Trench Holding Corp., 90 F.3d 1523, 1532-33 (10th Cir. 1996)(citations omitted).

> General jurisdiction is based on an out-of-state defendant's "continuous and
> systematic" contacts with the forum state, and does not require that the claim be

related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo:* in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078. Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir. 2011).

For a court to exercise specific jurisdiction "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*." Bristol-Myers, 137 S. Ct. at 1780 (quoting Daimler AG v. Bauman, 134 S. Ct. at 754)(alterations and emphasis in Bristol-Myers). See Bristol-Myers, 137 S. Ct. at 1781 ("[T]here must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.")(quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)("Goodyear")); Burger King Corp. v. Rudzewicz, 471 U.S. at 472 (ruling that a court may assert specific jurisdiction "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.")(citations and quotation marks omitted). The Tenth Circuit has characterized this inquiry as a two part test: "[F]irst . . . the out-of-state defendant must have 'purposefully directed' its activities at residents in the forum state, and second, . . . the plaintiff's injuries must 'arise out of' defendant's forum-related activities." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1071. The Supreme Court of the United States of America has recently emphasized that, "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. In the tort context, a defendant has

"purposefully directed" his activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1072 (quoting Calder v. Jones, 465 U.S. 783, 789-90 (1984)).

Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'"  TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd., 488 F.3d 1282, 1287-88 (10th Cir. 2007)(quoting Burger King Corp. v. Rudzewicz, 471 U.S. at 473, 478). The mere foreseeability of harm occurring in a particular forum will not support a finding of minimum contacts.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S.at 295 (holding that, although "an automobile is mobile by its very design and purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a forum state, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause"). "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  World–Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297.  As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook

intentional actions that were expressly aimed at that forum state." <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d at 1077.

General personal jurisdiction jurisprudence has "followed a markedly different trajector[y]" than specific personal jurisdiction. <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 757. The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum State. <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760 (quoting <u>Goodyear</u>, 564 U.S. at 924). For corporations, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction." <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 760 (quoting <u>Goodyear</u>, 564 U.S. at 924). In <u>Daimler AG v. Bauman</u>, the Supreme Court rejected an argument that "continuous or systematic" contacts within a forum state were, in and of themselves, sufficient to subject a corporation to general personal jurisdiction. <u>See</u> <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 761-62. In so doing, the Supreme Court reemphasized that a corporation is most often exposed to general personal jurisdiction only if that entity is incorporated in the forum state or if the forum state hosts the entity's principal place of business. <u>See</u> <u>Daimler AG v. Bauman</u>, 134 S. Ct. at 761.

> If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him does not offend "traditional notions of fair play and substantial justice." <u>See</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980)(quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>See</u> <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:
>
> > (1) the burden on the defendant, (2) the forum state's interests in resolving

the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

Id. (brackets omitted); see also OMI Holdings, Inc., 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1167 (10th Cir. 2011). The Supreme Court has recently emphasized that, among these factors, the primary concern "is 'the burden on the defendant.'" Bristol-Myers, 137 S. Ct. at 1780 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)). "Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." Bristol-Myers, 137 S. Ct. at 1780.

Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

Bristol-Myers, 137 S. Ct. at 1780-81 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 294).

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M.2009)(Browning, J.), aff'd in part and rev'd in part, 382 F. App'x. 723 (10th Cir. 2010)(unpublished),[7] the Court considered whether it

---

[7]Silver v. Brown is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case

had personal jurisdiction over defendants who allegedly slandered, defamed, and caused the plaintiff -- Michael Silver -- distress, by posting a blog on the internet that portrayed him in a negative light.  See 678 F. Supp. 2d at 1204.  The Court determined that it did not have personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that McMullen "was significantly associated with the blog or controlled it in any way."  678 F. Supp. 2d at 1212. The Court also concluded that it did not have personal jurisdiction over the blog post's author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to New Mexico, and did not transact business there.  See 678 F. Supp. 2d at 1211. The Court said that Brown's blog posts similarly did not establish personal jurisdiction, because

> the blog is closer to an informative website than a commercial website.  No services are offered, and Brown is not collecting revenue from the website. Brown does not interact with the people who post information on the blog. Brown, to the Court's knowledge, did not solicit negative postings on the website. Further, even though people in New Mexico can view the website, the blog is not a website that is directed solely at the people of New Mexico.  The number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, according to the statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211-12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its decision as to Brown.  See Silver v. Brown, 382 F. App'x. at 727-32.  In an opinion that the

---

before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Silver v. Brown, Driggers v. Clark, King v. PA Consulting Grp., Inc.,, and Georgacarakos v. Nalley  have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Honorable Monrow G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Brorby and Ebel joined, the Tenth Circuit applied the three-part test from Calder v. Jones to conclude that the Court had personal jurisdiction over Brown. See Silver v. Brown, 382 F. App'x. at 727-32. Judge McKay first explained that the posting of the blog was "clearly an intentional act" designed to damage the plaintiff's reputation. 382 F. App'x. at 729. Second, Judge McKay said that Brown had "expressly aimed his blog at New Mexico," where Silver, his business, and the majority of his customers were located. 382 F. App'x. at 729. Judge McKay noted: "It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and [his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico." 382 F. App'x. at 729-30. Third, Judge McKay explained that Brown knew Silver would suffer the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business activities." 382 F. App'x. at 730.

In several other recent cases, the Court grappled with whether it could assert general or specific jurisdiction over non-individual entities. In Fabara v. GoFit, LLC, 308 F.R.D. 380 (D.N.M.2015)(Browning, J.), a plaintiff -- injured by an allegedly defective exercise ball in New Mexico -- brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma. See 308 F.R.D. at 408. The manufacturer moved to dismiss the complaint, under rule 12(b)(2), arguing that the Court lacked general jurisdiction because its contacts with New Mexico were neither continuous nor systematic. See 308 F.R.D. at 384. The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them. See 308 F.R.D. at 389. The Court rejected this theory,

explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here."  308 F.R.D. at 397.  The Court noted that the manufacturer had almost no physical connections with New Mexico, and that its New Mexico internet sales -- roughly $20,000.00 over nine years -- were insufficiently "substantial" to support general jurisdiction.  308 F.R.D. at 402-03.

In <u>Diener v. Trapeze Asset Management, Inc.</u>, 2015 WL 8332933 (D.N.M.)(Browning, J.), the Court considered whether it had specific jurisdiction over a Canadian asset-management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico.  <u>See</u> 2015 WL 8332933, at *1.  The Court concluded that it did not have specific jurisdiction for four primary reasons.  <u>See</u> 2015 WL 8332933, at *1. First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site."  2015 WL 8332933, at *15.  Second, the third-party listing was similarly passive.  <u>See</u> 2015 WL 8332933, at *15.  Third, the Court noted that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," noting that the alleged torts occurred in Canada.  2015 WL 8332933, at *17 (quoting <u>Benton v. Cameco Corp.</u>, 375 F.3d 1070, 1077 (10th Cir. 2004)).  Fourth, the plaintiffs reached out to the defendants to create the contractual relationship, distinguishing the case from others finding purposeful availment.  <u>See</u> 2015 WL 8332933, at *17 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 473).

Finally, in <u>Resource Associates Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free School Dist.</u>, 193 F. Supp. 3d 1200 (D.N.M. 2016)(Browning, J.), the Court

considered whether it had personal jurisdiction over a union that had never conducted any business in New Mexico, had never sent a representative to New Mexico, and its only contacts with a New Mexico entity were via telephone and email correspondence that the New Mexico company had initiated.  See 193 F. Supp. 3d at 1239.  Highlighting the contractual nature of the particular contacts at issue, and that due process may be satisfied in contractual relations if the defendant "'reache[s] out' to the forum state," the Court concluded it could not exercise personal jurisdiction over the union, because the union did not "not reach out to New Mexico to enter into an agreement"; rather, the New Mexico entity had initiated the communications and contract. 193 F. Supp. 3d at 1241-43 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 479-85).

## LAW REGARDING VENUE

"Venue is defined as the appropriate district court in which to file an action."  Whiting v. Hogan, 855 F. Supp. 2d 1266, 1282 (D.N.M. 2012)(Browning, J.)(citing NLRB v. Line, 50 F.3d 311, 314 (5th Cir. 1995)).  The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action. See Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979).  Venue should not be confused with subject-matter jurisdiction, see Wachovia Bank v. Schmidt, 546 U.S. 303, 315-16 (2006), or with personal jurisdiction, see Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979)("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum.").  "To the extent that they are relevant, the laws relating to venue give added protection to defendants beyond those that are provided by the statutory and constitutional

prerequisites of personal jurisdiction." 14D C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3801, at 15 (3d ed. 2007)("Wright and Miller").

The federal venue provision allows a plaintiff to file in: (i) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (ii) "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."; or, (iii) "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).

## LAW REGARDING TRANSFER OF VENUE

In 1948, Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district.  That statute provides, in pertinent part: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or division to which all parties have consented."  28 U.S.C. § 1404(a).  Section 1404(a) affords a district court broad discretion to adjudicate motions to transfer based on a case-by-case review of convenience and fairness.  See Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010); Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991). "Recognizing that what is convenient for one litigant may not be convenient for the other, the Supreme Court has taught that section 1404(a) 'is intended to place discretion in the district court to adjudicate motions for transfer according to [a] . . . case-by-case consideration of convenience

and fairness.'" <u>Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.</u>, 626 F.3d 973, 977 (7th Cir. 2010)(quoting <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988)). "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." <u>Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.</u>, 626 F.3d at 977. The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations. <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. at 29. In considering a motion to transfer, a court weighs the following discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

<u>Employers Mut. Cas. Co. v. Bartile Roofs, Inc.</u>, 618 F.3d at 1167. <u>See</u> <u>Tex. Gulf Sulphur v. Ritter</u>, 371 F.2d 145, 147 (10th Cir. 1967)(stating the factors that courts consider in making a venue determination under § 1404(a)).

28 U.S.C. § 1406 permits transfer to cure a venue defect. It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid." <u>Van Dusen v. Barrack</u>, 376 U.S. 612,

634 (1964). 28 U.S.C. § 1631 addresses transfer to cure want of jurisdiction and provides that, when a

> court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it was transferred on the date upon which it was actually filed in or noticed for the court from which it was transferred.

28 U.S.C. § 1631. The Tenth Circuit has held that 28 U.S.C. § 1631 was "specifically designed for cases transferred from one federal court to another for lack of jurisdiction," and that it "served to simplify the process and streamline its application." Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987). It has held that, although many courts have interpreted § 1406(a) to permit transfer where personal jurisdiction is lacking, the enactment of § 1631 makes such a "strained" construction "no longer necessary." Viernow v. Euripides Devel. Corp., 157 F.3d 785, 793 (10th Cir. 1998).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citations omitted). In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d, 220-21 (7th Cir.

1986)).  The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action.  Driggers v. Clark, 422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

The Court has previously granted motions to transfer.  See e.g., Montoya v. Financial Federal Credit, Inc., 872 F. Supp. 2d 1251, 1281 (D.N.M. 2012)(Browning, J.)("Montoya").  In Montoya, the Court transferred the case under 28 U.S.C. § 1406(a), because (i) "there are potential statute-of-limitations problems for the Plaintiffs if the Court were to dismiss their case"; (ii) "there is no indication that the Plaintiffs filed their Complaint in this forum to harass" the other party; and (iii) the Plaintiffs were not forum shopping.  Montoya, 872 F. Supp. 2d at 1281-82.  The Court has also denied motions to transfer.  See, e.g., Navajo Health Foundation -- Sage Hosp., Inc. v. Burwell, 86 F. Supp. 3d 1211, 1248-51 (D.N.M. 2015)(Browning, J.)("Navajo Health").  In Navajo Health, the Court weighed the § 1404(a) factors and concluded that transfer was inappropriate, in large part, because "the parties' convenience, the witnesses' convenience, and the location of physical evidence" weighed "heavily against transfer."  Navajo Health, 86 F. Supp. at 1250.  In that case, the evidence and the parties were more closely located to Albuquerque than to Phoenix -- the forum the Defendants wanted -- so the Court denied transfer.  Navaho Health, 86 F. Supp. at 1250-51.

## LAW REGARDING FORUM SELECTION CLAUSES

The Court has previously stated:

Contrary to the general rule that a defendant's removal of the action from state court waives or cures any objection to improper venue in the federal court, an objection to the lack of proper venue based on a clause designating a court of

another state or a foreign court as the exclusive forum is not waived or cured if the defendant removes the action from state court.

Knight Oil Tools, Inc. v. Unit Petrol. Co., 2005 WL 2313715, at *2 (D.N.M. Aug. 31, 2005)(Browning, J.)(citations omitted)(citing 17 James Wm. Moore, Moore's Federal Practice §§ 111.04[3][d], 111.36[5][a], at 111-42 to 111-43, 111-179 (3d ed. 2004)("Moore's")). Accord Lambert v. Kysar, 983 F.2d 1110, 1113 n.2 (1st Cir. 1993)("[A] valid forum selection clause operates to render venue improper, not only under 28 U.S.C. § 1391 [the general venue statute] but also under 28 U.S.C. § 1441(a) [the removal statute]."). See Int'l Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 113-15 (5th Cir. 1996)(without discussing removal issue, affirming dismissal on improper venue grounds of action removed from state court when forum selection clause specified state courts of another state as exclusive forum); Spradlin v. Lear Siegler Mgmt. Servs. Co., 926 F.2d 865, 866 (9th Cir. 1991)(without discussing removal issue, affirming dismissal of removed action on improper venue grounds based on clause making Saudi Arabia the exclusive forum).

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations." Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas, 571 U.S. 49, 62 (2013)("Atlantic Marine")(footnote omitted). "Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interests of justice.'" Atlantic Marine, 571 U.S. at 62-63 (quoting 28 U.S.C. § 1404(a)). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause." Atlantic Marine, 571 U.S. at 63.

The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." [Stewart Organization, Inc. v. Ricoh Corp., 487 U.S.] at 33 . . . (KENNEDY, J., concurring). For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote "the interest of justice," "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." [Stewart Organization, Inc. v. Ricoh Corp., 487 U.S.] at 33 ([Kennedy, J., concurring)).

Atlantic Marine, 571 U.S. at 63.

"The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." Atlantic Marine, 571 U.S. at 63. "First, the plaintiff's choice of forum merits no weight." Atlantic Marine, 571 U.S. at 63 ("[A]s the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained for is unwarranted."). "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." Atlantic Marine, 571 U.S. at 64 ("[A] district court may consider arguments about public-interest factors only."). "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files a suit in a different form, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules -- a factor that in some circumstances may affect public-interest considerations." 571 U.S. at 64. Given these modifications to the 28 U.S.C. § 1404(a) factor analysis, the Supreme Court held that, "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." Atlantic Marine, 571 U.S. at 62. See id. at 66 ("In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain."); Niemi v. Lasshofer, 770 F.3d 1331, 1351 (10th Cir. 2014)("We will enforce a mandatory forum selection clause unless the party challenging it

'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.'")(quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). "[T]he proper mechanism for enforcement of a forum selection clause is a motion to transfer under 28 U.S.C. § 1404(a)." Niemi v. Lasshofer, 770 F.3d at 1351. See Atlantic Marine, 571 U.S. at 60.

1. **Choice-of-Law Issues and interpreting Forum Selection Clauses.**

In Stewart Organization v. Ricoh Corp., the Supreme Court held: "Federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum selection clause." 487 U.S. at 32. See Atlantic Marine, 571 U.S. at 52 ("[A] forum selection clause may be enforced by a motion to transfer under § 1404(a)."). There is a distinction, however, between what law governs the enforceability of a forum selection clause and what law governs the interpretation of a forum selection clause. See Yavuz v. 61 MM, Ltd., 465 F.3d 418, 430 (10th Cir. 2006). See also Weber v. PACT XPP Technologies, AG, 811 F.3d 758, 770 (5th Cir. 2016)("[A]s several circuits have explicitly recognized, the question of enforceability is analytically distinct from the issue of interpretation."); Martinez v. Bloomberg LP, 740 F.3d 211, 220 (2d Cir. 2014)("Distinguishing between the enforceability and the interpretation of forum selection clauses, moreover, accords with the traditional divide between procedural and substantive rules developed under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 . . . (1938)["Erie"].").

Notably, the Tenth Circuit has not drawn rigid distinctions between state and federal law when interpreting forum selection clauses, and has applied federal law when interpreting these clauses when "there are no material discrepancies between [state] law and federal common law

on these matters." Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d 318, 320-21 (10th Cir. 1997)(not deciding the choice-of-law issue between Colorado law and federal law). In contrast, the United States Court of Appeals for the Third Circuit has ruled that federal law cannot apply to forum selection-clause interpretation, because that would "frustrate[] the principles of *Erie*." Collins on behalf of herself v. Mary Kay, Inc., 874 F.3d 176, 182 (3d Cir. 2017)("Applying federal common law to these issues would generate a sprawling federal general common law of contracts."). See Weber v. PACT XPP Technologies, AG, 811 F.3d at 770 ("A choice-of-law analysis to determine what substantive law should guide this court's interpretation of the [forum selection clause] is proper under ordinary principles governing diversity litigation."); Martinez v. Bloomberg LP, 740 F.3d at 221 ("*Erie* . . . warns against an approach that would force federal courts to generate a sprawling federal general common law of contracts to govern such questions [of interpretation] whenever they arise in the context of forum selection clauses."). But see Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 513 (9th Cir. 1988)("Moreover, because enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses."). Since the Tenth Circuit's decision in Excell, Inc. v. Sterling Boiler & Mech., Inc., it has not confronted whether state or federal law should be used to interpret a forum selection clause, but, when confronted with a contract between foreign citizens with a forum selection clause, the Tenth Circuit has held that, "under federal law, the courts should ordinarily honor an international commercial agreement's forum-selection provision *as construed under the law specified in the agreement's choice-of-law provision*." Yavuz v. 61 MM, Ltd., 465 F.3d at 430 (emphasis in original).

2.    **Enforceability of Forum Selection Clauses.**

The Supreme Court has noted that there is substantial overlap between precedent interpreting the enforceability of arbitration agreements and forum selection clauses.  See Scherk v. Alberto-Culver Co., 417 U.S. 506, 518-19 (1974)("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.").  The Supreme Court has stated that "an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion."   Scherk v. Alberto-Culver Co., 417 U.S. at 518-19 (emphasis added).   Reiterating this rule, the Tenth Circuit has stated: "A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed. R. Civ. P. 9(b) and 11, plead fraud going to the specific provision; the teachings of Scherk, interpreting M/S Bremen, require no less."  Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960.  Thus, the Tenth Circuit requires that a party seeking to avoid a forum selection clause produce evidence showing that the arbitration provision is a product of fraud or coercion.  See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960 ("Third, at no time did Riley offer any evidence on the stipulated issues tending to show that the arbitration provision (or any other choice provision, for that matter) was a product of fraud or coercion." (emphasis in original)).  The Honorable Lourdes A. Martinez, former United States Magistrate Judge for the District of New Mexico, has similarly stated that "[a] general claim of fraud or misrepresentation concerning an entire contract does not affect the validity of a forum selection clause."  Mann v. Auto. Protection Corp., 777 F. Supp. 2d 1234, 1240 (D.N.M. 2011) (Martinez, J.).

The Supreme Court has rejected the notion that the parties must specifically negotiate a forum selection clause for it to be enforceable. See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593 ("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining."). Accord Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 221 (5th Cir. 1998)(holding that a forum selection clause in a seaman's employment contract was enforceable even when the parties did not negotiate for the provision). Magistrate Judge Martinez has similarly held:

> This argument also fails because unequal bargaining position and form contracts do not invalidate forum selection provisions. The fact that Plaintiff is an individual and the contract was presented to him as a form contract does not invalidate the forum selection provision, and Plaintiff's belief that he could not negotiate or change the terms of the Agreement does not rise to the level of overreaching that would make it unreasonable or unfair to enforce the forum selection provision.

Mann v. Auto. Protection Corp., 777 F. Supp. 2d at 1240 (citations omitted)(citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593-94).

Courts have also imposed a high standard for negating a forum selection clause on the basis that it is inconvenient. The Tenth Circuit has, for instance, stated:

> Finally, in Carnival Cruise Lines, the Court relied on M/S Bremen in enforcing a domestic forum selection clause, despite inconvenience to the plaintiffs. Only a showing of inconvenience so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause.

> Riley suggests that enforcement of the choice of forum and law provisions is unreasonable because he effectively will be deprived of his day in court. The basis underlying this contention is his perception that recovery will be more difficult under English law than under American law. Riley will not be deprived of his day in court. He may, though, have to structure his case differently than if proceeding in federal district court. The fact that an international transaction may

be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair. English law does not preclude Riley from pursuing an action for fraud and we agree with the Defendants that the Lloyd's Act does not grant statutory immunity for such claims. We have been shown nothing to suggest than an English court would not be fair, and in fact, our courts have long recognized that the courts of England are fair and neutral forums. Given the international nature of the insurance underwriting transaction, the parties' forum selection and choice of law provisions contained in the agreements should be given effect.

Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958 (citations omitted). Magistrate Judge Martinez similarly held that, "[t]o invalidate a forum selection provision for reasons of inconvenience, however, a party must show that enforcement of the provision would cause an inconvenience 'so serious as to foreclose a remedy.'" Mann v. Auto. Protection Corp., 777 F. Supp. 2d at 1240 (quoting Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

### 3. Permissive and Mandatory Forum Selection Clauses.

"The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'" Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d 921, 926 (10th Cir. 2005). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d at 926-27 (citation omitted). In K & V Scientific Co. v. BMW, the Tenth Circuit adopted the majority rule for enforcing forum selection clauses. See 314 F.3d at 500. Specifically, it concluded that, when venue is specified, such as when the parties designate a particular county or tribunal, and mandatory or obligatory language accompanies the designation, a forum selection clause will be enforced as mandatory. See K & V Scientific Co. v. BMW, 314 F.3d at 499.

In Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342 (10th Cir. 1992), the Tenth Circuit held that the forum selection clause was mandatory and precluded removal of the case to federal court.  See 963 F.2d at 1343.  In that case, the defendant appealed an order remanding the breach-of-contract action to a Kansas state court.  See 963 F.2d at 1343.  The federal district court concluded that an enforceable forum selection clause in the agreement required the remand.  See 963 F.2d at 1343.  The clause in the Milk 'N' More, Inc. v. Beavert agreement provided: "The parties herein have mutually agreed that said lease and the purchase option agreement contained herein, where applicable, shall be governed by the laws of the State of Kansas and the parties further agree that venue shall be proper under this agreement in Johnson County, Kansas."  963 F.2d at 1343.  The federal district court granted the motion to remand on the ground that the contractual agreement contained an enforceable forum selection clause, relying on the principle that forum selection clauses are "prima facie valid and should be enforced" unless shown to be unreasonable.  963 F.2d at 1344 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. at 10).  On appeal, the defendant contended that the federal district judge erred in construing the clause as a mandatory agreement between the parties to resolve any dispute under the contract exclusively in the state court in Johnson County, Kansas; he said instead that the court should have construed the clause as merely a permissive designation on venue.  See Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1344.  The defendant contended that the district court erroneously construed the contract language as an agreement making Johnson County, Kansas, the exclusive forum in which the parties could resolve disputes that arose under the agreement.  See 963 F.2d at 1345.  The Tenth Circuit affirmed, stating that the clause's dispositive portion provided that "venue shall be proper under this agreement in Johnson County, Kansas."  963

F.2d at 1345-46. The Tenth Circuit held: "We are persuaded that the district judge made the proper interpretation and correctly enforced the clause." 963 F.2d at 1346.

In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit stated that it was mindful that a waiver of one's statutory right to be in federal court must be "clear and unequivocal." 963 F.2d at 1346 (quoting Regis Assocs. v. Rank Hotels (Mgmt.) Ltd., 894 F.2d 193, 195 (6th Cir. 1990)). The Tenth Circuit acknowledged that, if there is ambiguity in the clause, the court should construe it against the drafter. See Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346. Nevertheless, the Tenth Circuit said that "[s]uch clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." 963 F.2d at 1346. The Tenth Circuit stated that the provision that "venue shall be proper under this agreement in Johnson County, Kansas" was "reasonably clear and the wording strongly points to the state court of that county." 963 F.2d at 1346. The Tenth Circuit said the use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the contrary is made. 963 F.2d at 1346. In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit cited with approval Intermountain Systems, Inc. v. Edsall Construction Co., 575 F. Supp. 1195, 1198 (D. Colo. 1983)(Kane, J.), stating that the case was particularly persuasive, because it held enforceable a similar clause: "It is agreed for purposes of this agreement, venue shall be in Adams County, Colorado." Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346. In K & V Scientific Co. v. BMW, the parties entered into a new agreement which, unlike their earlier agreement, contained a jurisdictional and choice-of-law provision, which stated: "Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich. All and any disputes arising out of or in connection with this agreement are subject to the laws of the Federal

Republic of Germany." 314 F.3d at 496. The plaintiff filed suit, asserting various contract, tort, and statutory causes of action. See 314 F.3d at 497. The defendant removed the case to federal court, and moved to dismiss under to rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure for lack of personal jurisdiction and improper venue. See 314 F.3d at 497. The district court granted the defendant's motion to dismiss for improper venue. See 314 F.3d at 497. The district judge concluded that the forum selection clause contained in the second confidentiality agreement was "unambiguous and enforceable," and demonstrated "[t]he parties' intent to locate jurisdiction for this action solely in the courts of Munich." 314 F.3d at 497. On appeal, the plaintiff argued that the clause's language contained no reference to venue, contained no language designating the courts in Munich as exclusive, and contained no language indicating that suit elsewhere is impermissible. See 314 F.3d at 497. The Tenth Circuit made the distinction between a venue provision which fixes venue in a certain location -- a mandatory clause -- versus one which merely grants jurisdiction to a certain place -- a permissive clause. The Tenth Circuit set forth an analysis for determining whether forum selection clauses within a contract are mandatory or permissive:

> This court and others have "frequently classified" forum selection clauses "as either mandatory or permissive." Excell, 106 F.3d at 321. "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum." Id. (internal quotations omitted). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." Id. (internal quotations omitted).

K & V Scientific Co. v. BMW, 314 F.3d at 498. The Tenth Circuit cited Milk 'N' More, Inc. v. Beavert, stating that the Tenth Circuit there had concluded that a forum selection clause stating "venue shall be proper under this agreement in Johnson County, Kansas" was mandatory. K & V Scientific Co. v. BMW, 314 F.3d at 498. The Tenth Circuit concluded, however, that no

Tenth Circuit case had yet dealt with a forum selection clause similar to the one at issue.  K & V Scientific Co. v. BMW, 314 F.3d at 501.

The Tenth Circuit stated that, "generally speaking," the Courts of Appeals are in "agreement" that the following formula is to be used in determining whether the selection clause is mandatory or permissive: "[W]here venue is specified [in a forum-selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive."  K & V Scientific Co. v. BMW, 314 F.3d at 499 (alterations in original)(quoting Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 757 (7th Cir. 1992)).  The Tenth Circuit analyzed language from six forum selection clauses considered permissive, including four different forum selection clauses wherein the provision used the word "shall" together with the name of a court.  K & V Scientific Co. v. BMW, 314 F.3d at 499.  The K & V Scientific Co. v. BMW formula for the four clauses using the word "shall" and considered permissive are:

> * "Any dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts."  John Boutari [& Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs. Inc.], 22 F.3d [51,] 52 [(2d Cir. 1994)].
>
> . . . .
>
> * "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract."  Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 76 (9th Cir. 1987).
>
> . . . .
>
> * "This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New

York." Keaty [v. Freeport Indon., Inc.], 503 F.2d [955,] 956 [(5th Cir. 1974)] (concluding phrase was ambiguous and, when construed against drafter, was permissive).

* "This agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany. * * * Place of jurisdiction shall be Dresden." Hull 753 Corp. v. Elbe Flugzeugwerke GmbH, 58 F. Supp. 2d 925, 926 (N.D. Ill. 1999).

K & V Scientific Co. v. BMW, 314 F.3d at 499. The other two examples of permissive clauses are:

* "The laws and courts of Zurich are applicable." Caldas & Sons, Inc. v. Willingham, 17 F.3d 123, 127 (5th Cir. 1994).

. . . .

* "Place of jurisdiction is Sao Paulo/Brazil." Citro Florida[, Inc. v. Citrovale, S.A.], 760 F.2d 1231, 1231 (11th Cir. 1985)(concluding phrase was ambiguous and, when construed against drafter, was permissive).

K & V Scientific Co. v. BMW, 314 F.3d at 499. The Tenth Circuit in K & V Scientific Co. v. BMW also noted that the courts had held the following clauses to be mandatory:

* "[P]lace of jurisdiction . . . is the registered office of the trustee [in Germany], to the extent permissible under the law." Frietsch v. Refco, Inc., 56 F.3d 825, 827 (7th Cir. 1995); see id. at 829 (concluding that the phrase "to the extent permissible under the law" "would have no function if the [forum selection] clause were not mandatory -- if, in other words, a party could sue anywhere he wanted").

* "In all disputes arising out of the contractual relationship, the action shall be filed in the court which has jurisdiction for the principal place of business of the supplier . . . . The supplier also has the right to commence an action against the purchaser at the purchaser's principal place of business." Paper Express[, Ltd. v. Pfankuch Maschinen GmbH], 972 F.2d at 755; id. at 756 (concluding the last sentence "would be appropriate and meaningful only if the clause were in fact mandatory").

* "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. Venue of any action brought hereunder shall be deemed to be

in Gloucester County, Virginia." <u>Docksider[, Ltd. v. Sea Tech., Ltd.,]</u> 875 F.2d [762,] 763 (9th Cir. 1989).

<u>K & V Scientific Co. v. BMW</u>, 314 F.3d at 499-500 (footnote omitted).

Using the majority rule, the Tenth Circuit had little trouble concluding that the forum selection clause at issue in <u>K & V Scientific Co. v. BMW</u> was permissive. <u>See</u> 314 F.3d at 500. The clause referred only to jurisdiction and did so in non-exclusive terms. <u>See</u> 314 F.3d at 500. A clause is mandatory, in accordance with <u>K & V Scientific Co. v. BMW</u>, only when the venue is specific with mandatory language. <u>See</u> 314 F.3d at 500. Mandatory language is venue coupled with such terms as "exclusive," "sole," or "only." 314 F.3d at 500. If the paragraph is ambiguous -- capable of being construed as either permissive or mandatory -- the paragraph is deemed to be permissive. The Tenth Circuit in <u>K & V Scientific Co. v. BMW</u> states:

> Even if the clause were deemed to be ambiguous (i.e., capable of being construed as either permissive or mandatory), the rule in this circuit and others is that the clause must be construed against the drafter, in this case defendant. <u>See</u> <u>Milk 'N' More</u>, 963 F.2d at 1346 (holding "if there is any ambiguity in the clause [the court] should construe it against the drafter"). Accordingly, the clause would be deemed permissive.

344 F.3d at 500-01 (citations omitted).

In an unpublished decision that followed <u>K & V Scientific Co. v. BMW</u>, the Tenth Circuit clarified that the <u>K & V Scientific Co. v. BMW</u> decision addresses the issue

> whether a recognition-of-jurisdiction provision implies an exclusive selection of venue. Use of mandatory language like "shall" in a clause dealing <u>directly with venue</u> carries stronger implications regarding the intent to designate an exclusive forum. <u>See</u> <u>Milk 'N' More</u>, 963 F.2d at 1346 (holding clause stating that "venue shall be proper . . . in" effected an exclusive designation of forum). When, as here, the relation of such language to the question of venue is at most derivative, through a jurisdictional provision, decisions such as "<u>Milk 'N' More</u> . . . are of little assistance in resolving the . . . dispute." <u>K & V Scientific</u>, 314 F.3d at 498-99.

King v. PA Consulting Grp., Inc., 78 F. App'x 645, 648 n.2 (10th Cir. 2003)(unpublished) (emphasis in original).  The Tenth Circuit, in American Soda, LLP v. U.S. Filter Wastewater Group, Inc., has also recognized that a party to a contract can waive venue in federal court in a forum selection clause, thus requiring remand the dispute to state court:

> The parties not only consented to the jurisdiction of the Colorado state courts, they went a step further by designating the state courts or arbitration as "the exclusive forum for the resolution of any disputes related to or arising out of [the contract]."  We conclude that by consenting to state court jurisdiction and selecting the state courts as the "exclusive forum," the parties indicated their intent to make venue exclusive in state court with respect to any disputes not resolved in arbitration.  Because the forum selection clause at issue is mandatory, U.S. Filter unequivocally waived its right to remove this lawsuit to federal court.

428 F.3d at 927.

The Court has concluded that a forum selection clause is mandatory when the clause states that a certain district or county is "the exclusive jurisdiction" for litigation.  See Montoya, 872 F. Supp. at 1276 (emphasis in original)("The word exclusive in relation to Harris County as a venue indicates the parties' intent that Harris County be the exclusive venue for any suits."). The Court has also determined that a forum selection clause with "shall" language was mandatory.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1211 (D.N.M. 2015)(Browning, J.).  Although acknowledging the Tenth Circuit's rule that "shall" language does not automatically make a forum selection clause mandatory, it determined that the forum selection clause at issue strongly "parallels [the] structure of the clause in Docksider, Ltd v. Sea Technology, Ltd.," so concluded that the  clause was mandatory. Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under <u>Erie</u>, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." <u>Butt v. Bank of Am., N.A.</u>, 477 F.3d 1171, 1179 (10th Cir. 2007). <u>Accord</u> <u>Mem. Hosp. v. Healthcare Realty Trust Inc.</u>, 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." <u>Guidance Endodontics, LLC v. Dentsply Int'l., Inc.</u>, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an <u>Erie</u> prediction should look first to the words of the state supreme court."[8] <u>Peña v. Greffet</u>, 110 F. Supp. 3d

---

[8]In performing its <u>Erie</u>-mandated duty to predict what a state supreme court would do if faced with a case, <u>see</u> <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, <u>see</u> <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d at 1247 n.30. Courts should, obviously, be reticent to formulate an <u>Erie</u> prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an <u>Erie</u> prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. <u>See</u> <u>Peña v. Greffet</u>, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court <u>Erie</u> predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty

1103, 1132 (D.N.M. 2015)(Browning, J.)("Peña").[9]  If the Court finds only an opinion from the

Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court

of Appeal[s'] decision in making its determination, the Court is not bound by the Court of

Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."

Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where

the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district

court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the

case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must

attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek

guidance from decisions rendered by lower courts in the relevant state")).[10]  The Court may also

---

corner of the common law which does not get much attention or have much application -- and
clearly wrong.

[9]The Supreme Court of New Mexico later adopted and cited heavily the Court's
reasoning from Peña.  See Spurlock v. Townes, 2016-NMSC-014, ¶¶ 16-20, 368 P.3d 1213,
1217-18.  That kind of result is what federal courts should strive for when making Erie
predictions.
    [10]The Supreme Court has addressed what the federal courts may use when there is not a
decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of
> the federal courts, where the state law supplies the rule of decision, to ascertain
> and apply that law even though it has not been expounded by the highest court of
> the State.  An intermediate state court in declaring and applying the state law is
> acting as an organ of the State and its determination, in the absence of more
> convincing evidence of what the state law is, should be followed by a federal
> court in deciding a state question.  We have declared that principle in *West v.
> American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.
> It is true that in that case an intermediate appellate court of the State had
> determined the immediate question as between the same parties in a prior suit, and
> the highest state court had refused to review the lower court's decision, but we set

rely on Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[11]  Ultimately, "the Court's task is to

---

forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A Moore's § 124.20, at 75, 83 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[11]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which holds that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent

result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there at least to be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a

better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Court, for example, gets the New Mexico Bar Bulletin and at least glances at every published Supreme Court of New Mexico case and some of the published Court of Appeals of New Mexico cases.

The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state Supreme Court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); See Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of state law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3], at 90 n.7.3 (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, the <u>Restatements of Law</u>, and personnel changes on the court -- considerations that would not remotely inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree. In <u>Wankier v. Crown Equipment Corp.</u>, the Tenth Circuit said that,

_____

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[*, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening

predict what the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## ANALYSIS

The Court will sever Presidential Hospitality's and Blue's claims and transfer them to the District of New Jersey. As an initial matter, the Court concludes that the forum selection clause is contractually valid, as the Plaintiffs do not challenge the provision's validity specifically and there is no evidence in the record to suggest that it is invalid. The Court further concludes, as another initial matter, that, should the Court transfer Presidential Hospitality's and Blue's claims, the District of New Jersey may assert personal jurisdiction over those two parties, because Presidential Hospitality and Blue consented to New Jersey as a forum for claims arising from the Franchise Agreement. The Court determines, however, that Ace Development did not consent to a New Jersey forum and that there is no evidence that Ace Development is otherwise subject to suit in New Jersey. Accordingly, the Court may not soundly transfer Ace Development's claims to New Jersey. See Chrysler Credit Corp. v. Country Chrysler, 928 F.2d at 1515 ("1404(a) does not allow a court to transfer a suit to a district which lacks personal jurisdiction."). Nevertheless,

_____

decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4], at 94 (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

given the strong policy preference for honoring forum selection clauses, the Court concludes that, if the 28 U.S.C. § 1404(a) factors counsel toward transferring Presidential Hospitality's and Blue's claims, severance of Ace Development's claims and transfer of Presidential Hospitality's and Blue's claims is proper.

Next, the Court concludes that, under <u>Stewart Organization, Inc. v. Ricoh Corporation</u>, the Court cannot properly consider state statutes voiding forum selection clauses when a party moves for a 28 U.S.C. § 1404(a) transfer. <u>See</u> 487 U.S. at 30-31. Moreover, even if the Court could properly consider New Mexico's public policy, it would conclude that the Franchise Agreement and the Assignment Agreement are not construction contracts as N.M. Stat. Ann. § 57-28A-1 contemplates. Those agreements are license agreements and not contractor-subcontractor agreements. Thus, the proper inquiry is guided only by 28 U.S.C. § 1404(a) and, as the Supreme Court has recently commanded, "[w]hen the parties have agreed to a valid forum selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." <u>Atlantic Marine</u>, 571 U.S. at 62. The Court discerns no unusual circumstances suggesting that it should buck the Supreme Court's command, so the Court will transfer Presidential Hospitality's and Blue's claims to New Jersey.

## I.      THE FORUM SELECTION CLAUSE IS CONTRACTUALLY VALID.

When faced with a forum selection clause that covers the dispute, a preliminary question is whether that clause is contractually valid. <u>See Atlantic Marine</u>, 571 U.S. at 62 n.5. "Forum selection provisions are prima facie valid and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." <u>Riley v. Kinglsey</u>

Underwriting Agencies, Ltd., 969 F.2d at 957.  "A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed. R. Civ. P. 9(b) and 11, plead fraud going to the specific provision."  Riley v. Kinglsey Underwriting Agencies, Ltd., 969 F.2d at 960.  "Thus, the Tenth Circuit requires that a party seeking to avoid a forum selection clause or arbitration provision produce evidence showing that the forum selection clause or arbitration provision was a product of fraud or coercion."  Juaire v. T-Mobile West, LLC, 2013 WL 6504326, at *11 (D.N.M. Oct. 31, 2013)(Browning, J.)(citing Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960).

The Plaintiffs present no evidence that the forum selection clause was induced by fraud or coercion.  See generally Response at 1-15.  They contend that the "Defendants' reliance on the forum selection clause is misplaced because Plaintiffs contend . . . that they were fraudulently induced to enter into the Microtel Franchise Agreement," Response at 2; see Tr. at 10:21-22 (Enriquez), but attacks on the contract in general do not amount to attacks on specific contract provisions, see Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960.  "Riley's complaint alleges that he was induced generally to enter the contracts in question as a result of fraud. . . .  However, Riley never pleaded that the *specific* choice provisions at issue were obtained by fraud."  Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960 (emphasis in original).  See Weber v. PACT XPP Technologies, AG, 811 F.3d at 773 ("Arguments that go to the validity of the contract as a whole do not prevent enforcement of an FSC.").  Indeed, as in Riley v. Kingsley Underwriting Agencies, Ltd., the Plaintiffs' FAC alleges that they were fraudulently induced into entering the Franchise Agreement, Assignment Agreement, and Guaranty in general, but not that they were fraudulently induced to enter the forum selection

clause in particular. See, e.g., FAC ¶ 2, at 2 ( alleging that "Wyndham and Microtel . . . induced

Mr. Blue to purchase a Microtel Franchise"); id. ¶ 42, at 9 (alleging that "[t]o induce Mr. Blue

into purchasing the Microtel franchise. . . "); id. ¶¶ 94-95, 113(a)-(i), 118-20, at 21, 24-26. The

FAC, in fact, does not once mention the forum selection clause. See generally FAC ¶¶ 1-137, at

1-29. Accordingly, because the Plaintiffs have not met their "heavy burden" to demonstrate that

the forum selection clause is contractually invalid, the Court concludes that the forum selection

clause is contractually valid. Riley v. Kinglsey Underwriting Agencies, Ltd., 969 F.2d at 957.

## II. THE DISTRICT OF NEW JERSEY HAS PERSONAL JURISDICTION OVER PRESIDENTIAL HOSPITALITY AND BLUE, BUT NOT ACE DEVELOPMENT.

Another threshold matter to consider is whether the transferee court has jurisdiction over

the transferred parties. See Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1515

(requiring transferor court to determine that transferee court has personal jurisdiction over parties

before it may transfer); Georgacarakos v. Nalley, 356 F. App'x 210, 212 (10th Cir.

2009)(unpublished). Presidential Hospitality and Blue consented to personal jurisdiction in New

Jersey by signing the Franchise Agreement and Assignment Agreement. See Franchise

Agreement at 29 ("You expressly agree that you are subject to the jurisdiction and venue of

[New Jersey state or federal] courts for purposes of such litigation."); Assignment Agreement at

2; Response at 2 n.1 (conceding that the Assignment Agreement "incorporates the forum-

selection clause").[12] Therefore, should the 28 U.S.C. § 1404(a) test favor transfer of those two

---

[12]The Plaintiffs argue that New Jersey cannot assert personal jurisdiction over the parties for any of those parties' claims as they relate to the Dev. Incentive Note, because there is no forum selection clause in the Dev. Incentive Note. See Tr. at 9:19-10:7 (Enriquez). The Court disagrees, because the Dev. Incentive Note, as an amendment to the Franchise Agreement, is "related to" the Franchise Agreement, so is covered by the Franchise Agreement's forum selection clause. Franchise Agreement at 29("Any litigation arising out of or related to this

Plaintiffs, the Court may transfer them. See United States v. Vreeken, 803 F.2d 1085, 1089 (10th Cir. 1986)("[P]arties can consent to personal jurisdiction.").

A separate issue is whether the District of New Jersey may assert personal jurisdiction over Ace Development. The FAC alleges that Ace Development and Blue both guaranteed Presidential Hospitality's obligations, see FAC ¶ 2, at 2, but the Guaranty filed with the Court has only Blue as a signatory, see Guaranty at 1 (acknowledging that the forum selection clause in the Franchise Agreement applies to the Guaranty). Thus, it appears that Ace Development has not expressly consented to a New Jersey forum. Under some Courts of Appeals precedent that fact would not end the issue, because many have held that a non-party to a forum selection clause may still be bound to that clause if the non-party is "closely related to the dispute such that it becomes foreseeable that it will be bound." Hugel v. Corporation of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993)("Hugel"). See Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 722 (2d Cir. 2013); Holland America Line Inc. v. Wartsila North America, Inc., 485 F.3d 450, 456 (9th Cir. 2007); Marano Enterprises of Kansas v. Z-Teca Restaurants, L.P., 254 F.3d 753, 757 (8th Cir. 2001); Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1299 (11th Cir. 1998).[13] Thus, for example, in Hugel, the United States Court of Appeals for the Seventh Circuit determined that two corporations -- Gulf Coast Marine, Inc. and Ocean Marine Indemnity, Co., companies that were non-signatories to a forum selection clause -- could be bound by that clause, because the clause's signatory, Dieter Hugel, was chairman and president of both corporations

Agreement . . . shall be instituted . . . in the state or federal court . . . closest to our then-current principal business address."). See Assignment Agreement at 4 (noting that the Dev. Incentive Note amends the Franchise Agreement).

[13]For an opinion exploring this rule's rationale, see Adams v. Raintree Vacation Exchange, LLC, 702 F.3d 436, 440-41 (7th Cir. 2012)(Posner, J.).

and Hugel owned ninety-nine percent of Gulf Coast Marine, and Gulf Coast Marine owned one-hundred percent of Ocean Marine Indemnity Company.  See Hugel, 999 F.2d at 209-10 ("[T]he corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause.").  Confronted with similar facts, the United States Court of Appeals for the Eight Circuit concluded comparably:

> As for Leon Marano, the plaintiffs jointly represented to the District Court that he is a shareholder, officer director of Marano Enterprises, which *was* a party to the agreements.  As such, he is, without question, "closely related" to the disputes arising out of the agreements and properly bound by the forum-selection provisions.

Marano Enterps. of Kansas v. Z-Teca Restaurants, L.P., 254 F.3d at 757 (quoting Hugel, 999 F.2d at 209)(emphasis in Marano Enterps of Kansas v. Z-Teca Restaurants, L.P).

The Tenth Circuit has never considered whether a forum selection clause can bind a non-party.  The Court has, however, encountered such a situation before.  It noted the prevailing winds from those United States Courts of Appeals, stating that their rule is that a forum selection clause may bind a non-signatory "if the connection between the agreement and the non-signatory is sufficiently strong -- i.e., if the party is closely related to the dispute such that it becomes foreseeable that it will be bound."  Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1211 (D.N.M. 2015)(Browning, J.).  "Under this standard, courts have, for example, applied forum-selection clauses to corporations owned and controlled by the signatory."  Presbyterian Healthcare Servs. v. Goldman Sachs Co., 122 F. Supp. 3d at 1211.  The Court, nevertheless, rejected the rule noting that it is wary of "applying contracts and forum selection clauses to people who did not sign the contract."  Presbyterian Healthcare Servs. v. Goldman Sachs Co., 122 F. Supp. 3d at 1211 (citing Smith/Enron Cogeneration Ltd. P'ship, Inc.

v. Smith Cogeneration Int'l, 198 F.3d 88, 97 (2d Cir. 1999)).  The Third Circuit has adopted the

same rule that the Court has chosen.  See In re: Howmedica Osteonics Corp., 867 F.3d 390, 407

(3d Cir. 2017)("We have held, however, that a forum-selection clause can be enforced only by

the signator[y] to [the] agreement[].")(alterations in original).  See also Dayhoff Inc. v. Heinz

Co., 86 F.3d 1287, 1293-96 (3d Cir. 1996)(determining that a "forum selection clause . . . can be

enforced only by the signatories to those agreements" because of Supreme Court

precedent)(citing First Options of Chicago, Inc. v. Kaplan, 518 U.S. 938, 945-46 (1995)).

The Court is inclined to stick with its previous holding.  It notes, however, that should it

adhere to its previous holding, it appears at first glance that judicial inefficiency would result.

The New Jersey Action and this action arise from a common nexus of fact.  The Defendants

assert that the Plaintiffs owe damages under the Franchise Agreement; the Plaintiffs assert that

they do not owe damages, because the Franchise Agreement was induced by fraud.  See supra at

18.  Accordingly, two courts' work could be reduced to one court's work should the Court

transfer all of the Plaintiffs' claims.  That efficiency is seemingly stymied if the Court sticks with

its previous ruling, because that holding results in the Court keeping Ace Development's claims

and thus two courts would adjudicate nearly identical cases.

A curious aberration results if the Court scraps its previous holding, however: the Court

would conclude that New Jersey has personal jurisdiction over Ace Development by virtue of the

forum selection clause, but the New Jersey court would be forced to conclude that it does not

have personal jurisdiction over Ace Development, because the Third Circuit -- which includes

the District of New Jersey -- has rejected the theory that forum selection clauses can bind non-

signatories.  See In re: Howmedica Osteonics Corp., 867 F.3d at 407.[14]  Accordingly, after transfer to New Jersey, the Defendants could likely secure a dismissal of Ace Development's claims.  The ultimate result is that Ace Development would likely re-file its claims here.  Thus, transferring Ace Development would not produce judicial efficiency.  The Court, therefore, sees no reason to depart from its previous determination that forum selection clauses do not bind non-signatories, and the Court will not transfer Ace Development and its claims to the District of New Jersey.

Although the Court concludes that it cannot transfer Ace Development and its claims to New Jersey, the Court contemplates severing Ace Development's claims and transferring Presidential Hospitality's and Blue's claims to New Jersey.  See Presbyterian Healthcare Serv. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1214 ("[A] district court may sever a case under Rule 21 to 'transfer one action while retaining jurisdiction over another.'")(quoting Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1519).  See also Fed. R. Civ. P. 21; Wright and Miller, § 3846, at 104 ("[I]n cases involving multiple plaintiffs or defendants, the district court has discretion to sever under Civil Rule 21 and transfer the case as to some parties while retaining jurisdiction over the case as to other parties.").  In considering whether severance and transfer is appropriate, the Court has noted "that it should not sever and transfer cases when the cost to judicial efficiency outweighs the benefit to the parties, particularly in light of § 1404(a)'s

_____

[14]This argument assumes that New Jersey cannot assert personal jurisdiction over Ace Development under a minimum-contacts analysis.  The Court has no evidence or even argument about Ace Development's contacts with New Jersey.  Should the Defendants demonstrate to the Court that New Jersey has personal jurisdiction via that or some other avenue, the Court would be willing to reconsider its conclusion here.  The Court also would be willing to reconsider this conclusion if the Defendants demonstrate that Ace Development signed a separate guaranty that incorporated the Franchise Agreement's forum selection clause.

purpose to minimize inefficiency." <u>Presbyterian Healthcare Services v. Goldman Sachs & Co.</u>, 122 F. Supp. 3d at 1214 (citing <u>Cont'l Grain Co. v. The FBL-585</u>, 364 U.S. 19, 26 (1960)).  This normal efficiency principle, however, has little bearing on the Court's decisionmaking here.  No matter what the Court does, two courts will decide highly similar issues.  If the Court severs and transfers Presidential Hospitality's and Blue's claims, both New Jersey and the Court will have to adjudicate facts surrounding the parties' various agreements; if the Court declines to sever, both New Jersey and the Court will still have to adjudicate facts surrounding the parties' various agreements.  Some efficiency might result from severing Ace Development from the rest, as Ace Development is not a party in the New Jersey Action.  Thus, if the Court severs and transfers Presidential Hospitality and Blue, one court may hear all of the facts specific to those two parties.  If efficiency would result, however, it would likely be slight.  Given that efficiency concerns do not give the Court a clear signal either way, the Court determines that the forum selection clause points toward severance and transfer.  <u>See</u> <u>In re Rolls Royce Corp.</u>, 775 F.3d 671, 681 (5th Cir. 2014)(concluding that, in light of <u>Atlantic Marine</u>, severance and transfer is proper if the private parties' choices -- as expressed through a forum selection clause -- outweigh the judicial efficiency of adjudicating all the claims in one forum); <u>Ashley Furniture Indus., Inc. v. Packaging Corp. of Amer.</u>, 275 F. Supp. 3d 957, 961-62 (W.D. Wis. 2017)(Conley, J.)("'[I]f the Court were to conclude that the pertinent factors render transfer appropriate under § 1404(a), then severance, too, would be proper.'")(quoting <u>Paduano v. Express Scripts, Inc.</u>, 55 F. Supp. 3d 400, 431-32 (E.D.N.Y. 2014)(Spatt, J.))  The Court therefore turns to the 1404(a) factors to determine whether it should transfer Presidential Hospitality's and Blue's claims.

## III. THE COURT, SITTING IN DIVERSITY, MAY NOT PROPERLY CONSIDER NEW MEXICO PUBLIC POLICY WHEN CONSIDERING A TRANSFER MOTION UNDER § 1404(a), BUT, EVEN IF IT COULD, THE FORUM SELECTION CLAUSE IS NOT VOID UNDER NEW MEXICO LAW, BECAUSE THE OPERATIVE AGREEMENTS ARE NOT CONSTRUCTION CONTRACTS.

At the outset, the Court notes that, when considering transfer under 28 U.S.C. § 1404(a), it cannot properly consider whether the forum selection clause is void under New Mexico public policy. As Stewart Organization, Inc. v. Ricoh Corporation instructs, when a federal court sits in diversity and construes a 28 U.S.C. § 1404(a) transfer motion requesting transfer to another federal court pursuant to a forum selection clause, 28 U.S.C. 1404(a) trumps any state-law void-under-public-policy arguments. See Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 30-31. In that case, the Supreme Court considered whether the United States District Court for the Northern District of Alabama properly denied a motion to transfer under 28 U.S.C. § 1404(a), despite a forum selection clause designating Manhattan as the proper forum, when the district court reasoned that Alabama public policy voided the forum selection clause. See Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 24. In adjudicating the matter, the Supreme Court analogized to Hanna v. Plumer, 380 U.S. 460, 471 (1965) to frame the inquiry. It reasoned that so long as 28 U.S.C. § 1404(a), "covers the point in dispute," and § 1404(a) is a "a valid exercise of Congress' authority under the Constitution . . . that is the end of the matter." Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 27. The Supreme Court held that, because the issue was whether to transfer the case, 28 U.S.C. § 1404(a) "governs the parties' venue dispute," 487 U.S. at 28, and that the statute was a valid exercise of Congressional power "under Article III as augmented by the Necessary and Proper Clause," see id. at 31-32. Accordingly, it

determined that Alabama's public policy invalidating the forum selection clause was of no moment:

> The premise of the dispute between the parties is that Alabama law may refuse to enforce forum-selection clauses providing for out-of-state venues as a matter of state public policy. If that is so, the District Court will have either to integrate the factor of the forum-selection clause into its weighing of considerations as prescribed by Congress, or else to apply, as it did in this case, Alabama's categorical policy disfavoring forum-selection clauses. Our cases make clear that, as between these two choices in a single field of operation, the instructions of Congress are supreme.

487 U.S. at 30. The Plaintiffs' argument that New Mexico public policy invalidates the forum selection clause is almost identical to the plaintiff's argument that the Supreme Court rejected in Stewart Organization, Inc. v. Ricoh Corporation. Congress has commanded that "multiple considerations govern transfer within the federal court system," but, if the Court follows New Mexico law, which "focus[es] on a single concern" New Mexico law would "defeat that [Congressional] command." Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 31. Thus, the Court cannot properly apply N.M. Stat. Ann. § 57-28A-1 and instead must apply 28 U.S.C. § 1404(a).

Even if the Court could consider N.M. Stat. Ann. § 57-28A-1, however, it determines that the statute does not invalidate the forum selection clause in the Franchise Agreement and incorporated in the Assignment Agreement, because the Franchise Agreement and the Assignment Agreement are not construction contracts. N.M. Stat. Ann. § 57-28A-1 provides:

> A provision of a construction contract, agreement, understanding, specification or other documentation that is made part of a construction contract for an improvement to real property in New Mexico is void, unenforceable and against the public policy of the state if the provision:
>
> (1)    makes the construction contract subject to the laws of another states; or

> (2)     requires any litigation arising from the construction contract to be
> conducted in another state.

N.M. Stat. Ann. § 57-28A-1(A).  The statute also details:

> As used in this section, 'construction contract' means a public, private, foreign or
> domestic contract or agreement relating to construction, alteration, repair or
> maintenance of any real property in New Mexico and includes agreements for
> architectural services, demolition, design services, development, engineering
> services, excavation or other improvement to real property including buildings,
> shafts, wells and structures, whether on, above or under real property.

N.M. Stat. Ann. § 57-28A-1(C).  No New Mexico court or any other court has interpreted this

statute.

Although the Supreme Court of New Mexico has not considered the meaning of

construction contract pursuant to N.M. Stat. Ann. § 57-28A-1(C),  it has considered the meaning

of a construction contract pursuant to N.M. Stat. Ann. § 56-7-1(E), which uses the same

definition of construction contracts as N.M. Stat. Ann. § 57-28A-1(C).   See United Rentals

Northwest, Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, ¶ 8, 237 P.3d 728, 731 ("United

Rentals").   In United Rentals, the Supreme Court of New Mexico considered whether a rental

contract for construction equipment sufficiently "relat[es] to construction" such that the rental

contract is a construction contract under  N.M. Stat. Ann. § 56-7-1(E) -- a sub-provision of a

statute which voids indemnification clauses in construction contracts.   United Rentals, 2010-

NMSC-030, ¶ 1, 237 P.3d at 730.  The Supreme Court of New Mexico began with N.M. Stat.

Ann. § 56-7-1(E)'s language and noted that the New Mexico Legislature did not write "a narrow

anti-indemnification statute that addresses only contracts *for* construction"; rather "the

Legislature defined the statutory scope as including all contracts *relating* to construction."

United Rentals, 2010-NMSC-030, ¶ 10, 237 P.3d at 732 (emphasis in original).  The parties in

United Rentals, much like the parties here, argued whether that "relating to construction" language was sufficiently broad to cover the contract in question, but the Supreme Court of New Mexico in United Rentals held that the "relating to construction" language was not controlling. 2010-NMSC-030, ¶ 12, 237 P.3d at 732. Instead, it determined that the "relating to construction" clause was "an uncertain term with no clear end to its reach," so was too ambiguous a term to dictate the case's outcome. 2010-NMSC-030, ¶ 12, 237 P.3d at 732. See California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc., 519 U.S. 316, 335 (1997)(Scalia, J., concurring)("But applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."). The Supreme Court of New Mexico also considered other language within N.M. Stat. Ann. § 56-7-1(E), specifically the general list of construction-contract examples, e.g., "construction contract . . . includes agreements for architectural services, demolition, design services, development, . . ." and determined that such language did not resolve the case either, because the list was non-exhaustive and could plausibly be interpreted to include or exclude equipment-rental agreements. See United Rentals, 2010-NMSC-030, ¶¶ 13-15, 237 P.3d at 732-33. Accordingly, the Supreme Court of New Mexico turned to the statue's legislative purpose to determine whether the New Mexico Legislature meant to capture equipment-rental agreements within N.M. Stat. Ann. § 56-7-1's scope. See 2010-NMSC-030, ¶¶ 16-17, 237 P.3d at 733. It ruled that the law's purpose is to "promot[e] safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence." 2010-NMSC-030, ¶ 18, 237 P.3d at 733. Accordingly, the Supreme Court of New Mexico held that the good repair of construction equipment sufficiently implicated the safety of a

construction workplace that equipment-rental agreements were construction contracts under N.M. Stat. Ann. § 56-7-1(E). See 2010-NMSC-030, ¶ 21, 237 P.3d at 734.

The Plaintiffs invoke the same vague "relating to construction" language as the Supreme Court of New Mexico interpreted in United Rentals to argue that the Franchise Agreement is related to construction, and thus is a construction contract under N.M. Stat. Ann. § 57-28A-1. Response at 9. There is no meaningful difference between the two "relating to construction" clauses in N.M. Stat. Ann. § 56-7-1(E) and § 57-28A-1(C), so the Court concludes that, under United Rentals, the "relating to" language is too ambiguous to resolve whether the Franchise Agreement and Assignment Agreement are construction contracts. The Court also concludes that N.M. Stat. Ann. § 57-28A-1(C)'s nonexhaustive list of examples, i.e. construction contracts "include[] agreements for architectural services, demolition, design services, development, engineering services, excavation or other improvement to real property including buildings, shafts, wells and structures, whether on, above or under real property," does not determine this case's outcome either. N.M. Stat. Ann. § 57-28A-1(C). Although the Court is of the opinion that "franchise agreements" is unlike the other items on that list, the Court is also of the opinion that, given United Rentals, the Supreme Court of New Mexico would conclude that the statute's "list of non-obvious examples" is too ambiguous to resolve whether the Franchise Agreement and the Assignment Agreement are construction contracts. 2010-NMSC-030, ¶¶ 13-15, 237 P.3d at 732-33. Accordingly, the statute's language does not resolve whether the Franchise Agreement and the Assignment Agreement is a construction contract, so, under New Mexico

law, the Court turns to the statute's legislative purpose. United Rentals 2010-NMSC-030, ¶¶ 16-17, 237 P.3d at 733.[15]

In deciphering legislative purpose, the Court may look to caselaw stating what that purpose is, to other statutes in the same jurisdiction on the same subject matter, and to similar statutes, with their accompanying caselaw, in other jurisdictions. See United Rentals, 2010-NMSC-030, ¶¶ 17-39, 237 P.3d at 733-38. As the Court already noted, there is no caselaw on this statute. In addition, N.M. Stat. Ann. § 57-28A-1 appears to be the first statute that the New Mexico Legislature passed voiding forum selection clauses in construction contracts. There is no legislative history and no stated statutory purpose. There are also relatively few New Mexico statutes on the books outlawing forum selection clauses, suggesting both that the general New Mexican rule is that forum selection clauses are valid and that the New Mexico Legislature had a distinct purpose for selecting construction contracts for this uncommon protection. See N.M. Stat. Ann. § 24-1i-2(B).[16] The Court notes that, in other contexts, New Mexico has defined franchise agreements and has not singled them out for forum selection clause protection. See N.M. Stat. Ann. §§ 57-16-1 to 16; N.M. Stat. Ann. §§ 57-23-1 to 8. Although this suggests that the New Mexico Legislature may not have meant to void the forum selection clause in the

---

[15]If the Court were not bound by Erie, it would take the statute's language as it is. The "relating to" language is broad, but that is how the New Mexico Legislature drafted it. Thus, the Court would conclude that the law voids forum selection clauses in any contract that relates to construction. The Court concludes, however, that the Supreme Court of New Mexico would follow its approach from United Rentals, so the Court, accordingly, turns to legislative purpose as the Supreme Court of New Mexico did in United Rentals.

[16]Apart from N.M. Stat. Ann. § 57-28A-1, the only other New Mexico statute the Court located voiding forum selection clauses is N.M. Stat. Ann. § 21-1i-2(B), which voids forum selection clauses in agreements for clinical health care services. See N.M. Stat. Ann. § 21-1i-2(B).

Franchise Agreement and Assignment Agreement, the Court concludes that those statutes are not dispositive, because a contract can be more than one type of contract. See Shaeffer v. Kelton, 1980-NMSC-117, ¶¶ 11, 619 P.2d 1226, 1230 (concluding that a contract could be both one to construct a building and to convey property). Thus, with little guidance from intra-state authority, the Court turns to other jurisdictions' statutes and caselaw to decode the New Mexico Legislature's intent.

Many states outlaw forum selection clauses in construction contracts. See, e.g., Minn. Stat. § 337.10; N.Y. Gen. Bus. Law § 757; Or. Rev. Stat. § 701.640(1). See generally 7 Philip L. Bruner & Patrick J. O'Connor on Construction Law § 21:30.10, n.2 (collecting statutes). Several of these states outlaw such clauses, because large multi-state general contractors were forcing local sub-contractors into them, thus compelling those local sub-contractors to resolve disputes at great cost in the large general-contractor's home state. See, e.g., Vita Planning and Landscape Architecture, Inc. v. HKS Architects, Inc., 192 Cal. Rptr. 3d 838, 847 (Cal. Ct. App. 2015); Ill. Senate Trans., 2002 Reg. Sess. No. 94, p. 24 ("And apparently what happens is some gigantic, behemoth national companies, sort of in an adhesion-type fashion, thrust this language upon Illinois contractors."). See also, Neb. Statement of Intent, 2009 Reg. Sess. L.B. 552, (2009)(stating that the Nebraska Construction Prompt Pay Act, which includes the provision outlawing forum selection clauses in construction contracts, is meant to "address the payment of contractors and subcontractors on construction projects"); Testimony of Richard Peel, 73 Nev. Assembly Comm. Min., (2005)(prohibiting "contractor[s] and subcontractor[s]" from having forum selection clauses in their contracts). Commentators have identified the same force

compelling legislators to pass such laws protecting construction contracts from forum selection clauses:

> Large general contractors perform work in many states. Given the budget restraints under which most construction projects operate, much of the work is performed by local subcontractors. Subcontractors and the organizations that support them long have complained about the common practice of requiring subcontractors to resolve their disputes in the home states of the general contractors employing them. Many subcontractors believe this practice puts them at a distinct disadvantage, as it costs them more to pursue or defend claims. State legislatures have been receptive to subcontractor concerns on this score, and generally are in favor of local courts resolving in-state construction disputes. As a consequence, many states have enacted laws that prohibit enforcement of contract provisions that require the resolution of construction disputes in foreign forums.

7 Philip L. Bruner & Patrick J. O'Connor on Construction Law § 21:30.10. See Deborah J. Mackay & Jason Greves, Foreign Forum Selection Clauses in Construction Contracts and State Attempts to Limit Their Enforcement, Construction Briefings No. 2004-7 (2004)("State legislators, usually encouraged by local contractors' associations, seem eager to pass this type of protective legislation."). See V. Frederic Lyon & Douglas W. Ackerman, Controlling Disputes by Controlling the Forum: Forum Selection Clauses in Construction Contracts, 22-FALL Construction Law. 15, (2002)("Although absent legislative history, [Fla. Stat. § 47.025] apparently resulted from the lobbying of the contracting community increasingly opposed to going out of state to resolve disputes involving projects in a rapidly growing Florida."). New Mexico passed N.M. Stat. Ann. § 57-28A-1 in 2011 later than most other states that passed similar laws. See e.g., Cal. Civ. Proc. § 410.42 (passed in 1991); Fla. Stat. § 47.025 (passed in 1999); 815 Ill. Comp. Stat. 665/10 (passed in 2002); Neb. Rev. St. § 45-1209 (passed in 2010); Nev. Rev. Stat. § 108.2453 (passed in 2005).

Given these analogous state laws' purposes, and given that New Mexico passed its law after the other states passed theirs, the Court concludes that the New Mexico Legislature intended, with N.M. Stat. Ann. § 57-28A-1, to protect local subcontractors from forum selection clauses. The statute's text supports this interpretation. When listing examples of construction contracts protected, each one is an example of a contractor-subcontractor contract. See N.M. Stat. Ann. § 57-28A-1(C)("As used in this section, construction contract . . . includes agreements for architectural services, demolition, design services, development, engineering services, excavation or other improvement to real property, including buildings, shafts, wells and structures."). Accordingly, the operative question is whether the Franchise Agreement and the Assignment Agreement can be characterized as a contractor-subcontractor contract.

The Court concludes that the Supreme Court of New Mexico would determine that the Franchise Agreement and the Assignment Agreement cannot fairly be characterized as contractor-subcontractor contracts. To determine whether those agreements are contractor-subcontractor contracts, the Court looks to their text. See Shaeffer v. Kelton, 1980-NMSC-117, ¶¶ 7-8, 619 P.2d 1226, 1229 (instructing that, to classify a contract, a court must "enforce the intent of the parties as shown by the contents of the instrument."). A typical contractor-subcontract contract is an agreement that the subcontractor will carry out some subset of a project's construction to which the contractor has agreed with a third party to carry out the project's entire construction. See Romero Excavation and Trucking, Inc. v. Bradley Const., Inc., 1996-NMSC-010, ¶ 2, 913 P.2d 659, 660-61 (describing a contractor-subcontractor relationship in a bid to construct a building for New Mexico State University). See also Chavez v. Sundt Corp., 1996-NMSC-046, ¶ 2, 920 P.2d 1032, 1034; Sierra v. Garcia, 1987-NMSC-116, ¶ 1, 746

P.2d 1105, 1106; <u>C & D Plumbing, Inc v. Armstrong</u>, 1987-NMSC-068, ¶¶ 2-3, 740 P.2d 705, 705-06.

The Franchise Agreement's and the Assignment Agreement's text do not support a conclusion that the parties entered into such a contractor-subcontractor agreement. First, the Franchise Agreement is characterized as a "license agreement" and not a contractor agreement. <u>See</u> Franchise Agreement at 1 ("The license agreement ('Agreement' or 'License Agreement'), dated March 18, 2011, is entered into . . ."). Moreover, the majority of the clauses in the Franchise Agreement demonstrate that it is a license agreement. <u>See</u> <u>Sonic Indus. v. New Mexico</u>, 2006-NMSC-038, ¶ 2, 141 P.3d 1266, 1268 (characterizing a license agreement as a contract in which one party gives the other party the right to "registered trademarks, trade names, and service marks" in exchange for royalty payments). <u>See</u> <u>also</u> N.M. Stat. Ann. § 57-16-3 (defining a franchise, in the motor vehicle context, as an agreement "in which a manufacturer, distributor or representative grants to a motor vehicle dealer a license to use a trade name, service mark or related characteristic"). For example, the Franchise Agreement's first section is entitled "The License" and provides that Microtel Inn has "the exclusive right to license a unique concept and system (the 'Hotel System')" and that Blue "wish[es] to enter into this Agreement to obtain a license to use the Hotel System." Franchise Agreement at 1. The Hotel System described to be licensed bears the hallmarks of a licensing agreement, and includes

> (i) the trade names, trademarks, service marks 'Microtel Inn,' 'Microtel Inn and Suites' and 'Microtel Suites' and such other trade names, trademarks, service marks, collective certification marks, logos, slogans, trade dress, domain names, and all other designations of source and origin, and all derivatives of the foregoing, that we designate and develop for use in connection with the Hotel System . . . ; (ii) all copyrightable materials developed in connection with our business, including the Manual (as defined below), videotapes, marketing materials . . . , architectural drawings . . . , building designs, and business and

marketing plans . . . ; (iii) all materials of any kind and other information that are designated 'Confidential' . . . ; (iv) a national toll free number for the central reservation system . . . ; (v) the national Microtel directory of Hotels . . . ; (vi) management, personnel and operational training programs, materials and procedures; (vii) standards and specifications for operations, marketing, construction, equipment and furnishings described in our confidential manuals . . . ; and (viii) marketing, advertising and promotional programs.

Franchise Agreement at 1-2. Additionally, Blue's responsibilities under the Franchise Agreement do not demonstrate that he is a subcontractor. See, e.g., Chavez v. Sundt Corp., 1996-NMSC-046, ¶ 2, 920 P.2d at 1034 (explaining that a subcontractor's job was to complete the electrical work on a renovation project). To the contrary, they show that his responsibilities primarily entail operating a hotel and paying Microtel Inn. See Franchise Agreement at 2-6.

While the Franchise Agreement mentions construction and building the hotel, the Court concludes that those phrases do not transfigure this licensing agreement into a contractor-subcontractor contract. See, e.g., Franchise Agreement at 1 ("We have the exclusive right to license a unique concept and system (the 'Hotel System') to establish and operate all new construction, budget hotels. . ."); id. (licensing "standards and specifications for . . . construction"); id. at 2 ("[W]e hereby grant to you a non-exclusive license (the 'License') to use the Hotel System to build and operate the Hotel. . ."). As explained above, a typical contractor-subcontract contract is an agreement that the subcontractor will carry out some subset of a project's construction to which the contractor has agreed with a third party to carry out the project's entire construction. See supra, at 80. The relationship between Microtel Inn and Blue, as embodied in the Franchise Agreement, is not one of Blue agreeing to build a hotel so that Microtel Inn can fulfill some larger construction obligation to a third party. Instead, it is one of Microtel Inn granting Blue the right to use Microtel Inn's intellectual property in operating a

hotel.  Although the Franchise Agreement also requires Blue to build a hotel in compliance with certain Microtel Inn specifications, that reality does not change the fundamental agreement between the two parties to such a degree that it becomes a contractor-subcontractor agreement.

The Assignment Agreement is also not a contractor-subcontractor agreement.  Based on its language, the Assignment Agreement is meant to transfer Blue's rights and obligations under the Franchise Agreement to Presidential Hospitality.  <u>See</u> Assignment Agreement at 1 ("Assignor assigns, transfers, bargains, sells, and delegates to Assignee all of its rights . . ."); <u>id.</u> at 1 ("Assignee accepts and assumes the rights, benefits and obligations of the Licensee. . .").  Again, that there are references to the hotel that needs to be completed, does not make this assignment a contractor-subcontractor relationship.[17]  Accordingly, even if the Court could consider N.M. Stat. Ann. § 57-28A-1 in its transfer analysis, it would conclude that the forum selection clauses in these contracts are valid.

_____

[17]The Plaintiffs also argue that the Dev. Incentive Note, which, under the Assignment Agreement, amends the Franchise Agreement, demonstrates that the Assignment Agreement and Franchise Agreements are construction contracts.  <u>See</u> Response at 8; Assignment Agreement at 4.  The Dev. Incentive Note is, however, a loan agreement, in which Presidential Hospitality promises to repay $105,000.00 to Microtel Inn over a period of time.  <u>See</u> Dev. Incentive Note at 1.  Although one of the conditions which Microtel Inn requires of Presidential Hospitality before fund disbursement is that the hotel is completed in compliance with the Franchise Agreement's standards, <u>see</u> Dev. Incentive Note at 1, that condition does not transform the Dev. Incentive Note into a contractor-subcontractor contract.  Microtel Inn is not an overseer of a construction project to be completed for a third party.  There is no third party expecting a structure.  Accordingly, the Court concludes that the Dev. Incentive Note is not a construction contract, nor does it make the Franchise Agreement and Assignment Agreement a construction contract under N.M. Stat. Ann. § 57-28A-1.

## IV. THE COURT WILL TRANSFER PRESIDENTIAL HOSPITALITY'S AND BLUE'S CLAIMS UNDER 28 U.S.C. § 1404(a).

The Court will transfer Presidential Hospitality's and Blue's claims. When deciding whether to transfer a case under 28 U.S.C. § 1404(a), the Court considers several discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167. Because there is a valid forum selection clause, however, "[t]he calculus changes." Atlantic Marine, 571 U.S. at 63. Under Atlantic Marine, the analysis changes in three ways: (i) "[f]irst, the plaintiff's choice of forum merits no weight"; (ii) "[s]econd, a court evaluating a defendant's § 1404(a) motion to transfer . . . should not consider arguments about the parties private interests."; and (iii) "[t]hird . . . a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules -- a factor that in some circumstances may affect public-interest considerations." Atlantic Marine, 571 U.S. at 63-64. In light of these three changes to the typical analysis, the Supreme Court has said that "'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" Atlantic Marine, 571 U.S. at 63 (quoting Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. at 33 (Kennedy, J. concurring)(bracketed language only in Atlantic Marine)).

Given <u>Atlantic Marine</u> and given a valid forum selection clause, the Court considers only the following "public" factors: (i) questions as to the enforceability of a judgment if one is obtained; (ii) relative advantages and obstacles to a fair trial; (iii) difficulties that may arise from congested dockets;  (iv) questions under conflict-of-laws; (v) the advantage of having a local court determine questions of local law; and (vi) all other considerations of a practical nature that make a trial easy, expeditious and economical.

The Plaintiffs have not raised any questions about the enforceability of a judgment or the relative advantages New Mexico might provide over New Jersey vis-à-vis a fair trial.  <u>See</u> Response at 1-15.  The Court independently does not see why a New Jersey judgment would be more difficult to enforce than a New Mexico judgment, nor does it see how New Mexico would provide a fairer trial than New Jersey.  Accordingly, those factors do not counsel either way.

Concerning the congested-dockets factor, the Plaintiffs argue that the New Jersey civil docket is, on average, more congested than the New Mexico docket, so a New Mexico forum is favorable.  <u>See</u> Response at 14.  The Court stands by its observation at the hearing that the "civil statistics" do not "tell the full story, given the tremendous criminal load we have out here."  Tr. at 7:15-17 (Court).  Indeed, examining the same document to which the Plaintiffs cite to support that New Jersey district judges have more civil cases than New Mexico district judges, the Court notes that New Jersey district judges have 26 criminal felony filings per judge, whereas New Mexico district judges have 639 criminal felony filings per judge.  <u>See</u> United States District Courts - National Judicial Caseload Profile, June 2017 Federal Court Management Statistics, at 15, 81 http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2017.pdf. The Court's criminal docket in particular has been busy of late, given that it has just finished two

multi-defendant seven-week criminal trials and has another lengthy criminal trial scheduled for the month of July. See United States v. DeLeon, No. 15-4268 (D.N.M.)(Browning, J.); United States v. Baca, No. 16-1613 (D.N.M.)(Browning, J.). Moreover, the District of New Mexico has had or will have at least two district judges take senior status this year, and their replacements will take some time to be nominated and confirmed. The Court expects a concomitant rise in all of the remaining district judges' caseloads until new judges can take their places. The Court does suggest in any way that New Jersey district judges are not busy.[18] Nevertheless, given the above realities in this border state, the Court concludes that the congested-docket factor does not weigh for transfer.

Conflicts of law issues and the advantage of having a local court determine questions of local law counsels only mildly against transfer. The Tenth Circuit has defined the conflict-of-laws factor as the principle that "courts prefer the action to be adjudicated by a court sitting in the state that provides the governing substantive law." Employees Mut. Cas. Co v. Bartile Roofs, Inc., 618 F.3d at 1169. The local-court-advantage factor weighs against transfer "[w]hen the merits of an action are unique to a particular locale." Employees Mut. Cas. Co v. Bartile Roofs, Inc., 618 F.3d at 1170. The Plaintiffs allege violations under the New Mexico UPA, fraudulent inducement, and negligent misrepresentation. See FAC ¶¶ 77-132, at 19-28. One of the Plaintiffs' theories of liability under the UPA, however, is that the Defendants violated federal law, which also happens to be a violation of the UPA. See FAC ¶¶ 84-85, at 19 ("A violation of Section 436.1(a) of the Franchise Rule and section 5(a) of the FTC Act constitutes a violation of the New Mexico Unfair Practices Act.").; id. at ¶¶ 103-04, at 22. There is no local

---

[18]The Court clerked on the Third Circuit. It knows that the District of New Jersey is a busy district.

court advantage in adjudicating that theory of liability, as, at bottom, it is a federal issue. There is a portion of their UPA theory, however, that turns only on New Mexico law, see FAC ¶¶ 86-89, at 20; id. ¶¶ 105-08, at 22-23, but that theory is premised on false or misleading statements, which is not all that unique of a theory. New Jersey courts deal with unfair practice claims premised on misleading statements all of the time. See, e.g., N.J. Stat. Ann. § 56:8-2 (declaring unlawful any fraud or material misstatements in connection with the sale of merchandise or real estate); Meade v. Kiddie Academy Domestic Franchising, 2012 WL 1043120, at *1-2 (D.N.J. March 28, 2012)(Cavanaugh, J.)(adjudicating, among other things, an unfair practice claim, which involved "alleged fraudulent statements and misrepresentations made in connection with a franchise agreement"). The remaining claims are negligent misrepresentation and fraudulent inducement, see FAC ¶¶ 110-32, at 23-28, which are likewise common claims under New Jersey law, see, e.g., RNC Systems, Inc. v. Modern Technology Grp., Inc., 861 F. Supp. 2d 436, 451 (D.N.J. 2012)(Simandle, C.J.); Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 529 (D.N.J. 2008)(Hochberg, J.); Karu v. Feldman, 574 A.2d 420, 425 (N.J. 1990); Jewish Center of Sussex County v. Whale, 432 A.2d 521 (N.J. 1981). Any advantage the Court has in adjudicating those familiar common law claims over a New Jersey court is slight. See Employees Mut. Cas. Co v. Bartile Roofs, Inc., 618 F.3d at 1170 (concluding that, although Wyoming law "provides the substantive law," the factor weighed only slightly against transfer away from Wyoming, "because the action does not involve complex legal issues, the substantive laws of Wyoming and Utah are essentially equivalent with respect to the relevant issues, and the judges in each potential forum are qualified to decide the state-law issues"). Accordingly, the Court concludes that this factor weighs, slightly, against transfer.

The Court may also consider all other practical considerations that make a trial easy, expeditious, and economical. Had the Court been able to transfer all parties and all claims, this consideration would weigh towards transfer. The facts in both actions center on the Franchise Agreement, so judicial economy would be served if one forum heard all issues about that agreement. Because the Court cannot properly transfer Ace Development at this juncture, that judicial-economy consideration does not weigh as heavily as it otherwise would. The Court notes, nevertheless, that some judicial economy is served by severing and transferring Presidential Hospitality's and Blue's claims to New Jersey. Ace Development is not a plaintiff in the New Jersey Action. Thus, by severing and transferring Presidential Hospitality's and Blue's claims, one forum -- New Jersey -- can hear all of the arguments and evidence as to those two parties. Accordingly, the Court concludes that this factor weighs slightly toward transfer.

With several factors landing neutrally on the scale and other factors weighing slightly one way or the other, the determinative factor -- indeed, the one-thousand pound gorilla destroying the scale -- is the forum selection clause. Atlantic Marine, 571 U.S. at 63 ("[A] valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases."). The Court sees no exceptional circumstances authorizing it to rip up the valid forum selection clause.[19] Accordingly, the Court will sever and transfer Presidential Hospitality's and Blue's claims to the United States District Court for the District of New Jersey.

---

[19]If the Court could consider some of the private factors in § 1404(a) balancing, the Court agrees that the cost to the Plaintiffs of transporting their material witness -- all of whom live in the Southwest -- to New Jersey weighs toward keeping this action here. The Court is also receptive to the argument that Wyndham Hotel, the parent company of the other Defendants, is a multi-national conglomerate that can ably -- and without too great a burden -- defend itself in New Mexico. The Court must abide, however, the Supreme Court's command to favor greatly

**IT IS ORDERED** that the requests in the Defendants' Brief in Support of Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a), filed September 29, 2017 (Doc. 19), are granted in part and denied in part. The Court severs Plaintiff Ace Development, Inc.'s claims, and transfers Plaintiff Presidential Hospitality, LLC and Plaintiff Sam Blue and their claims to the United States District Court for the District of New Jersey.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Bobbie Jo Collins
Lewis Roca Rothgerber Christie LLP
Albuquerque, New Mexico

-- and --

E. Martin Enriquez
Anovven Law
Greenwood Village, Colorado

     *Attorneys for the Plaintiffs*

Rufus E. Thompson
Elizabeth Ann Martinez
Modrall, Sperling, Roehl, Harris & Sisk, PA
Albuquerque, New Mexico

---

forum selection clauses. It therefore determines that, under <u>Atlantic Marine</u>, the proper course is to sever and transfer Presidential Hospitality's and Blue's claims.

-- and --

David S. Sager
Steven R. Marino
DLA Piper
Short Hills, New Jersey

*Attorneys for the Defendants*